THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOBRICK WASHROOM EQUIPMENT, INC. | : : : | |
| Plaintiff, | : : | |
| v. | : : | 3:14-CV-00853 (JUDGE MARIANI) |
| SCRANTON PRODUCTS, INC. | : : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Presently before the Court is Defendant Scranton Products, Inc.'s ("SP" or "Scranton Products") Partial Motion to Dismiss with Prejudice. (Doc. 324). For the reasons that follow, SP's Motion will be denied in its entirety.

## I.    INTRODUCTION AND PROCEDURAL HISTORY

In May 2014 SP filed a complaint against Bobrick Washroom Equipment Inc. ("Bobrick") alleging, among other things, that Bobrick "carefully orchestrated a campaign to scare architects, product specifiers, procurement representatives, building owners, and others in the construction industry into believing that Scranton Products' toilet partitions are fire hazards, are unsafe and pose health and safety risks if used in building projects across the country." (Doc. 1 at ¶ 1). SP asserted two claims under the Lanham Act, 15 U.S.C. § 1125(a), alleging "literally false advertising," and "deceptive and misleading advertising" and sought both monetary damages and equitable relief. (*Id.* at ¶¶ 61-76). SP also brought claims under Pennsylvania law, alleging common law unfair competition, commercial

disparagement, and tortious interference with existing or prospective business relations. (*Id.* at ¶¶ 77-92). Bobrick filed its Answer on June 25, 2014. (Doc. 21).

On November 10, 2016, Bobrick filed a Motion for Leave to file an Amended Answer with Counterclaims.[1] (Doc. 213). The day before Bobrick's Motion was fully briefed SP filed a Motion for Voluntary Dismissal. (Doc. 233). The Court subsequently granted both Motions. (Docs. 240, 287). In the Complaint, Bobrick asserts a claim against SP under the Lanham Act, a claim for wrongful use of civil proceedings under Pennsylvania's Dragonetti Act, as well as common law unfair competition and abuse of process claims. (Doc. 318). On April 3, 2017, SP filed a Motion to Dismiss Bobrick's common law unfair competition and abuse of process claims, and also sought dismissal of Bobrick's request for punitive damages. (Doc. 324). The Court held oral argument on SP's Motion on May 12, 2017.

## II.    **STATEMENT OF FACTS**

Bobrick's Complaint alleges the following facts, which the Court accepts as true for the purpose of this Motion:

### A. Bobrick's Lanham Act and Unfair Competition Claims

Bobrick's Lanham Act and unfair competition claims "arise from Scranton Products systematic misrepresentation of its own products in the marketplace." (Doc. 318, at ¶ 2). Specifically, SP "has falsely represented thousands of its high density polyethylene ('HDPE') toilet partitions sold for installation in schools and other public and private buildings

---

[1] For ease of reference, the Court will refer to Bobrick's Amended Answer with Counterclaims as the "Complaint."

as being compliant with applicable fire, life safety, and building code requirements." (*Id.*).

More specifically, SP has falsely represented that its HDPE toilet partitions comply with the

requirements of the NFPA 286 room-corner test ("NFPA 286"), a fire performance test

promulgated by the National Fire Protection Association. (*Id.* at ¶ 3).

According to the Complaint, SP's claims that certain of its HDPE toilet partitions comply

with NFPA 286 are false for three reasons:

    (a) Scranton Products, acting through Western Fire Center, Inc. ('Western Fire'), the testing laboratory that conducted NFPA 286 testing on its behalf, improperly modified and manipulated the test methodology to produce a favorable result, thereby invalidating the test;

    (b) Neither Scranton Products nor Western Fire has any primary documentation or actual knowledge of the chemical composition of the Scranton Products HDPE materials that were actually tested, nor were any of the tested materials preserved by Scranton Products or Western Fire, thereby making it impossible for Scranton P roducts to show that any of the HDPE toilet partitions it has sold as NFPA 286-compliant are made of the same material that Scranton Products actually tested under NFPA 286; and

    (c) Scranton Products' own manufacturing records show that the chemical composition and physical structure of the HDPE toilet partitions that Scranton Products has sold as NFPA 286-compliant are substantially different from the chemical composition and physical structure of the HDPE materials that Scranton Products claims to have successfully tested under NFPA 286.

(*Id.* at ¶¶ 4(a)-(c)).

SP has alleged, both in the marketplace and throughout this litigation, that its HDPE

toilet partition materials have passed the unmodified NFPA 286 test on two separate

occasions: (1) on May 3, 2011 (the "2011 Test"); and (2) on August 7, 2013 (the "2013

3

Test").[2]  (*Id.* at ¶ 12).  The NFPA 286 testing protocols require "the tested material to be attached to the walls of the test chamber in the manner that best simulates actual installation conditions in the field." (*Id.* at ¶ 14).  However, in both the 2011 Test and 2013 Test, Western Fire, with SP's knowledge and authorization, attached SP's HDPE material as an interior finish to the walls of the test chamber "using metal 'furring strips' (also called 'hat channels') with screws, which allowed the HDPE material to be affixed to the chamber wall while still being slightly displaced from the chamber wall, creating a one-inch air cavity." (*Id.* at ¶ 15).  Rather than placing the furring strips vertically "which would have more appropriately simulated actual installation conditions by allowing heat, flame, and hot gases to rise behind the HDPE panel as well as in front of the panel," Western Fire placed the furring strips horizontally.  (*Id.* at ¶ 16).  When installed horizontally, "the furring strips effectively served as a fire-stopping, fire blocking, or draft-stopping mechanism that blocked or restricted heat, flame, and hot gases from reaching the full height of the side of the HDPE panel that faced the test chamber well."[3]  (*Id.*).

