## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BOBRICK WASHROOM EQUIPMENT,　:
INC.,　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　: CIVIL ACTION NO. 3:14-CV-853
　　　　　　　　Plaintiff,　　　　　: (JUDGE MARIANI)
　　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
SCRANTON PRODUCTS, INC.,　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　　Defendant.　　　　 :
　　　　　　　　　　　　　　　　　:

## MEMORANDUM OPINION
### I. INTRODUCTION

Here the Court considers three pending motions: Bobrick Washroom Equipment,

Inc.'s Motion to Enforce Settlement Agreement (Doc. 452); Bobrick Washroom Equipment,

Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548); and

Defendant Scranton Products Inc.'s Motion to Enforce Settlement Agreement (Doc. 550).

The motions relate to the Settlement Agreement ("SA") which the parties filed on December

29, 2017, and the Court approved on March 6, 2018.  (Docs. 435, 444.)  Following a six-day

evidentiary hearing, the parties filed proposed findings of fact and proposed conclusions of

law addressing all motions.  (Docs. 670, 671.)  The parties then separately briefed each

pending enforcement motion.  (Docs. 685, 686, 687, 691, 692, 693, 696, 697, 728.)  For the

reasons that follow, the Court will deny Bobrick Washroom Equipment, Inc.'s Motion to

Enforce Settlement Agreement (Doc. 452) and Bobrick Washroom Equipment, Inc.'s

Amended Second Motion to Enforce Settlement Agreement (Doc. 548), and the Court will

deny Defendant Scranton Products Inc.'s Motion to Enforce Settlement Agreement (Doc.

550).

## II. BACKGROUND[1]

Bobrick Washroom Equipment, Inc. ("Bobrick") and Scranton Products Inc.

("Scranton Products") are indirect competitors in the toilet partition market.  (Doc. 671 ¶ 5.)

In the underlying litigation, Scranton Products filed a five-count complaint against Bobrick on

May 2, 2014, alleging violations of the Lanham Act, 15 U.S.C. § 1125(A), for "Literally False

Advertising" and "Deceptive and Misleading Advertising," Common Law Unfair Competition,

Commercial Disparagement, and Tortious Interference with Existing or Prospective

Business Relations.  (Doc. 1.)  These claims were related to Bobrick's alleged statements

that Scranton Products did not sell a high-density polyethylene ("HDPE") toilet partition that

complied with 2009 and 2012 International Building Codes, in particular NFPA 286, a test

developed by the National Fire Protection Association ("NFPA").

As explained in the SA,

> Bobrick disputed the material allegations in, and liability arising from, the claims alleged against it in the Action. On December 9, 2016, Scranton Products sought leave of court to dismiss all of its claims against Bobrick with

---

[1] Although extensive background information has been presented in connection with the pending motions, the Court focuses on the facts deemed directly relevant to issues raised in the enforcement motions.

prejudice, without any payment of money, settlement, admission of liability, or other consideration from Bobrick. On February 10, 2017, the Court permitted Scranton Products to dismiss its claims against Bobrick.

Bobrick filed counterclaims against Scranton Products in the Action, seeking damages and injunctive relief based on claims under the Lanham Act, 15 U.S.C.§ 1501 et seq.; under Pennsylvania's Dragonetti Act, 42 Pa. C.S.A. § 8351; and for common-law unfair competition and abuse of legal process. Scranton Products disputes the material allegations in, and liability arising from, the claims filed against it in the Action.

(SA ¶¶ 7-8.)

Bobrick's counterclaims were settled in the SA in exchange for, among other things, $7,500,000.  (Doc. 671 ¶ 31.)  As part of the SA approved by the Court, the parties agreed that Scranton Products would send a customer letter to certain Scranton Products' customers.  (SA ¶¶  81-88.)  Regarding breaches of the SA, the SA provides for reasonable opportunities to cure (SA ¶¶ 90-93), defines various breaches (*id*. ¶¶ 95-97), and identifies available relief (*id.* ¶¶ 98-103).

Bobrick's first enforcement motion (Doc. 452), filed on June 6, 2019, alleges that Scranton Products breached the SA by sending a customer letter that was deficient in three respects: 1) the size of the font and typeface were not as required;[2] 2) the closing line of the customer letter was changed, with "call me" replaced by "call Scranton Products"; and 3) the customer letter was not sent "along with" its communication of a purchase order

_____

[2] Subsequent arguments focus on font size rather than typeface and the Court will do the same.

confirmation.  (Doc. 452 ¶¶ 5-7, 13, 18, 19.)  Bobrick's second amended enforcement

motion (Doc. 548), filed on February 2, 2021, alleges further breach of the "along with"

requirement.  (Doc. 548 ¶ 14.)  Scranton Products' enforcement motion (Doc. 550), filed on

March 4, 2021, alleges that Bobrick breached the SA by prematurely filing an enforcement

motion on November 6, 2020, (Doc. 529) when the cure period did not expire until

December 23, 2020, at the earliest.  (Doc. 550 ¶¶ 30-33.)  The parties contend that the

alleged breaches are "Level 1" breaches under the SA.  (*See* Doc. 452 at 21; Doc. 548 at

18; Doc. 550 at 17.)

Several SA provisions concerning the customer letter are relevant to the pending

motions.

> Beginning five (5) business days after the Effective Date, for each and every
> sale of non-NFPA 286-compliant HDPE toilet partitions (including, but not
> limited to, Class A fire-rated HDPE toilet partitions, Class B fire-rated HDPE
> toilet partitions, and non-fire-rated HDPE toilet partitions), Scranton Products
> will send the entity that submits the purchase order to Scranton Products (the
> "purchaser") (regardless of location, because Scranton Products is often not
> aware of the end user or ultimate locations of installation) a letter in the form of
> **Exhibit D** (the "Customer Letter").

(SA ¶ 81.)

> Scranton Products will send the Customer Letter along with its communication
> of the purchase order confirmation, in the same manner in which it usually
> communicates that information to that purchaser (in most cases the dealer) in
> the ordinary course of business (for example, by email, if that is Scranton
> Products' usual method of communication with that purchaser, or by Federal
> Express, United Parcel Service, or U.S. mail if any of those is Scranton
> Products' usual method of communication with that purchaser).

(SA ¶ 82.)

> Scranton Products may, at its discretion, modify the Customer Letter from time to time, but only (a) with the prior written agreement of Bobrick, which agreement will not unreasonably be withheld if the changes are non-substantive, or if the changes are substantive but reflect a change in the law or an alteration in the requirements of NFPA 286, or (b) by approval of the Court upon Scranton Products' motion after Bobrick has had notice sufficient to provide it with an opportunity to request to be heard by the Court.

(SA ¶ 88.)

The SA contains provisions allowing a party a reasonable opportunity to cure an

alleged breach.

> If a Party believes that the other Party has breached the Settlement Agreement, it must provide the other Party with written notice of the breach (consistent with paragraph 156 below) and a reasonable opportunity to cure the breach prior to seeking relief from the Court, which must be sought by filing an Enforcement Motion; provided, however, that no opportunity to cure a breach will be afforded to a Party following that Party's third breach, within any twelve-month period, arising from the same or substantially similar acts or omissions.

(SA ¶ 90.)

> Following the exhaustion of any reasonable cure period afforded under the preceding paragraph, the Party alleging breach may bring an Enforcement Motion, as defined in paragraph 104 below, to bring the matter before the Court for determination, pursuant to the process described in paragraphs 104–112 below. If the Court finds that there has been a breach of the Settlement Agreement, the breaching Party will pay the other Party liquidated damages as set forth in this Settlement Agreement. The Party determined to be in breach will also pay the other Party's reasonable attorneys' fees and costs incurred in enforcing the Settlement Agreement, in an amount determined by the Court.