_____

[2] "Both the 2011 Test and the 2013 Test were performed on behalf of Scranton Products, and with the attendance and participation of one or more Scranton Products employees" by Western Fire. (Doc. 318, at ¶ 13).

[3] Howard Stacy, a former Western Fire employee who was involved in various NFPA 286 tests carried out on behalf of SP testified as follows:

> I've had a great deal of experience with the NFPA 286 standard and—as I've been experienced in developing test standards.  This particular standard did not seem to me to be well suited to test a toilet partition because of the—well, it just didn't seem to represent a realistic fire—potential fire exposure that it might see.  So I put a test together where we had a partial—we just had the corner populated, and we had steel hat channels that were placed vertically so we would simulate potential for the fire to get underneath the partition and burn both sides.  And, in my view, there are

4

The text of the NFPA 286 standards include a section entitled "Specimen Mounting."

(*Id.* at ¶ 18). That section provides, in relevant part:

5.1.1    Test specimens shall be mounted on a framing or support system that is comparable to that intended for their actual field use, using substrates, backing materials, insulation, or air gaps as appropriate to the intended application, and representing a typical value of thermal resistant for the wall system. . . .

5.1.7    A detailed description of the mounting method used shall be given in the test report.

5.1.8    If a special mounting technique is used in order to improve the physical behavior of the specimen during the test, it shall be clearly stated in the report.

(*Id.*). According to the Complaint, the horizontal placement of the metal furring strips to create a fire block "was an intentional manipulation by Scranton Products of the NFPA 286 test methodology to produce a more favorable result by enabling Scranton Products' HDPE material to barely pass the modified NFPA 286 test." (*Id.* at ¶ 19). Indeed, "[m]ounting the HDPE toilet partition using non-combustible, horizontal metal furring strips to create a fire block below the resulting air gap was not 'appropriate to the intended application,' because a HDPE toilet partition is not mounted in the field in a manner that blocks access by heat, flame, and hot gases to one side of the panel." (*Id.* at ¶ 20). In addition, Western Fire did

two things. I thought that was a more adverse condition than testing just the surface of the product because the fire actually—the burner was actually underneath the 55-inch tall partition, that's the only way I could think of that would get the partition burning in a manner that I thought was representative of real life, so we ran those tests. Now, NFPA 286 provides for I think—I don't have the document in front of me, but . . . it's the laboratory's responsibility to test the product in a manner that most closely represents its actually installation.

(Doc. 318, at ¶ 17).

not include in its test reports for the 2011 Test and 2013 Test a "'detailed description of the mounting method used' that revealed how it installed the horizontal furring strips, and, although Western Fire—at Scranton Products' behest—used a 'special mounting technique . . . in order to improve the physical behavior of the specimen during the test,' it did not so state in any form in its test report." (Id. at ¶ 21). Accordingly, this "modification and manipulation of the NFPA 286 test methodology rendered the results inaccurate, invalidated Scranton Products' NFPA 286 testing for all purposes, and made it improper for Scranton Products to rely on the doctored test results to represent to the public . . . that any of its HDPE toilet partitions are NFPA 286-compliant based on an unmodified NFPA 286 test." (Id. at ¶ 23).

SP has alleged, both in the marketplace and this litigation, that two different formulations of its HDPE toilet partition material have passed the unmodified NFPA 286 test. (Id. at ¶ 24). SP, either through its parent company CPG International, or its sister company Vycom, "produced both formulations of HDPE material in-house, using the company's own extrusion equipment, for NFPA 286 testing at Western Fire." (Id. at ¶ 25). Despite the in-house production of the materials at issue, SP "has never produced any primary documentation— such as a work order or bill of materials listing the ingredients and their weights— establishing the chemical composition of the HDPE materials actually used in the 2011 Test

or the 2013 Test."[4] (*Id.* at ¶ 26). According to Bobrick, SP "never maintained primary

documentation of the chemical composition of the HDPE materials tested in May 2011 and

August 2013, or it destroyed any such documentation when it was already contemplating

litigation against Bobrick over the compliance of Scranton Products' toilet partitions with

NFPA 286."[5] (*Id.* at ¶ 29). Therefore, "there is no Scranton Products officer or employee

who has actual knowledge of the chemical composition of the HDPE material used in the

2011 Test or the 2013 Test." (*Id.* at ¶ 31). "Because authentic and credible evidence of the

chemical composition of the tested HDPE material does not exist, Scranton Products has no

---

[4] On September 15, 2015, this Court ordered SP to produce, among other things, "contemporaneous production documents that demonstrate the composition of the materials tested on May 3, 2011 and August 7, 2013 in at least the same level of detail that is contained in the 'work order' documents submitted to the Court on August 17, 2015—that is, showing the specific ingredients and their weights." (Doc. 318, at ¶ 27). Through its former counsel, SP admitted (by letter dated March 9, 2016) "that it was unable to comply with the quoted portion of the Court's order, stating, 'Scranton Products does not have 'contemporaneous production documents' for the HDPE toilet materials subjected to full or modified NFPA 286 fire performance test akin to the 'work order' documentation submitted to the Court on August 17, 2015, because these documents were not generated for the 'prototype' HDPE materials produced for the purpose of fire testing.'" (*Id.* at ¶ 28).