(SA ¶ 91.)

The Parties agree that three months is a presumptively reasonable amount of time for curing a breach, but the Court may, in its discretion, determine that particular circumstances justify extending the reasonable time period permitted for curing any specific breach.

(SA ¶ 92.)

The SA defines Level 1 Breach as a breach "intended by the parties to denote a serious violation of this Settlement Agreement that threatens to frustrate or undermine the core purposes of the agreement." (SA ¶ 95.) Examples of a Level 1 Breach include the following: "Scranton Products systematically failing to send any or a majority of the Customer Letters for a period longer than one month (not including the time permitted for a reasonable opportunity to cure the breach following written notice by Bobrick" (SA ¶ 95(b)); and "Scranton Products systematically failing to send the Customer Letters to a particular purchaser for a period longer than six months (not including the time permitted for a reasonable opportunity to cure the breach following written notice by Bobrick" (SA ¶ 95(c)).

A Level 2 Breach is defined as one intended by the Parties to denote a violation of The Settlement Agreement that does not rise to the degree of a Level 1 Breach. (SA ¶ 96.) Level 2 Breaches include "isolated instances of failure by Scranton Products to send the required Customer Letters." (*Id.*)

The SA also provides that

[i]f one Party alleges that the other Party has breached the Settlement Agreement, and the breach alleged is not specifically described in paragraph 95 or 96 of this Settlement Agreement, the Court is authorized to determine whether the alleged breach constitutes a Level 1 Breach or a Level 2 Breach by reference to the stated purposes of this Settlement Agreement and the examples given in paragraphs 95 and 96.

(SA ¶ 97.)

### III. ANALYSIS[3]

#### A.    Bobrick's First Enforcement Motion

As set out above, Bobrick Washroom Equipment, Inc.'s Motion to Enforce Settlement Agreement (Doc. 452), filed on June 6, 2019, alleges that Scranton Products breached the SA by sending a customer letter that was deficient in three respects: 1) the size of the font and typeface were not as required; 2) the customer letter did not properly identify a Scranton Products contact person; and 3) the customer letter was not sent "along with" its communication of a purchase order confirmation.  (Doc. 452 ¶¶ 5-7, 13, 18, 19.)

---

[3] The Court's findings of fact and conclusions of law which are to be set out with the Court's order resolving an enforcement motion (*see* SA ¶ 127) are incorporated in the analysis of each motion. Setting out herein the facts and law which the Court finds directly relevant to the disposition of the pending motions, the Court does not separately address the one hundred five (105)  proposed findings of fact and sixty-seven (67) conclusions of law submitted by Scranton Products (Doc. 670) and the four hundred forty-three (443) combined proposed findings of fact and conclusions of law submitted by Bobrick (Doc. 671).

The SA provides that the "Customer Letter" is "a letter in the form of Exhibit D" attached to the SA.  (SA ¶ 81.)  The text of Exhibit D is in 14-point Times New Roman font and its last sentence reads "Please feel free to call me with any questions."  (Doc. 671 ¶ 86.)  The SA states that the Customer Letter is to be sent "along with its communication of the purchase order confirmation, in the same manner in which it usually communicates that information to that purchaser . . . in the ordinary course of business . . . ."  (SA ¶ 82.)

In its post-hearing supporting brief, Bobrick argues that the "along with" provision of the SA is not ambiguous and forecloses Scranton Products sending the Customer Letter "embedded in" the purchase order confirmation.  (Doc. 685 at 8.)  Concluding that it is undisputed that Bobrick breached paragraphs 81 and 82 of the SA by embedding the Customer Letter in 8-point font as the last page of the purchase order confirmation, omitting the signature block and contact information, and changing the closing line of the Customer Letter from "Please feel free to call me if you have any questions" to "Please feel free to call Scranton Products if you have any questions," Bobrick further argues that Scranton Products did not cure its breach because it continues to send the Customer Letter as the last page of the purchase order confirmation.  (Doc. 685 at 6, 14 (citations omitted).)

In its responsive brief, Scranton Products argues that it did not breach the SA on the grounds asserted, that it addressed all alleged concerns, and Bobrick's identified cure obligations go beyond what the SA requires.  (Doc. 728 at 1.)

## 1. Contract Construction

The SA states that ""all claims arising out of or relating in any way to this Settlement Agreement, will be governed by and/or construed in accordance with the laws of the Commonwealth of Pennsylvania, without regard to principles or rules concerning conflicts or choice of law." (SA ¶ 151.)

To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead the following elements: (1) the existence of a contract, including its essential terms; (2) the defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach. *See Ware v. Rodale Press, Inc.,* 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Pursuant to Pennsylvania law, it is

> well established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties. *Robert F. Felte, Inc. v. White,* 451 Pa. 137, 302 A.2d 347, 351 (1973).
>
> In cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. *Pines Plaza Bowling, Inc. v. Rossview, Inc.,* 394 Pa. 124, 145 A.2d 672 (1958). When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1986). When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 663 (1982); *Herr's Estate,* 400 Pa. 90, 161 A.2d 32, 34 (1960). A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being

> understood in more than one sense. *Hutchison,* 519 A.2d at 390. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact. *Community College v. Society of the Faculty,* 473 Pa. 576, 375 A.2d 1267, 1275 (1977).

*Kripp v. Kripp*, 849 A.2d 1159, 1163–64 (Pa. 2004).

Pennsylvania courts may consult dictionary definitions to determine the "ordinary meaning" of a term. *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super. Ct. 2016) (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999)) (a court "may inform [its] understanding of [contractual] terms by considering their dictionary definitions").

In interpreting a contract, the provisions must be construed as a whole and harmonized, if possible, so that all of the terms are given effect. *Contrans, Inc. v. Ryder Truck Rental, Inc.,* 836 F.2d 163, 169 (3d Cir.1987). A contract should not be interpreted in a manner that renders provisions meaningless, superfluous, unreasonable, contradictory, or would lead to absurd results. *Lesko v. Frankford Hosp.-Bucks Cnty.,* 609 Pa. 115, 15 A.3d 337, 343 (Pa.2011); *Contrans,* 836 F.2d at 169.

The party asserting a breach of contract claim bears the burden of proof concerning the elements of the claim and must establish them by a preponderance of evidence. *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 102 (3d Cir. 2001) (applying Pennsylvania law).

## 2. Settlement Agreement's Customer Letter Provisions

To prevail on its enforcement motion, Bobrick must show by a preponderance of the evidence that Scranton Products breached the SA by not sending the Customer Letter in 14-point Times New Roman font, by sending the Customer letter without the exact sentence "Please feel free to call me if you have any questions," and by not sending the Customer letter "along with" its communication of each purchase order confirmation. (*See, e.g.*, Doc. 452 ¶¶ 13, 17-19.)   The first two identified grounds are based on the SA's requirement in paragraph 81 that Scranton Products send "a letter in the form of Exhibit D": 1) Exhibit D is in 14-point Times New Roman font where the letter sent by Scranton Products is in 8-point font; and 2) Exhibit D contains the sentence "Please feel free to call me if you have any questions" where Scranton Products letter says "Please feel free to call Scranton Products if you have any questions."  (Doc. 452 ¶¶ 18-19.)  The third ground is based on the requirement in paragraph 82 of the SA that the Customer Letter be sent "along with" Scranton Products' communication of its purchase order confirmation. (*Id.* ¶¶ 13-15.)