[5] Bobrick notes that SP "has stated that it is relying solely on certain spreadsheets as proof of the chemical composition of the HDPE materials used in the 2011 Test and 2013 Test" and that the "spreadsheets in question are of unknown authorship, date, and provenance, contain manually entered data of unknown origin, and lack any indicia of authenticity or reliability." (Doc. 318, at ¶ 30). In addition, Western Fire was never informed of the chemical composition of the HDPE materials used in the 2011 Test or the 2013 Test. (*Id.* at ¶ 32). Moreover, "the remnants of the actual Scranton Products HDPE materials tested by Western Fire in May 2011 and August 2013 were not returned to Scranton Products or preserved by Scranton Products or Western Fire, making it impossible to confirm their chemical composition by direct sampling." (*Id.* at ¶ 33). And "Scranton Products has at various times served conflicting verified interrogatory answers concerning the alleged chemical composition of the HDPE material tested in August 2013." (*Id.* at ¶ 34). Bobrick then goes into more specific details about SP's alleged inconsistent and contradictory statements submitted to this Court about the chemical composition of the HDPE material tested, (*Id.* at ¶¶ 35-44), which it represents "demonstrate that Scranton Products does not have actual knowledge or reliable records of the chemical composition and other physical properties of the HDPE materials actually tested by Western Fire in May 2011 and August 2013." (*Id.* at ¶ 45).

basis to claim that any of the HDPE toilet partitions it has sold to the public as NFPA 286-

complaint are, in fact, made of the same material that was tested in May 2011 or August

2013." (*Id.* at ¶ 48). Thus, according to the Complaint, "when Scranton Products filed its

Complaint, it knew that it had no basis to allege that any HDPE toilet partitions it sold to the

public as NFPA 286-compliant were made of the same material that was tested in May 2011

or August 2013." (*Id.* at ¶ 49). Thus, Bobrick asserts that:

> [T]he only plausible explanation for the nonexistence of such evidence are that Scranton
> Products never generated the relevant documentation in the first place, or that Scranton
> Products destroyed the relevant documentation. In either case, Scranton Products
> presumably acted as it did to conceal the fact that the HDPE toilet partitions it planned to
> (and did) market as NFPA 286-compliant are substantially different from the HDPE
> material that it purportedly tested under NFPA 286.

(*Id.* at ¶ 50).

Putting aside the issue of whether the HDPE material tested by Western Fire in May

2011 and August 2013 in fact had the chemical composition and characteristics that SP

claims, SP's "own manufacturing records show that the HDPE toilet partitions that Scranton

Products has actually sold to the public as NFPA 286-compliant have chemical

compositions and physical characteristics that are substantially different from the alleged

chemical compositions and physical characteristics of the Scranton Products HDPE

materials purportedly tested successfully under NFPA 286." (*Id.* at ¶ 51). Specifically, SP

has claimed that the HDPE material tested by Western Fire in the 2011 Test "formed the

basis of Scranton Products' 'first generation' of NFPA 286-compliant HDPE toilet partitions,

which Scranton Products claims to have offered for sale from mid-2011 until May 2014."

(*Id.* at ¶ 52). However, "analysis of Scranton Products' manufacturing records show that the chemical composition and physical properties" of these toilet partitions "do not match the alleged chemical composition and physical properties of the toilet partitions tested by Western Fire in May 2011." (*Id.* at ¶ 57).

SP has also claimed that the HDPE material tested by Western Fire in August 2013 "formed the basis of Scranton Products' 'second generation' of NFPA 286-compliant HDPE toilet partitions, which Scranton Products purports to have offered for sale from 'late 2013' through the present." (*Id.* at ¶ 58). But "analysis of Scranton Products' manufacturing records show that the chemical composition and physical properties" of these toilet partitions materials "do not match the alleged chemical composition and physical properties of the toilet partitions tested by Western Fire in August 2013." (*Id.* at ¶ 62). Scranton Products has represented "that it has marketed and sold two, and only two, formulations of allegedly NFPA 286-compliant HDPE toilet partitions." (*Id.* at ¶ 64). "However, Scranton Products' manufacturing records reveal that, out of 557 orders for NFPA 286-compliant HDPE toilet partitions for which Scranton Products quoted prices between March 1, 2012 and November 4, 2015, 218 of those orders involved HDPE toilet partitions whose structure and composition bear no relationship to the HDPE materials allegedly tested in May 2011 and August 2013." (*Id.* at ¶ 65). Therefore, "as to a significant proportion of its sales of purportedly NFPA 286-compliant HDPE toilet partitions nationwide, Scranton Products sold

its customers partitions that were substantially different from any HDPE material it claims to have tested under NFPA 286."[6] (*Id.* at ¶ 67).