## a. Letter in the Form of Exhibit D

According to the testimony of Marc Loucheim, Bobrick's chairman and CEO, "in the form of" meant identical in all respects to Ex. D except for letterhead and signature block. (Hearing Transcript ("Hr'g Tr.") Day 1, 39:17-19, 80:9-13, 143:10-24; *see also* Doc. 685 at 4-5.)   In its proposed findings of fact and conclusions of law, Bobrick states that "Paragraph

81 alone specifically identifies the form and format of the Customer Letter. Indeed, it references an exemplar Customer Letter in attached Exhibit D that shows exactly what the letter's wording, font size, and closing is required to look like." (Doc. 671 ¶ 188.) Bobrick continues "[b]y contrast, ¶ 82 only generally references the 'the ordinary course of business' in reference to sending, not form or content. Thus, even if there were a contradiction between ¶¶ 81 and 82, ¶ 81 and Exhibit D referenced therein would override ¶ 82's general 'ordinary course of business' language." (Id. (citing Sullivan v. Phares, No. 00-CV-380, 2001 WL 22999, at *6 (Iowa Ct. App. Jan. 10, 2001) (concluding that specific language overrode general "ordinary course of business" provision in contract for sale of business)).)

In its responsive brief, Scranton Products maintains that "in the form of" did not mean identical. (Doc. 728 at 7-9.) Specifically, Scranton Products asserts

> as Bobrick admitted, the parties carefully selected the word "form" in Paragraph 81 to embody the reality that Exhibit D was not the final version of the Letter. ([Doc. 671] ¶¶ 87–88; [Doc. 670] ¶ 30.) Both parties understood that changes would be made to the Letter to finalize it. ([Doc. 670] ¶ 30.) The parties made a conscious and informed decision to leave the exact manner of communication of the Letter to Scranton. ([SA] ¶ 82.) The parties could have agreed that Scranton had to send a letter "exactly" like Exhibit D, or "in the same font size as Exhibit D," but they did not.

(Doc. 728 at 8.) Scranton Products also asserts that paragraph 81 was properly interpreted to be consistent with the obligation in paragraph 82 to send the Customer Letter "in its ordinary course of business." (Id.)

12

Relying on the testimony of Scott Van Winter, the president of Scranton Products,

Bobrick states in its supporting brief that Scranton Products agrees that the requirement that

Scranton Products send "a letter in the form of Exhibit D (the 'Customer Letter')" as required

in paragraph 81 of the SA is not ambiguous.  (Doc. 685 at 4-5 (citing Doc. 671 ¶ 85).)

Testimony on the issue is set out in paragraph 85 of the proposed findings of fact and

conclusions of law.

> Q. Okay. Was there any question or ambiguity, in your mind, about the Settlement Agreement, at the time you signed it?
>
> A. No.
>
> Q. Everything seemed perfectly clear to you?
>
> A. Everything seemed perfectly clear.

(Doc. 671 ¶ 85 (quoting Hr'g Tr. Day 2, 9:10-14).)

> Q. Was there anything, when you signed the Settlement Agreement, about this Exhibit D, this form here, which was vague or ambiguous, in any way?
>
> A. No.

(*Id.*, 71:15-18.)

In its opposition brief, Scranton Products responds that "Bobrick claims that Scranton

admitted certain provisions in the Settlement Agreement, such as Paragraphs 81 and 82,

were 'perfectly clear.' . . . But Bobrick fails to clarify that Scranton's witnesses testified those

provisions are 'perfectly clear' in supporting ***Scranton's interpretation***."  (Doc. 728 at 8

n.10 (quoting Doc. 685 at 5).)

The parties' varying interpretations of the SA's relevant provisions undermine the

claimed clarity of their respective positions on the meaning of "in the form of" in paragraph

81.  Thus, the Court will first attempt to discern the meaning of "a letter in the form of Exhibit

D" by looking to the SA itself.

The meaning of "in the form of" is not provided in the SA.  Research does not reveal

a definition of the phrase under Pennsylvania law or within the Third Circuit.  The Oxford

English Dictionary defines "in the form of" as "[t]he particular character, nature, structure of

a thing; the particular mode in which a thing exists or manifests itself."

https://www.oed.com/seach/disctionary/?scope=Entries&q=in+the+form+of.   Merriam

Webster's Collegiate Dictionary does not define "in the form of" and provides ten definitions

of the noun "form" with subparts. https://www.merriam-webster.com/dictionary/form.  These

include "a prescribed and set order of words" exemplified by "the *form* of the marriage

service."  *Id.*  Given the numerous definitions of the word "form" and the parties' agreement

that Exhibit D did not represent the final form of the Customer Letter, the Court concludes

that no "*ordinary* meaning," *True R.R. Assocs.*, 152 A.3d at 339 (emphasis added), of "in the

form of" or "form" establishes the meaning of the term in the SA.  Bobrick's description of

Exhibit D as an "exemplar Customer Letter" (Doc. 671 ¶ 188) bolsters this conclusion in that

"exemplar" is defined as "one that serves as a model or example," https://www.merriam-webster.com/dictionary/exemplar, and the ordinary meaning of "model" or "example" does not suggest that the Customer Letter was *required* to adhere in all respects to Exhibit D.

Reference to other sections of the SA does not provide clarity as to the parties' intended meaning of "in the form of Exhibit D" in paragraph 81.  Paragraph 82 addresses the "manner" in which the Customer Letter is to be sent—the way in which Scranton Products communicates purchase order confirmation information "in the ordinary course of business"-- rather than the form of the Customer Letter addressed in paragraph 81.  With no apparent intent that the descriptive phrase "in the ordinary course of business" should apply more broadly than to the *manner* of communication, the Court finds no basis to conclude that the phrase informs the meaning of the subject matter of paragraph 81.  Similarly, because the Customer Letter is "a letter in the form of Exhibit D" (SA ¶ 81) and paragraph 88 addresses only the modification of the "Customer Letter" with no mention of Exhibit D, paragraph 88 does not inform the meaning of "in the Form of Exhibit D" in paragraph 81.

Because "in the form of Exhibit D" is "reasonably susceptible of different constructions and capable of being understood in more than one sense," *Hutchison,* 519 A.2d at 390, as demonstrated by the parties' disagreement which cannot be resolved through reference to the ordinary meaning of words used or provisions of the SA itself, the Court concludes that paragraph 81 is ambiguous.  With this determination, the Court will

look to "evidence outside the contract's words (called parol evidence) to determine the

intent of the parties," *Angino v. Wells Fargo Bank, N.A.*, 666 F. App'x 204, 207 (3d Cir.

2016), regarding word changes and font size, the specific subjects of the alleged breaches.

### i. Closing Line

To decide whether Scranton Products' change of "Please feel free to call *me* if you

have any questions" to "Please feel free to call *Scranton Products* if you have any

questions" (Doc. 452 ¶ 18), the Court will look to parol evidence of the parties' intent

regarding change in a word or words contained in Exhibit D.

Loucheim testified that "we negotiated the fact that they weren't allowed to change

one word, without our permission, and that was very intentional, from our perspective."

(Hr'g. Tr. Day 1, 63:3-6.)  On the issue of the word change, an exchange took place

between Bobrick's counsel and Van Winter where Van Winter was asked whether he

violated paragraph 88.  (Hr'g Tr. Day 2, 63:11-13.)  He responded: "I agree paragraph 88 is

clear.  My point is, I think, in the context of communicating to the customers, the customer

letter, as we do in the ordinary course of business, was the back-drop for changing the word

[me to Scranton Products]."  (*Id.*, 64:13-16.)  When the Court ruled that Van Winter had not

answered the question of whether he violated paragraph 88, Bobrick's counsel again asked

if he had violated paragraph 88 and Van Winter responded, "It is.  And again, independent

of other things in the agreement that you think provided some flexibility, then, yes." (*Id.* 65:19-20.)