Because SP's toilet partitions allegedly do not comply with NFPA 286, SP "has repeatedly made literally false and/or false and misleading representations to purchasers and other market participants nationwide concerning its allegedly NFPA 286-compliant HDPE toilet partitions." (*Id.* at ¶ 74). In support, Bobrick points to the multiple statements in the Complaint, including:

- On November 29, 2012, counsel for Scranton Products, Wendelynne J. Newton, Esq. of Buchanan Ingersoll & Rooney P.C., sent a letter on behalf of Scranton Products to Tom Becraft of Engineered Concepts, an independent sales representative for Bobrick and other manufacturers of bathroom hardware and accessories. In the letter, Ms. Newtown represented, on behalf of Scranton Products and with Scranton Products' authorization, 'Scranton Products manufactures and sells HDPE bathroom partitions that comply with the unmodified NFPA 286 room-corner test, and any suggestion to the contrary by Bobrick or its sales representatives is incorrect.' (*Id.* at ¶ 76).

- Ms. Newtown sent identically worded letters to numerous other independent sales representatives for Bobrick in late November and early December 2012. (*Id.* at ¶ 77).

- Further, in those same letters, and based on the same representations, Ms. Newtown threatened Bobrick's independent sales representatives that if they made any statements to the contrary, they would face legal action by Scranton Products: 'Scranton Products is serious about clearing up any confusion that may exist in the industry regarding the characteristics and

---

[6] "Moreover, within this untested third category of HDPE toilet partitions" that SP sold as NFPA-286 compliant, SP's "manufacturing records show wide variations in the chemical components used from batch to batch, including variability in the relative weights of the different components, changes in the pigments used, and fluctuating weights per cubic foot." (Doc. 318, at ¶ 68). Accordingly, Bobrick alleges that SP "has also changed key ingredients and vendors of key ingredients without ever retesting the successive formulations of HDPE material." (*Id.* at ¶ 69).

performance of its products, and will not tolerate misrepresentation about its products and will seek legal remedies if needed.' (*Id.* at ¶ 78).

According to Bobrick, these statements were false, and Scranton Products knew them to be false at the time they were made. (*Id.* at ¶ 76).

Next, Bobrick alleges that in a December 1, 2012 letter printed on SP's letterhead and signed by SP's director of national sales and marketing David Casal, Mr. Casal noted "[t]his letter is in response to your request for information on the fire ratings for Scranton Product's HDPE Bathroom Partitions." (*Id.* at ¶ 79). The letter contained the following statements: (1) "Scranton Products manufactures HDPE bathroom partitions that conform with the requirements of the NFPA 286 fire test, including the International Building Code," (*Id.*); (2) "Independent fire testing centers have tested our material, including with respect to NFPA 286 (2011)," (*Id.*); and (3) "Our Hiny Hinders solid plastic bathroom partitions conform to NFPA 286." (*Id.*). Bobrick alleges that the above-quoted statements in Mr. Casal's letter were false, and both Mr. Casal and Scranton Products knew them to be false at the time they were made.[7] (*Id.* at ¶ 80).

Bobrick next points to a June 27, 2013 statement by Kelly Oester, a Scranton Products sales employee, sent to Stumbaugh & Associates, an independent dealer of bathroom hardware and accessories, to be passed on to the architect and general contractor for a

---

[7] "Upon information and belief, Scranton Products has widely disseminated copies of Mr. Casal's letter of December 1, 2012, or other letters substantially identical thereto, to numerous participants in the market for toilet partitions." (Doc. 318, at ¶ 81).

project to renovate Dodger Stadium in Los Angeles.[8] (*Id.* at ¶ 82). The one-page information sheet includes the statement "Scranton Products manufactures HDPE bathroom partitions that conform with the requirements of the NFPA fire test, including in the International Building Code. Independent fire testing centers have tested our material, including with respect to NFPA 286 (2011). We have bathroom partitions that conform to NFPA 286." (*Id.* at ¶ 84). Bobrick alleges that the quoted statement was false, and that SP knew it to be false at the time.[9] (*Id.* at ¶ 85).

On July 3, 2013, in response to a request from the general contractor for the Dodger Stadium renovation project, Ms. Oester forwarded a written confirmation from SP's David Casal, attesting to the NFPA 286 compliance of the specific toilet partitions being supplied by SP for the project. (*Id.* at ¶ 87). Mr. Casal's written confirmation, dated June 27, 2013 and printed on SP's letterhead, stated the following with respect to SP's sales orders 848923 and 850511:

> This will confirm that the material that shipped on SO#848923 on 2/19/13, as well as SO#850511 on 2/16/13, was our NFPA 286 material as indicated on your Sales Order Acknowledgement and Invoice from Scranton Products. We have provided you with our 3rd party NFPA 286 test reports which shows that our material passes the NFPA 286

---

[8] The "NFPA 286 material that Ms. Oester sent to Stumbaugh & Associates on June 27, 2013 included "(a) a one-page information sheet headed 'Scranton Products HDPE Bathroom Partitions Fire Ratings/NFPA 286,' and (b) a copy of a six-page May 11, 2011 'summary letter report' by Western Fire concerning 'NFPA 286 Room Fire Testing of a HDPE Toilet Partition Panel – Gray.'" (Doc. 318, at ¶ 83).