The Court construes this as an admission that the change in wording in the closing line of the Customer Letter from "me" to "Scranton Products" was a breach of the SA. Thus, the next question is whether the breach was cured. Before addressing the cure issue, the Court will consider whether Scranton Products breached the SA based on the font size of the Customer Letter or the manner in which it sent the Customer Letter.

### ii. Font Size

As to whether the requirement that "a letter in the form of Exhibit D" required that the Customer Letter be in 14-point font, no provision of the SA addresses font size and parol evidence shows that font-size was not discussed during settlement negotiations.

Loucheim agreed that Exhibit D did not represent the final form of the Customer Letter, stating that certain aspects of the Customer Letter "were forthcoming." (Hr'g Tr. Day 1 80:9-13, 143:22-23.) Loucheim also agreed that he never had any discussion with anyone at Scranton Products about what the Customer Letter would look like. (Hr'g Tr. Day 1, 123:17-24.) He testified that the parties "agreed to a letter" but "didn't have a discussion as to what a letter was." (*Id.* 123:12, 20.) Loucheim added "that was one of the things that, I think, common sense and practice dictate, you know, pretty clearly, what a letter is. That

was not something that any of us felt a need to negotiate [the] particular definition of a letter." (*Id.* 123:20-24.)   Loucheim provided specific testimony on font size:

> Q. I'm going to ask you some questions about 8-point font. Is it your testimony that there were discussions, during the Settlement Agreement process, about the font size of the letter?
>
> A. No.
>
> Q. That was never discussed; right?
>
> A. Correct.
>
> Q. That was a detail that Bobrick never insisted on putting n the letter, right -- pardon me -- in the Settlement Agreement; correct?
>
> A. That is correct but ridiculous.

(Hr'g Tr. Day 1, 130:18-131:4.)

Alan Gettelman, Bobrick's Vice-president of External Affairs, testified that he attended three meetings discussing settlement and reviewed drafts of the agreement on a regular basis. (*Id.* 190:19, 193:6-18.)  He agreed that at the meetings he attended there was no discussion about font size and more broadly stated that "there was no discussion to the form" of the Customer Letter. (*Id.* 196:20-24.)  Scott Van Winter, the president of Scranton Products, testified that he was aware of no discussions with Bobrick about font size during SA negotiations. (Hr'g Tr. Day 2 5:22-23, 153:12-14, 25-154:1.)

Because "a letter in the form of Exhibit D" is ambiguous and there was no testimony that font size was discussed during settlement negotiations, the Court will not read a

specific font-size requirement into the SA.  Unlike the closing-line issue where testimony supports the conclusion that the parties negotiated that a change of wording was prohibited, *see supra* p.15, paragraph 88 is not read to address font size given the unrefuted testimony that font size was not discussed.   Therefore, Bobrick has not shown that Scranton Products breached the SA by sending the Customer Letter in a font size which differed from Exhibit D.  Further, for the reasons discussed below, the Court would conclude that Bobrick is not entitled to the relief requested even if the Court concluded that the use of anything other than a 14-point font violated the SA.

**b.  "Along With" Requirement**

Bobrick maintains that Scranton Products violated the requirement in paragraph 82 of the SA that the Customer Letter be sent "along with its communication of the purchase order confirmation in the same manner in which it usually communicates that information to that purchaser . . . in the ordinary course of business."  The basis of the alleged breach is that Scranton Products included the text that should have been presented in a Customer Letter in the same communication as the purchase order confirmation in violation of the requirement that the Customer Letter be sent along with the purchase order confirmation. (Doc. 452 ¶¶ 14, 15.)

As with paragraph 81, the parties both assert that paragraph 82 is not ambiguous and the plain meaning of "along with" supports their divergent interpretations.  (*See, e.g.*,

19

Doc. 685 at 5-6; Doc. 728 at 5.)  The SA does not define "along with."  The dictionary definition of "along with" is "in addition to (something or someone)" and "together with (something or someone)."  https://www.merriam-webster.com/dictionary/along with. Scranton Products agrees with these definitions and concludes that its "process of sending the Customer Letter together with the order acknowledgment within one PDF attachment fits squarely within each of these definitions."  (Doc. 728 at 5.)  Bobrick does not offer an alternative dictionary definition but states in its motion that, based on "the plain meaning of the phrase 'along with,'" the "Customer Letter is required to be sent as a separate and coequal document at the same time and in the same manner as the purchase order confirmation, and it may not be subsumed within, appended to, or made a part of the purchase order confirmation."  (*Id.* ¶ 14.)  The Court concludes that no plain meaning of "along with" supports Bobrick's "separate and coequal" definition of the term.  Therefore, Bobrick has not satisfied its burden of showing that Scranton Products breached the SA regarding the manner in which Scranton Products sent the Customer Letter.

With its arguments that the way in which Scranton Products sent the Customer Letter "ignores the concept of a 'letter,'" and renders paragraph 82 as "mere surplusage" (Doc. 685 at 5), Bobrick essentially asks the Court to ignore the ordinary meaning of "along with" and find that the parties bargained for something else.

Were the Court to find ambiguity in ¶ 82, parol evidence undermines Bobrick's position that Scranton Products manner of sending the Customer Letter "ignores the concept of a 'letter.'" Loucheim agreed that he never had any discussion with anyone at Scranton Products about what the Customer Letter would look like. (Hr'g Tr. Day 1, 123:17-24.) He testified that the format of the Customer Letter was not discussed and the parties did not feel "a need to negotiate [the] particular definition of a letter." (Hr'g Tr. Day 1, 123:23-24.) Thus, the parties did not negotiate anything about the Customer Letter that would preclude it from being sent as something other than a "separate and coequal document" (Doc. 452 ¶ 14). Further, Bobrick provides no basis to conclude that the concept of a letter is violated if the letter is not sent separately from another document.

In its supporting brief, Bobrick provides an additional argument in support of its definition of the meaning of "along with":

> Scranton Products' position that "along with" means that the Customer Letter can be embedded in the purchase order confirmation . . . renders as mere surplusage the entirety of ¶82 and its 'along with' requirement on which they rely. The entirety of ¶82 specifying that the Customer Letter should be sent "in the same manner as the purchase order confirmation is usually communicated to that particular customer in the ordinary course of business" would be unnecessary had the Settlement Agreement contemplated the inclusion of the Customer Letter within the purchase order confirmation as a single document (in which case they would by definition be sent in the same manner, rendering ¶82 a nullity).

(Doc. 685 at 5 (citing Doc. 671 ¶ 99).)

This argument is undermined by the fact that paragraph 82 is not "surplusage" when considered in the proper context, i.e., the details of how to send the Customer Letter were left to Scranton Products, including whether Scranton Products sent it along with the purchase order confirmation in the same envelope, email, or document or sent it separately. The Court finds it highly probative that Loucheim confirmed that there was never any discussion of what "along with" meant.  (Hr'g Tr. Day 1, 125:4-7.)  When asked if he "agreed to let Scranton Products figure out how they were going to execute on the, along with, requirement," Loucheim responded "yes." (*Id.* 126:18-21.)  Notably, Loucheim testified that he felt that "along with" meant "in the same envelope" when considered in the context of sending things through the U.S. Postal Service or FedEx.  (*Id.*, 128:11-15.)  Though in the electronic context Loucheim testified that he believed "along with" meant a separate PDF, he did not testify that there was any discussion on this issue during negotiations.  (*Id.*, 128:16-18.)