[9] "Because the one-page information sheet that Ms. Oester sent to Stumbaugh & Associate appears to be a standard form provided by Scranton Products to its sales representatives for distribution to the public, Bobrick believes and therefore avers that Scranton Products has furnished the same false statement to numerous other persons nationwide who have inquired about NFPA 286 compliance of Scranton Products' HDPE toilet partitions." (Doc. 318, at ¶ 86).

12

test. All of our NFPA 286 material is made using the same formula as used in the product tested. We do not test each lot. Color is not a factor in the test criteria.

(*Id.* at ¶ 88). According to Bobrick, all of the above-quoted statements (with the exception of the statement "We do not test each lot") were false, and both SP and Mr. Casal knew them to be false at the time they were made. (*Id.* at ¶ 89).

The false statements alleged by Bobrick do not end there. On October 18, 2013, Mr. Casal sent an email to recipients, including Randy Abercrombie, a representative of New South Specialties, LLC. (*Id.* at ¶ 90). In the e-mail, Mr. Casal stated, among other things:

- Scranton Products makes material to meet any fire rating you need including: standard, B, A, NFPA 286.

- We expect to actually start selling more NFPA 286 over the next 5 years. Anytime is fine with us as we have it fully tested, approved, and ready to ship so no worries on your end. We have the full test for your use readily available if you ever need it.

- We have been ready with NFPA 286 materials for two years, and have recently had a major improvement to the formulation that will allow us to sell it at 5% above standard material. This will put us significantly below the cost of Bobrick's SCRC [*i.e.*, Bobrick's competing solid color reinforced composite toilet partitions].

- NFPA 286 testing supersedes other testing. Thus, our NFPA 286 material meets and achieves all other fire ratings so over time, it will make our inventory management easier.

- Rest assured, we have material ready to meet all requirements and have been prepared for NFPA 286 for years. On a final note, we are the only HDPE manufacturer with a fully approved test. Thus, if the demand ever increases, we are the only manufacturer that can supply it today.

(*Id.*). According to Bobrick, all of the above-quoted statements in Mr. Casal's e-mail were

false, and both SP and Mr. Casal knew them to be false at the time.[10]

## B. Wrongful Use of Civil Proceedings and Abuse of Process Claims

Bobrick's claims for wrongful use of civil proceedings and abuse of legal process "arise

from Scranton Products' predatory conduct in initiating and subsequently using proceedings

before this Court." (*Id.* at ¶ 9). More specifically, the Complaint alleges that:

> When Scranton Products initiated these proceedings, it knew, or would have learned
> from a cursory pre-filing investigation, that its central allegation—that Scranton
> Products' HDPE toilet partitions complied with NFPA 286—was false. Scranton
> Products nevertheless initiated this action, and continued to engage in misconduct
> throughout the litigation, for the improper purpose of stifling legitimate competition by
> Bobrick, silencing Bobrick's efforts to educate market participants about code
> requirements in the interest of public safety, and inflicting financial harm on Bobrick
> for unfair competitive advantage by increasing Bobrick's costs and otherwise.

(*Id.* at ¶ 10).

After Bobrick had raised concerns within the marketplace "about Scranton Products'

false claims that its HDPE toilet partitions complied with NFPA 286, Scranton Products

initiated these proceedings by filing its Complaint on May 2, 2014." (*Id.* at ¶ 116).

According to the Complaint:

> Even a cursory pre-filing investigation by Scranton Products would have revealed that
> (1) the May 2011 and August 2013 tests by Western Fire were modified improperly and
> could not support the claims asserted in Scranton Products' Complaint; (2) Scranton
> Products lacked any direct evidence, either through material samples, contemporaneous
> documents, or witnesses with direct knowledge, of the chemical composition of the
> materials tested in May 2011 or August 2013; and (3) the chemical composition and

---

[10] Bobrick's Complaint then goes on to detail numerous additional statements made by SP and its
representatives that Bobrick alleges were false, and that SP knew to be false at the time they were made.
(Doc. 318, at ¶¶ 92-115). The Court need not repeat all of them here.

14

physical structure of the HDPE toilet partitions that Scranton Products actually sold are different from the chemical compositions and physical structure that Scranton Products now claims comprised the materials tested in May 2011 and August 2013.

(Id.). "Despite knowing that it could not prove its asserted claims, Scranton Products filed its Complaint against Bobrick because Scranton Products intended to use this litigation to exert financial pressure on Bobrick so that Bobrick would stop questioning Scranton Products' false statements in the marketplace." (Id. at ¶ 117).