Based on the discretion left to Scranton Products on the implementation of the requirement set out in paragraph 82, the Court concludes that Scranton Products did not breach the SA by not sending the Customer Letter as a "separate and coequal document" (Doc. 452 ¶ 14.)

**c. Cure**

Based on the foregoing determinations, Scranton Products breached the SA by changing the words in the closing line and the Court must determine whether the breach was cured. Though the Court has determined that no breach occurred with respect to font size, because the analysis of cure as to the closing line and the alleged font size are similar, the Court will, nonetheless, assume *arguendo* for present purposes only that the font of the original Customer Letter violated the SA for purposes of this discussion only.

Bobrick sent its notice of breach on March 5, 2019, identifying the three issues that are the subject of the first enforcement motion. (*See, e.g.*, Hr'g Tr. Day 3, 9:4.) The SA provides that three months is a presumptively reasonable amount of time for curing a breach. (SA ¶ 92.)

According to Van Winter's testimony, though Scranton Products disagreed that it had breached the SA, it agreed to increase the font size and change the closing line and made these changes in subsequent communications. (Hr'g Tr. Day 3, 13:1-7, 14:21-24.) Approximately one month after receiving the notice of breach, Scranton Products sent a revised Customer Letter with the requested changes in the closing line and font size. (Hr'g Tr. Day 3, 8:16-19, 9:6-10.) Jennifer Emiliani, Scranton Products' Director of Sales Operations, testified that restrospective cure letters were sent on May 31, 2019, and again in June 2019 because of a typo in a phone number on the May 31st letter. (Hr'g Tr. Day 5,

36:14-15, 46:15-47:13.)  The June letters were sent on June 4, 2019.  (*Id.* 27:19.)  Thus, the

Customer Letter had been changed and restrospective cure letters had been sent out within

three months of receipt of the notice of breach.  Importantly, Loucheim unequivocally

testified that he was satisfied with Scranton Products' change in the closing line and font

size following notice of the breach.  (Hr'g Tr. Day 1 147:15-148:1.)

> Q. Sir, you are aware, as of early April 2019, that Scranton modified the original
> letter that you complained about to address two of the three issues that you
> complained about; correct?
>
> A. Correct.
> Q. You're satisfied, on a going-forward basis, with those two but not the third;
> correct?
>
> A. Correct.
>
> Q. Just for clarity, the two that they modified that you're satisfied with are a
> change in 8-point to 14 and adding the signature block language; correct?
>
> A. Yes.

(Hr'g Tr. Day 1, 147:15-149:1.)

Bobrick argues that the alleged breaches were not cured with the revised Customer

Letter and retrospective cure letters because "Scranton Products has persisted in sending

the Customer Letter embedded as the last page of the purchase order confirmation" which

"nullifies any other changes that Scranton Products has made to the Customer Letter on a

go-forward basis."  (Doc. 685 at 14.)  The Court's conclusion that Scranton Products did not

breach the SA related to the manner in which it sent the Customer Letter forecloses this

24

argument—changes in font size and the closing line are not nullified because Scranton

Products is sending the Customer Letter in a manner consistent with the SA's requirement.

Therefore, Bobrick's assertion that Scranton Products did not cure its breach is without

merit and Bobrick Washroom Equipment, Inc.'s Motion to Enforce Settlement Agreement

(Doc. 452) will be denied.

**B.    Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement**

In Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce

Settlement Agreement (Doc. 548), filed on February 1, 2021, Bobrick asserts that Scranton

Products breached the SA

> by failing in multiple instances to send the Customer Letter "along with"—
> meaning, for purposes of this motion, at the same time as—a timely purchase
> order confirmation and that SP has failed and refused to cure the breach or to
> make a good-faith effort to cure the breach within three months after proper
> notice.

(*Id.* at 1.)  Alleged "multiple instances" include seventy-seven orders that the independent

auditor, James A. Swetz, Esq., identified in his May 26, 2020, report detailing the findings of

his audit conducted pursuant to the SA.  (*Id.* ¶ 13.)  In addition to the seventy-seven orders.

alleged "multiple instances" include instances "that do not appear to have been identified by

Auditor Swetz or included among the 77 Audit-Identified Orders (in some cases because

they occurred outside the time period covered by the audit."  (*Id.*)

The relevant notice of breach dated September 23, 2020, sets out the basis for the alleged breach.

> Through the audit recently performed by James A. Swetz, Esq. and through discovery obtained in connection with Bobrick's pending Enforcement Motion in this matter, Bobrick has learned that there have been numerous instances in which Scranton Products failed to send the mandatory Customer Letter along with its communication of the corresponding purchase order confirmation, instead sending the Customer Letter at some later time. This conduct constitutes a breach or breaches of paragraph 82 of the Settlement Agreement . . . .

(Notice of Breach at 1 (Doc. 548-1 at 6).)

The SA contains several provisions relevant to an independent audit.

> 84. Scranton Products will permit an audit, at Bobrick's request, but not more frequently than every six months, by an independent, mutually agreeable third-party auditor, to examine Scranton Products' records of transmission and confirm that Scranton Products has, in fact, sent the required Customer Letters.

> 85. The audit of the Customer Letters will be performed at Bobrick's expense, provided that if the auditor determines in any particular audit that Scranton Products has not complied with its obligations with respect to sending or keeping records of the Customer Letters, Scranton Products will pay the cost of that particular audit, in addition (if applicable) to any liquidated damages awarded in accordance with the other provisions of this Settlement Agreement.

> 86. For each audit of the Customer Letters, Bobrick will receive the summary results of the audit – that is, (a) the fact of whether or not Scranton Products is in compliance with its obligations concerning the Customer Letters, and, (b) if the auditor determines that Scranton Products is not in compliance, the number of instances of non-compliance (i) in the aggregate and (ii) for each purchaser (without identifying any purchaser or end user by name); provided, however, that Bobrick will not receive the names or other identifying information concerning Scranton Products' purchasers or end users; the pricing information

on any work order; or the content of any communication between Scranton Products and any of its purchasers.

(SA ¶¶ 84-86.)

The Court will first consider the appropriate scope of Bobrick's second amended motion as it relates to the Swetz audit findings and alleged other instances of breach. In a dispute concerning whether Mr. Swetz should be ordered to release information about his audit in addition to his Summary of Audit Findings issued on May 26, 2020, the Court concluded that he should not be so ordered. (Docs. 524, 525.) In the September 11, 2020, Memorandum Opinion, the Court informed the parties that "insofar as either party finds fault with Mr. Swetz's Report, the Court will not function in an appellate capacity." (Doc. 524 at 1.)

As set out above, seventy-seven instances of the alleged failure of Scranton Products to comply with SA paragraph 82's "along with" requirement relate to the Swetz audit. This number represents the instances where Mr. Swetz segregated the transaction for additional review to ascertain whether the Customer Letter was sent to the customer who purchased a non-NFPA 286-Compliant HDPE toilet partition. (Audit Report at 2.) Following review of the segregated material and consistent with his obligation under the SA, Mr. Swetz' report provided the summary findings required. Because Mr. Swetz concluded that Scranton Products had complied with its obligation to send the required Customer

Letter in each instance, [4] including those where the records were segregated for additional review, his audit did not need to contain other information set out in paragraph 86 of the SA. (*Id.* at 3.)