Nearly three years of costly and time-consuming litigation ensued and "Bobrick eventually learned through discovery the facts demonstrating the fatal flaws in Scranton Products' Complaint" and subsequently filed a Motion to Amend its Answer and to assert counterclaims. (Id. at ¶ 118). SP promptly moved to voluntary dismiss its complaint with prejudice "because Bobrick had discovered what Scranton Products knew, but had misused the proceedings in an attempt to conceal: that its HDPE toilet partitions did not comply with the NFPA 286 testing standard." (Id. at ¶ 119). After the Court granted SP's Motion for Voluntary Dismissal, SP initiated a "commercial action," writing to its customers "to inform them that Scranton Products 'can no longer maintain with 100% assurance that all of the current generation of 286 HDPE bathroom partitions [it] sold were NFPA 286 compliant and [it] will provide replacement options.'" (Id. at ¶ 121). Bobrick alleges that SP's voluntary dismissal of its complaint and commencement of the commercial action "demonstrate that Scranton Products knows it cannot credibly assert, as it did in its complaint for nearly three years during this litigation, that all of its HDPE toilet partitions sold as NFPA 286-compliant

actually comply with NFPA 286." (*Id.* at ¶ 122). Because SP knew that its claims against

Bobrick were baseless, Bobrick alleges that throughout the pendency of this litigation SP

"has improperly used the legal process for predatory purposes for which it was not

intended—namely, to inflict financial harm on Bobrick and to prevent Bobrick from

competing fairly and effectively in the marketplace by making truthful statements of facts

and legitimate statements of opinion." (*Id.* at ¶ 123).

Bobrick next points to certain conduct engaged in by SP throughout the course of this

litigation that it alleges demonstrate SP's abuse of legal process, including:

- Scranton Products destroyed numerous documents concerning its allegedly NFPA 286-compliant HDPE toilet partitions after it was already contemplating litigation against Bobrick over Bobrick's statements concerning those same toilet partitions. Scranton Products' spoliation has frustrated Bobrick's ability to discover facts material to its defense against Scranton Products' claim and unreasonably increased Bobrick's costs. (*Id.* at ¶ 125).

- Scranton Products has obstructed and resisted Bobrick's legitimate discovery requests at every turn, and has intentionally conducted discovery so as to increase Bobrick's cost. (*Id.* at ¶ 126). For example, Scranton Products refused to provide Bobrick with a list of construction projects it claimed Bobrick had interfered with, and it provided such a list only after expensive motion practice and multiple Court orders. (*Id.* at ¶ 127). When Scranton Products did finally serve the required list of allegedly interfered-with construction projects, it performed no investigation whatsoever and merely served a list of every construction project with respect to which Bobrick had sent a letter to the project owner or project architect, resulting in a list of 58 projects. (*Id.* at ¶ 128). Indeed, to the extent that Bobrick sent a letter to a project owner or project architect during this litigation, Scranton Products arbitrarily added that project to its list without analysis or investigation, clearly intending to use this lawsuit as a predatory means of silencing Bobrick and preventing Bobrick from fairly competing in the marketplace. (*Id.* at ¶ 129). That list forced Bobrick to take expensive and burdensome third-party discovery to determine the true facts concerning each of the listed construction projects. As a result of that lengthy process—to which Scranton Products contributed nothing—Bobrick presented Scranton Products with evidence

that compelled Scranton Products to reduce the list of 'lost jobs' from 58 projects to seven projects—and of the remaining seven, two have not yet been built, and no subcontracts for toilet partitions have been awarded in connection with those two projects as of the date of filing of this Counterclaim. (*Id.* at ¶ 130). If Scranton Products had performed even a rudimentary investigation—as it had a duty to do—before serving its original list of 58 projects, Bobrick need not have spent several months incurring the burden and expense of conducting the third-party discovery described above. The only plausible explanation of Scranton Products' failure to perform any investigation to support its Court-ordered interrogatory answer is that Scranton Products was deliberately prolonging this litigation and forcing Bobrick to shoulder ever-greater legal costs.[11]  (*Id.* at ¶ 131).

In sum, Bobrick alleges that "it is evident that Scranton Products initiated these

proceedings, then misused them, for purposes other than those for which the legal

process is intended: namely, to try to silence Bobrick in the marketplace and to inflict

financial harm on Bobrick by driving up its litigation costs, and to drag out the litigation

as long as possible to achieve both of those improper goals." (*Id.* at ¶ 133).

## III.  **STANDARD OF REVIEW**

A complaint must be dismissed under FED. R. CIV. P. 12(b)(6), if it does not allege

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must

---

[11] Bobrick notes, that "as this Court has already found," before SP commenced this litigation:

> It had already begun to engage in predatory and unethical litigation-related conduct against Bobrick by having its in-house general counsel secretly participate in a July 2013 telephone call between Scranton Products' president Don Wharton and Bobrick's chief executive officer Mark Louchheim, in part for the purpose of soliciting admission to be used—and that were, in fact, used—in preparing Scranton Products' Complaint in this matter.

(Doc. 318, at ¶ 124). Bobrick also notes that SP "redacted numerous documents based on its unilateral decisions about relevance, in spite of clear authority in this judicial district prohibiting such redactions and in spite of the fact that the redacted information was plainly relevant and discoverable." (*Id.* at ¶ 132).

aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not show[n] - that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

## IV.   ANALYSIS

In its Motion to Dismiss, SP asks this Court to dismiss with prejudice Bobrick's common law unfair competition and abuse of process claims, as well as Bobrick's request for punitive damages. The Court will address each in turn.