As the Court informed the parties previously, the Court will not function in an appellate capacity insofar as either party finds fault with Mr. Swetz's report.  (Doc. 524 at 7.) This determination is grounded in numerous considerations.  Review of the SA indicates that the independent, third-party auditor process set out in the SA is the method the parties agreed upon to determine if Scranton Products was sending the required Customer Letter. (SA ¶ 84-86.)  The SA did not provide for judicial review of audit results.  In retaining jurisdiction "for the limited purpose of enforcing the terms of this Settlement Agreement and adjudicating any disputes arising from it" (Doc. 444 ¶ 3), the Court did not contemplate such review and finds no reason to graft that role onto the parties' agreed-upon process.  Further, the parties' course of conduct since entering into the Settlement Agreement indicates that the parties' interest in "avoiding costly and protracted litigation" (SA ¶ 6) and the Court's

---

[4] Mr. Swetz stated in his Report that his role was "to confirm that Scranton has sent the required Customer Letter," noting that "[u]nder Paragraph 82 Scranton agreed to send the Customer Letter with its communication of the purchase order confirmation, in the same way it usually communicated that information not the purchaser."  (Audit Report at 2.)  Mr. Swetz' assessment of his role shows that he understood the contextual basis for his audit of the Customer Letter requirement.

interest in judicial economy and administrative efficiency counsel against expanding the Court's role regarding the independent audit.[5]

Applying this reasoning in the current context, Mr. Swetz found Scranton Products in compliance with the SA's Customer Letter obligations regarding purchase orders from March 13, 2018, through April 1, 2019 (Audit Report at 2-3), and, with its assertion that the Swetz audit revealed numerous instances where Scranton Products' conduct regarding the Customer Letter revealed a breach of the SA (*see, e.g.*, Notice of Breach at 1 (Doc. 548-1 at 6)), Bobrick essentially asserts that Mr. Swetz was wrong to find Scranton Products in compliance with the SA.  In other words, Bobrick finds fault with the Swetz report and asks the Court to find breaches where he did not.  This the Court will not do—the Court will not revisit Mr. Swetz' finding that Scranton Products did not violate paragraph 82 with respect to non-NFPA 286-compliant purchase orders from March 13, 2018, to April 1, 2019, because, to do so, would be to function in an appellate capacity.[6]

_____

[5] To the extent any previous action or statement of the Court can be construed to the contrary, the parties are hereby advised that the Court considers independent audit reports dispositive of the issues addressed and conclusions drawn therein.

[6] Because of the labyrinthine path traveled to this point, the Court, in this instance and for informational purposes only, notes that relevant evidence, including hearing testimony, supports Mr. Swetz' assessment.  Jennifer Emiliani, Scranton Products' Director of Sales since May 2020 who previously held the position of Senior Manager of Sales Operations beginning in August 2019 and before that held a position where she interacted with the IT team to implement the Customer Letter obligation in 2018 (Hr'g Tr. Day 5, 36:14-40:5), testified extensively about her investigation and analysis of the matters segregated by Mr. Swetz for further review.  Of approximately 16,000 orders reviewed, she explained that twenty-eight orders were not for toilet partitions and, therefore, a customer letter was not required (Hr'g Tr. Day 5, 48:1-3, 96:13-98:11); fourteen orders were "split orders" which means the order was part of a larger order where

As to "a large number of similar instances that do not appear to have been identified

by Auditor Swetz or included among the 77 Audit-Identified Orders (in some cases because

they occurred outside the time period covered by the audit)" (Doc. 548 ¶ 13), the Court

concludes that these alleged instances of breach derived from information gleaned from

Scranton's internal audit process during discovery related to the first motion are not properly

before the Court.  For the reasons discussed above and in the margin, the independent

audit provision of the SA is the prescribed method of determining whether Scranton

Products has sent the required Customer Letter.  For instances of alleged breach within the

time period covered by Swetz audit, Mr. Swetz determinations are dispositive—he reviewed

all relevant records, determined that seventy-seven required further review, and found

---

the customer letter was provided for the initial large order and, in some instances, was provided multiple
times (*id.,* 98:15-101:1); in five instances, revisions were made to orders that included the customer letter
with the revised order acknowledgements (*id.,* 101:9-102:5); in two instances where there were email
address issues, scenarios where the purchase order confirmation are always sent together when the email
issue is resolved (*id.,* 86:3-13;102:8-13); and, in twenty-eight instances, there was order entry error where
the fire rating was not initially selected when the order was entered (either by a customer or internally) and
the system would not know to trigger the Customer Letter (*id.,* 88:8-89:17, 104:16-107:28).  She further
testified that the order entry issue has been addressed by making the fire rating a required field and a
Customer Letter automatically being sent if it is blank, and, in all instances the customers had received the
Customer Letter before the defective order was placed (in conjunction with a different order) and all
received the cure letters sent on May 30 or 31, June 4, 2019 and again in December 2020.  (*Id.,* 89:8-17,
104:16-107:28).

Scranton Products in compliance with the SA Customer Letter requirements. As stated

previously, the Court will not function in an appellate capacity regarding a challenge to these

findings.

Further, the internal audits conducted by Scranton Products upon which Bobrick

relies to support its alleged additional instances of breach are not required by the SA and

information allegedly derived from them is speculative at best, Bobrick admitting that it

needs more information to show breaches in this respect.[7]  (See, e.g., Doc. 686 at 16, Doc.

697 at 16.)  For the alleged additional instances of breach, Bobrick seeks to shift the burden

of showing a breach by asserting that Scranton Products has the ability to rebut Bobrick's

allegations by providing unredacted internal audit documents.  This position does not reflect

the intention of the parties as set forth in the SA and the well-established principle that the

---

[7] Insofar as Bobrick's alleged additional instances of breach are based on information derived from or related to Scranton Products' internal audits, testimony about the purpose and methodology associated with the internal audit process undermines Bobrick's position that the audits are a proper source of finding a breach of the SA.  Jennifer Emiliani testified that she is in charge of the internal audit process which is performed daily by two team members who report to her.  (Hr'g Tr. Day 5, 37:11-17, 71:20-21.)  Daily reports have been generated since August 2019, and audit reports were originally monthly then weekly. (Hr'g Tr. Day 5,  72:17-73:2.)  Her testimony shows that nothing about an order flagged in an audit report means that a customer letter has not been sent along with a purchase order confirmation because the internal audit process flags instances where an order had been placed but no email has been sent, meaning that no order acknowledgement has been sent to the customer.  (Hr'g Tr. Day 5, 76:8-24, Day 6 19:9-20:16.)  In other words, the internal audit indicates that neither a purchase order confirmation nor a Customer Letter has been sent.  (Id.)  Ms. Emiliani described numerous circumstances where a flagged order would have no Customer Letter obligation attached to it and the variety of actions taken regarding the flagged orders.  (See, e.g., Hr'g Tr. Day 5, 77:8-78:20.)  In the case where no email was sent and the order required a customer letter (non-286 order), the audit-team member would "determine why the email didn't send, and then . . .  generate that email with the acknowledgment and letter to the customer."  (Id. 78:1-12.)

the burden of proof of noncompliance rests with the party who files the motion to enforce. It is also inconsistent with the SA's audit requirements in general and specifically the limitation of the audit information available to Bobrick set out above (SA ¶ 86) which indicates that the parties bargained for the independent audit to be the method of investigating Customer Letter compliance.

For alleged breaches outside the period audited by Mr. Swetz, Bobrick did not avail itself of the SA's audit process, and it cannot pursue the review intended to be conducted through an independent audit in its amended second enforcement motion. With this motion, Bobrick essentially seeks to undertake the review function of the auditor who was bargained to be an independent, mutually-agreeable third-party limited to sharing only summary results with Bobrick. *See supra* p. 25.