### A. The Complaint Plausibly Alleges That Scranton Products Engaged in Unfair Competition Under Pennsylvania Law

SP asks this Court to dismiss Bobrick's unfair competition claim with prejudice. The crux of SP's Motion is that the conduct alleged in the Complaint—in essence false advertising— is not cognizable under Pennsylvania unfair competition law. Specifically, SP argues that "[i]n light of longstanding Pennsylvania authority supporting a narrow interpretation of unfair competition . . . this Court should decline to expand the scope of the tort, and should dismiss with prejudice Bobrick's unfair competition claim accordingly."[12]   (Doc. 325, at 25). The Court disagrees with SP and declines to dismiss Bobrick's unfair competition claim at this stage of the proceeding.

---

[12] The Court notes that SP brought and prosecuted the very same claim premised on the same underlying facts for nearly three years before this Court. Now, it argues that such a claim is not, and was never, cognizable under Pennsylvania law.

19

"Pennsylvania law defines unfair competition as the passing off of rivals' goods as one's own, which creates confusion as to the authenticity of the goods in question." *Elsevier, Inc. v. Comprehensive Microfilm & Scanning Servs., Inc.*, No. 3:10-cv-2513, 2013 WL 1497946, at *12 (M.D. Pa. Apr. 10, 2013) (internal citation and quotation marks omitted). However, "Pennsylvania courts have also recognized unfair competition 'where there is evidence of, among other things, trademark, trade name, and patent rights infringement, *misrepresentation*, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information.'" *Id.* (emphasis added) (quoting *Synthes (U.S.A.) v. Globus Med. Inc.*, No. 04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005)). More recently, Courts in this Circuit "have examined unfair competition in light of the Restatement (Third) of Unfair Competition § 1 (1995)." *Baier v. Jersey Shore State Bank*, No. 4:07-CV-2236, 2009 WL 2843325, at *13 (M.D. Pa. Aug. 31, 2009).

The Restatement (Third) of Unfair Competition § 1 does not limit the tort of unfair competition merely to the passing off of rivals' goods as one's own.[13] Rather, the

---

[13] The Restatement provides:

> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:
>> (a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:
>>> (1) deceptive marketing, as specified in Chapter Two;
>>> (2) infringement of trademarks and other indicia of identification, as specified in Chapter Three;
>>> (3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four; or

Restatement defines the tort broadly to include, among other things, false and deceptive marketing and advertising. As such, Courts in this Circuit have recognized that allegations of false advertising—such as those alleged by Bobrick—may in certain circumstances properly state a claim for unfair competition under Pennsylvania law. *See, e.g., Larry Pitt & Assocs. v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 456 (E.D. Pa. 2014) ("[T]he Court will also allow [plaintiff] to pursue its unfair competition claim with regard to its false or misleading advertising allegations."); *Peek v. Whittaker*, No. 2:13-cv-01188, 2014 WL 2154965, at *10 (W.D. Pa. May 22, 2014) ("Pennsylvania courts have included misrepresentation and resulting injury to reputation and manner of doing business in the definition of unfair competition."). The Third Circuit has also recognized that Pennsylvania Courts would permit a cause of action for unfair competition in circumstances similar to those at issue in this litigation, noting:

> The common law tort of unfair competition is generally thought to be synonymous with the act of passing off one's good as those of another. Nevertheless, the Supreme Court of Pennsylvania has held that other types of conduct can constitute unfair competition actionable at common law. *See Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 203 A.2d 469, 473 (1964) (finding it illegal to make false or misleading statements about the circumstances under which an employee left an employer). Therefore, it is not so easy to conclude that there is one narrow and clear category of common law tort.

from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

(b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

Restatement (Third) Unfair Competition § 1 (1995).

*Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995).

Accordingly, where a competitor plausibly alleges it has been harmed as a direct result of

an intentional misrepresentation contained in a false advertisement, it has stated a claim for

unfair competition under Pennsylvania law. For these reasons, the Court concludes that

Bobrick's Complaint states a plausible claim for unfair competition under Pennsylvania law

and will thus deny SP's Motion to Dismiss in this respect.

## B. Bobrick's Abuse of Process Claim Will Not Be Dismissed

In its Motion, SP also seeks dismissal of Bobrick's abuse of process claim on the theory

that permitting Bobrick's claim to proceed "raises a dangerous specter" because, under

Bobrick's theory, "discovery disputes can be transformed into abuse of process simply by

adding a conclusory allegation that litigation positions were taken for 'improper purposes.'"

(Doc. 325, at 6). The Court rejects SP's arguments.[14]

"The Supreme Court of Pennsylvania has said that '[t]he gist of an action for abuse of

process is the improper use of process after it has been issued, that is, a perversion of it.'"