Bobrick's implication that the Court's September 11, 2020, Memorandum Opinion expressly allowed the claims brought in its amended second enforcement motion (Doc. 868 at 16 (citing Doc. 524 at 7-8)) is incorrect. The Court stated that "[i]f, through discovery, Bobrick finds *what it considers* a breach of the Settlement Agreement not previously identified, it is not precluded from raising that issue in an *appropriately filed* motion." (Doc. 524 at 7 (emphasis added).) To the extent the amended second motion is based on claimed error by the independent auditor (missing instances of noncompliance during the audit period), it is finding fault with Mr. Swetz's report and asking the Court to function in an

appellate capacity which is inappropriate for the reasons previously discussed in the text. To the extent the amended second motion claims Customer Letter breaches outside the audit period, an appropriately filed motion would follow an appropriately requested audit finding that Scranton Products was not in compliance with the SA's Customer Letter requirements.

To allow a party bringing an enforcement motion to circumvent SA provisions and raise claims of a speculative nature would result in an ever-widening claim of breach not tied to the professed intent of the SA or the methodology identified therein for monitoring certain SA requirements.  Thus, whereas here Bobrick claims it has learned of breaches of the SA through discovery related to its initial motion to enforce and has not followed relevant SA provisions before seeking Court intervention, the Court finds it inappropriate to allow litigation to proceed in this fashion.[8]

For the foregoing reasons, Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548) will be denied.

## C. Defendant Scranton Products Inc.'s Motion to Enforce Settlement

In Scranton Products, Inc.'s Motion to Enforce Settlement Agreement (Doc. 550), filed on March 4, 2021, Scranton Products alleges that Bobrick breached the SA by filing an enforcement motion before the cure period expired.  (*Id.* at 2.)   Scranton Products

---

[8] In any event, Bobrick has not satisfied its burden of showing specific "similar instances" of violations of paragraph 82 that occurred and/or were not cured.

specifically asserts that, pursuant to paragraphs 90 and 92 of the SA, Bobrick was

prohibited from filing an enforcement motion regarding the matters identified in Bobrick's

September 23, 2020, notice of breach until December 23, 2020, at the earliest and Bobrick

filed Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement

(Doc. 519) on November 6, 2020.  (Doc. 550 ¶¶ 31-33.)

Scranton Products' September 3, 2020, notice of breach was previously identified in

the context of In Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce

Settlement Agreement (Doc. 548), filed on February 1, 2021.  *See supra* p. 24 (citing Doc.

548-1 at 6).  The notice of breach claimed that, through the Swetz audit and discovery

obtained in the context of Bobrick's first motion to enforce the SA, Bobrick learned that there

were "numerous instances in which Scranton Products failed to send the mandatory

Customer Letter along with its communication of the purchase order confirmation."  (Doc.

548-1 at 6.)   As set out in the Background section above, paragraph 92 of the SA provides

that "[t]he Parties agree that three months is a presumptively reasonable amount of time for

curing a breach, but the Court may, in its discretion, determine that circumstances justify

extending the reasonable time period permitted for curing any specific breach."

The parties do not dispute that the presumptively reasonable cure period identified in

the SA is three months. They do not dispute that, calculated from Bobrick's September 23,

2020, notice of breach, the three-month period would run until December 23, 2020, and had

not expired when Bobrick filed Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement (Doc. 519) on November 6, 2020.

In Bobrick Washroom Equipment, Inc.'s Response and New Matter to Scranton Product, Inc.'s Motion to Enforce Settlement Agreement (Doc. 558), Bobrick advanced arguments as to why the November 6, 2020, filing of Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement (Doc. 519) did not constitute a breach of the SA. (Doc. 558 ¶¶ 52, 53.) The Court concludes that these arguments are without merit.

Bobrick first contends that Scranton Products had notice of the alleged breach related to the audit no later than May 26, 2020, when Mr. Swetz issued his Summary of Audit Findings. (*Id.* ¶ 52.) On this basis, Bobrick asserts that "Scranton Products was not entitled to wait three months to investigate and cure the breach" following the September 23, 2020 notice of breach. (*Id*.)

The Court rejects this argument for the fundamental reason that the SA provides that the notice of the breach is to be provided by the "*Party*" that believes "that the other Party has breached the Settlement Agreement." (SA ¶ 90 (emphasis added).) Only Bobrick was responsible for providing a notice of breach. Further, as discussed in the previous section of this Memorandum Opinion, Mr. Swetz's report did *not* identify instances of breach.

Bobrick also contends that it was justified in filing its November 6, 2020, enforcement motion because Scranton Products did not provide Bobrick with substantive information

about its proposed investigation and cure before it filed the second enforcement motion. (Doc. 558 ¶ 53.)  Bobrick identifies communication with Scranton Products following the notice of breach but asserts that Scranton Products deliberately acted in bad faith by avoiding the information Bobrick wanted concerning investigation and cure.  (*Id.*)

The Court rejects this argument because it is based on a presumed unilateral ability to ascertain the reasonable cure period in a given situation and contravenes the expressed intent of the parties for a three-month cure period to be "presumptively reasonable" (SA ¶ 92).  No provision of the SA gives a party claiming breach this authority.  The provisions of the SA addressing "Reasonable Opportunity to Cure," ¶¶ 90-94, set out the obligation of the party asserting the breach to provide "a reasonable opportunity to cure before seeking relief from the Court, which must be sought by filing an Enforcement Motion" (SA ¶ 90), reiterating that sequence with the directive that the party alleging breach may bring an enforcement motion "[f]ollowing the exhaustion of any reasonable cure period" (SA ¶ 91).  These provisions must be read in conjunction with the accompanying provision stating that the "[t]he Parties agree that three months is a presumptively reasonable amount of time for curing a breach, but the Court may, in its discretion, determine that particular circumstances justify extending the reasonable time period permitted for curing any specific breach" (SA ¶ 92).

Under the principles of contract construction previously discussed, *see supra* pp. 9-10, the Court interprets the plain meaning of paragraph 92 to allow the Court to extend but not to shorten the three-month period.  The plain meaning of paragraph 92 coupled with the absence of any allowance of a unilateral determination to shorten the cure period indicates that, absent agreement of the parties, the presumptively reasonable three-month period functions as the de facto minimum cure period and that minimum cure period applies to paragraphs 90 and 91 of the SA.

Further, if the Court were to find ambiguity in paragraph 92, parol evidence shows that Bobrick and Scranton Products clearly did not bargain for a party to be able to unilaterally conclude that a shorter cure period applied.  Scranton Products states that the parties discussed permitting the Court to shorten the three-month cure period in certain circumstances, but Scranton Products refused to agree to such a term.  (Doc. 550 ¶ 9; Doc. 687 at 14-15.)  Though Bobrick disagrees with Scranton Products' conclusion that the Court's authority to extend, but not shorten, the period indicates that the three-month period was intended to be the minimum cure period in every circumstance (Doc. 550 ¶ 8; Doc. 558 ¶ 8; Doc. 687 at 12-13; Doc. 691 at 8-12), Bobrick does not factually refute Scranton Products' assertions regarding consideration of the issue during settlement negotiations (Doc. 558 ¶ 9; Doc. 691 at 11-12).

Thus, viewed in the proper context, Bobrick's dissatisfaction with Scranton Products' communication during the cure period has no bearing on the bargained-for three-month duration, and Bobrick is incorrect that it was justified in proceeding with its November 6, 2020, enforcement motion.  Because the Court interprets the SA to provide a minimum three-month cure period following a party's notice of breach absent mutual agreement of the parties, Bobrick breached the SA by filing an enforcement motion before the three-month period elapsed.

On November 6, 2020, Scranton Products provided Bobrick with written notice of breach based on the filing of Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement (Doc. 519) on November 6, 2020.  (Doc. 550 ¶ 34.) Pursuant to the SA, the presumptive three-month cure period for Bobrick's breach would have expired on February 6, 2021.