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 304 (3d Cir. 2003) (quoting

---

[14] At oral argument, counsel for SP directed the Court to three cases to support its assertions that Bobrick's abuse of process claim must be dismissed with prejudice: *Giordano v. Murano-Nix*, Civil Action No. 12-7034, 2014 WL 62459 (E.D. Pa. Jan. 8, 2014); *Schwartz v. OneWest Bank, FSB*, Civil Action No. 13-0113, 2013 WL 6037078 (E.D. Pa. Nov. 13, 2013); and *Ickes v. Flanagan*, Civil Action No. 3:2007-143, 2008 WL 859183 (W.D. Pa. Mar. 31, 2008). The Court finds that *Giordano* and *Ickes* are factually distinguishable, and that applying the legal reasoning of *Schwartz* to the Complaint demonstrates that Bobrick has properly pleaded an abuse of process claim. *See Schwartz*, 2013 WL 6037078, at * 6 ("It is not enough that the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive. . . . Rather, there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail *or to coerce or compel the plaintiff to take some collateral action*.") (emphasis added).

*McGee v. Feege*, 517 Pa. 247, 535 A.2d 1020, 1023 (1987)). "A 'perversion' of legal process occurs when a party uses the process 'primarily to accomplish a purpose for which the process was not designed.'" *Id.* (quoting *Dumont Television & Radio Corp. v. Franklin Elec. Co. of Philadelphia*, 397 Pa. 274, 154 A.2d 585, 587 (1959)). "Generally speaking, to recover under a theory of abuse of process, a plaintiff must show that the defendant used legal process against the plaintiff in a way that constituted a perversion of that process and caused harm to the plaintiff." *Id.* Courts must "look at the legal process used and decide whether it was primarily to benefit someone in achieving a purpose which is not the authorized goal of the procedure in question." *Id.* at 305 (internal citation and quotation marks omitted). As the Third Circuit has recognized, the Supreme Court of Pennsylvania "has interpreted the tort broadly, making it clear that it 'will not countenance the use of the legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process.'" *Id.* (quoting *McGee*, 535 A.2d at 1026).

The Court finds that Bobrick has alleged sufficient facts raising a plausible inference that SP engaged in an abuse of process by knowingly continuing to prosecute a baseless lawsuit for the purpose of stifling competition, increasing Bobrick's legal costs, and silencing Bobrick's legitimate activities in the marketplace. The Complaint further alleges that SP engaged in deliberate and continuous discovery misconduct, including the filing of false affidavits, destruction of documents, and affirmatively misleading Bobrick and the Court, all for the specific purpose of harming Bobrick by driving up its legal costs. Although the Court

agrees with SP that run-of-the-mill discovery disputes cannot constitute an abuse of process under Pennsylvania law, Bobrick alleges facts far more detailed and nefarious: that SP knew that some or all of its HDPE toilet partitions did not actually comply with NFPA 286 (*i.e.*, its claims were baseless) yet SP nevertheless continued to prosecute this lawsuit for nearly three years, all while stifling Bobrick's legitimate discovery efforts for the specific purpose of financially harming Bobrick and gaining a competitive advantage in the marketplace. These allegations are sufficient to state a plausible claim for abuse of process under Pennsylvania law. *See e.g., Peek*, 2014 WL 2154965, at *7 ("In alleging Defendants obtained a [preliminary injunction] with knowingly false evidence for the purpose of hampering Plaintiffs' ability to compete . . . which caused harm to Plaintiffs' reputation and future business prospects, Plaintiffs have made out a valid claim for abuse of process."); *Lease v. Fishel*, Civil Action No. 1:07-CV-0003, 2009 WL 922486, at *6 (M.D. Pa. Apr. 3, 2009) (recognizing that, in certain circumstances, a party may state a claim for abuse of process against persons "who employ legal process primarily intending to burden or cause litigation expense to their adversaries"); *Gen. Refractories*, 337 F.3d at 307 ("Quite simply, a court should ask whether there has been a perversion of the process, or, whether a legal process has been used as a tactical weapon to coerce a desired result that is not the legitimate object of the process. . . . [W]e believe that using a legal process primarily to harass and cause direct injury to an adversary similar to what occurred here *could* constitute a perversion of that process.") (emphasis in original) (internal citation and

24

quotation marks omitted). Because the facts alleged by Bobrick *could* plausibly constitute an abuse of process, SP's Motion to Dismiss Bobrick's abuse of process claim will be denied.[15]

## V.    CONCLUSION

For the foregoing reasons, the Court will deny SP's Motion in its entirety. A separate Order follows.

Robert D. Mariani
United States District Judge

---

[15] SP's Motion to Dismiss also asks the Court to dismiss Bobrick's request for punitive damages because the Complaint "fails to plead any facts that could establish a level of outrageous conduct sufficient to satisfy Pennsylvania law." (Doc. 325, at 7). Again, the Court disagrees with SP. Bobrick's Complaint alleges sufficient facts that could support an award of punitive damages. For example, Bobrick alleges facts from which one could infer that SP knew that some or all of its HDPE toilet partitions did not actually comply with NFPA 286 yet nevertheless brought and prosecuted this lawsuit for nearly three years for the specific purpose of harming Bobrick and gaining a competitive advantage in the marketplace. The Court is satisfied that such allegations (among others), if proven, may support an award of punitive damages, and that "[d]ismissing plaintiffs' punitive damages claim now at the pleading stage would be premature." *Young v. Westfall*, No. 4:06-CV-2325, 2007 WL 675182, at *2 (M.D. Pa. Mar. 1, 2007). Accordingly, the Court will deny SP's Motion in this respect.