In addressing the issue of cure, subsequent filings and Court action must be considered.  On November 12, 2020, Scranton Products filed Scranton Products, Inc.'s Motion to Dismiss or, in the Alternative, to Strike Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement (Doc. 531).  Scranton Products argued that the Court should dismiss Bobrick's motion because the dispute was unripe, or, in the alternative, the Court should strike the motion because it contained "redundant, immaterial, and impertinent matter" based on Bobrick's failure to allow Scranton Products a reasonable

opportunity to cure the alleged breach.  (Doc. 532 at 1-2.)  Also on November 12, 2020,

Scranton Products filed Scranton Products, Inc.'s Motion for Expedited Relief to Stay

Proceedings on Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement

Agreement Pending Resolution of Scranton Products, Inc.'s Motion to Dismiss or,

Alternatively, Exhaustion of Mandatory Cure Period (Doc. 533).

On November 17, 2020, the Court issued an Order enjoining the parties from any

further filing, pending order of Court, related to "Bobrick Washroom Equipment, Inc.'s

Second Motion to Enforce Settlement Agreement" (Doc. 529), "Scranton Products, Inc.'s

Motion to Dismiss or, in the Alternative, to Strike Bobrick Washroom Equipment, Inc.'s

Second Motion to Enforce Settlement Agreement" (Doc. 531), and "Scranton Products,

Inc.'s Motion for Expedited Relief to Stay Proceedings on Bobrick Washroom Equipment,

Inc.'s Second Motion to Enforce Settlement Agreement Pending Resolution of Scranton

Products, Inc.'s Motion to Dismiss or, Alternatively, Exhaustion of Mandatory Cure

Period" (Doc. 533).  (Doc. 538.)

On January 14, 2021, the Court issued the following Order:

> **AND NOW, THIS _____ DAY OF JANUARY 2021,** in an effort to
> determine the appropriate duration of the filing injunction imposed by the
> Court's November 17, 2020, Order (Doc. 538), and the most efficient resolution
> of the pending matters affected by the injunction, i.e., "Bobrick Washroom
> Equipment, Inc.'s Second Motion to Enforce Settlement Agreement" (Doc.
> 529), "Scranton Products, Inc.'s Motion to Dismiss or, in the Alternative, to
> Strike Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce
> Settlement Agreement" (Doc. 531), and "Scranton Products, Inc.'s Motion for

Expedited Relief to Stay Proceedings on Bobrick Washroom Equipment, Inc.'s Second Motion to Enforce Settlement Agreement Pending Resolution of Scranton Products, Inc.'s Motion to Dismiss or, Alternatively, Exhaustion of Mandatory Cure Period" (Doc. 533), **IT IS HEREBY ORDERED THAT:**

1. Because the three-month cure period provided for in the parties' Settlement Agreement expired on December 23, 2020, (*see* Doc. 532 at 9), Bobrick Washroom Equipment, Inc., ("Bobrick") shall inform the Court on or before January 20, 2021, whether it wishes to stand on its Second Motion to Enforce Settlement Agreement (Doc. 529) as filed on November 6, 2020, or file an amended enforcement motion;

2. Bobrick's response shall be filed on the docket and shall not exceed two pages;

3. Following receipt of Bobrick's election, the Court will issue an Order addressing the injunction imposed on November 17, 2020, which remains in effect and will set out an appropriate briefing schedule.

(Doc. 542 at 1-2.)  On January 20, 2021, Bobrick's counsel informed the Court that Bobrick wanted to file an amended enforcement motion (Doc. 545).

On February 1, 2021, the Court issued an Order lifting the previously imposed filing injunction (Doc. 538), deeming moot Scranton Products' "Motion to Dismiss or Strike Second Motion to Enforce Settlement Agreement" (Doc. 531) and "Motion for Expedited Relief to Stay Proceedings on Second Motion to Enforce Settlement Agreement" (Doc. 533) in light of Bobrick's request to file an amended second motion, setting a filing deadline for the motion, and directing the parties on the appropriate procedures to be followed going forward.  (Doc. 547 at 1-2.)

Thereafter, Bobrick timely filed Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548), the pending motion addressed in the previous section of this Memorandum Opinion.

The procedural history of this case from the filing of Bobrick's September 23, 2020, notice of breach (Doc. 548-1 at 6) to the filing of Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548) on February 1, 2021, demonstrates that the path traveled has not been one addressed in, or anticipated by, the SA. Bobrick's failure to adhere to the SA's "Reasonable Opportunity to Cure" provisions generated a procedural morass which the Court sought to ameliorate by charting a course to keep the litigation within reasonable bounds. By enjoining the parties by Order of November 17, 2020, from further filing in Bobrick's November 6, 2020, second enforcement motion and Scranton Products' November 12, 2020, motions (Doc. 538), the Court afforded Scranton Products the three-month cure period to which it was entitled, effectively providing the relief sought in Scranton's November 12, 2020, motions and mitigating the negative impact of Bobrick's premature second enforcement motion. Specifically, the Court's November 17, 2020, Order thwarted Bobrick's attempt to truncate the cure period following Bobrick's September 23, 2020, notice of breach and relieved Scranton Products of its obligation to respond to Bobrick's second enforcement motion during the period of the stay. Because the cure was essentially effected by the Court's intervention, the Court, in a sense,

41

obviated the need for Bobrick to withdraw its motion.  In these unique circumstances, though the Court finds that Bobrick breached the SA with the filing of its November 6, 2020, enforcement motion and its arguments to the contrary are meritless, the Court further concludes that the effective cure of the breach through Court intervention forecloses finding that Bobrick failed to cure such that it has committed a sanctionable breach pursuant to the SA.[9]

In sum, Bobrick precipitated the sequence of events outlined above, including  the Court's intervention (undertaken for the reasons previously stated and, in part, at Scranton Products' request) which took the November 6, 2020, breach outside the realm anticipated and bargained for in the SA such that the Court cannot conclude that the breach alleged by Scranton Products was not cured before the February 6, 2021, expiration of the cure period which began to run on November 6, 2023, when Scranton Products provided Bobrick with the notice of breach based on the premature filing.  Therefore, Scranton Products, Inc.'s Motion to Enforce Settlement Agreement (Doc. 550) will be denied.

---

[9] Bobrick's post-breach actions of opting to file an amended second enforcement motion (thereby effectively withdrawing the November 6, 2020, second enforcement motion (Doc. 529)) and filing Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548) on February 1, 2023, were undertaken pursuant to, and consistent with, the Court's January 14, 2021, Order (Doc. 542).  Therefore, as of February 1, 2021, with the filing of Bobrick's amended second enforcement motion, any impact going forward of the improperly filed November 6, 2020, second enforcement motion was eliminated.

## IV. CONCLUSION

For the foregoing reasons, Bobrick Washroom Equipment, Inc.'s Motion to Enforce Settlement Agreement (Doc. 452) will be denied, Bobrick Washroom Equipment, Inc.'s Amended Second Motion to Enforce Settlement Agreement (Doc. 548) will be denied, and Defendant Scranton Products Inc.'s Motion to Enforce Settlement Agreement (Doc. 550) will be denied.  A separate Order will be entered.

The Court expresses disapproval with the manner in which the Settlement Agreement has been subverted and has been used as an attempt to expand the scope and duration of litigation.  In addition, the litigation emanating from the Settlement Agreement can be characterized in large part as an exercise in favoring litigation over conciliation and doing so in the most pedantic of ways.[10]

Robert D. Mariani
United States District Judge

---

[10] The Court further notes that the parties have presented numerous arguments in their initial and post-hearing submissions which are not specifically addressed in this Memorandum Opinion because the Court, having considered them, has found them to be without merit.