# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Bobrick Washroom Equipment, Inc.,

    *Plaintiff*

      **v.**

Scranton Products, Inc.,

    *Defendant*

No. 3:14-CV-853-RDM
Hon. Robert D. Mariani

## BOBRICK WASHROOM EQUIPMENT, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ITS THIRD <u>MOTION TO ENFORCE THE SETTLEMENT AGREEMENT</u>

# <u>TABLE OF CONTENTS</u>

**Page**

I.    Bobrick serves a Notice of Breach on Scranton Products; Scranton Products denies that it has violated the Settlement Agreement. ......................1

II.   Scranton Products updates the URL link in the Customer Letter, including in January 2022 and July 2024, to show that all 50 states had, as of the January 2022 update, adopted editions of the IBC that require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard.........................................................................................3

III.  Bobrick files its Third Enforcement Motion, and this Court rules that it has jurisdiction over Bobrick's claim that Scranton Products' marketing and advertising materials violate the Settlement Agreement.........6

IV.   Paragraph 89 of the Settlement Agreement prohibits marketing and advertising that contradicts the substance of the information in the Customer Letter; it must be read in the context of ¶ 5, which this Court previously ruled is a substantive provision of the Settlement Agreement..............................................................................................9

      A.    Paragraphs 89 and 5 of the Settlement Agreement ..............................9

      B.    The language of the Customer Letter..................................................14

V.    As of January 2022, all 50 states have adopted an edition of the IBC that requires HDPE bathroom partitions to pass the NFPA 286 test; after almost two years of litigation, Scranton Products has identified only two local jurisdictional exceptions that may allow HDPE toilet partitions in some unidentified buildings to be tested in accordance with the ASTM E84 standard. .......................................................................16

      A.    The 2009 International Building Code................................................17

      B.    The 2012 International Building Code................................................19

      C.    The 2015 International Building Code................................................20

D.    The 2009, 2012, and 2015 editions of the International Building Code require HDPE products used as an interior finish, including toilet partitions, to be tested in accordance with the NFPA 286 standard. ..............................................................21

E.    After almost two years of litigation, Scranton Products has identified only two local jurisdictions that do not require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard...............................................................................24

VI.  Scranton Products continues to use the terms "ASTM E84" and "Class B" as fire ratings to market and advertise its HDPE toilet partitions............27

A.    Scranton Products' website: ................................................27

B.    Scranton Products' proprietary specification: ....................29

VII.  Scranton Products' marketing and advertising violates ¶ 89 of the Settlement Agreement, as read in conjunction with ¶ 5, because it contradicts the substance of the information in the Customer Letter............31

A.    Scranton Products' marketing and advertising contradicts the substance of the information in the Customer Letter because (i) the Customer Letter recognizes only two categories of toilet partitions: NFPA 286-compliant and non-NFPA 286-compliant, not "Class B" and "ASTM E84-compliant," and (ii) the updated version of the Customer Letter that Scranton Products agreed to send shows that all 50 states require NFPA 286 compliance. ............31

B.    Paragraph 81 is irrelevant to whether Scranton Products violated ¶ 89 of the Settlement Agreement because it only concerns the "sale" of toilet partitions (in the context of when to send the Customer Letter), not the "marketing and advertising" of HDPE toilet partitions. ....................................................38

C.    Bobrick's President Matthew Louchheim testified that Scranton Products' marketing and advertising contradicts the substance of the information in the current version of the Customer Letter. .......40

D.     Scranton Products' expert Dale Wheeler is not a credible witness because he did not review relevant Scranton Products documents and lacks expertise concerning HDPE toilet partitions and the ASTM E84 and NFPA 286 fire tests.....................43

VIII.   Scranton Products' marketing and advertising that contradicts the substance of the information in the Customer Letter creates confusion in the marketplace and, as but one example, has resulted in dangerous, non-compliant HDPE toilet partitions being ordered for the Harrisburg Federal Courthouse, requiring injunctive relief...............................................45

IX.    Scranton Products failed to adequately cure the breach raised in Bobrick's Third Enforcement Motion. ...........................................................54

A.     Scranton Products' removal of the phrase "fire rated" from its website was not a good faith attempt to cure. .....................................54

B.     Any cure efforts undertaken by Scranton Products after Bobrick filed its Third Enforcement Motion are irrelevant to whether Scranton Products reasonably cured. ...................................................64

X.     Bobrick's remedies for breach of the Settlement Agreement include liquidated damages, injunctive relief, and attorneys' fees and costs. ...........65

A.     Liquidated damages and related injunctive relief: ...............................66

B.     Attorneys' fees and costs: ...................................................................73

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Prod. Corp. v. F.T.C.*,
  695 F.2d 681 (3d Cir. 1982) ..................................................................37

*Bobrick Washroom Equip., Inc. v. Scranton Products, Inc.*,
  2023 WL 5054671 (M.D. Pa. Aug. 8, 2023) ..........................................9, 13, 14

*Clark Motor Co. v. Manufacturers & Traders Tr. Co.*,
  360 F. App'x 340 (3d Cir. 2010) ..........................................................6, 35

*Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*,
  539 F.3d 199 (3d Cir. 2008) ..................................................................21

*F.T.C. v. Bronson Partners, LLC*,
  564 F. Supp. 2d 119 (D. Conn. 2008)......................................................37

*Fareed v. Cent. Rivers Power MA, LLC*,
  No. 20-CV-11053, 2021 WL 3634158 (D. Mass. Aug. 17, 2021) ....................50

*Hayes v. Harvey*,
  903 F.3d 32 (3d Cir. 2018) ..................................................................21

*Hollinger v. Home State Mut. Ins. Co.*,
  654 F.3d 564 (5th Cir. 2011) ................................................................25

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir.
  2005) ................................................................................................73

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ................................................................52, 69

*Mountain Prods., Inc. v. Piccola*,
  No. 22-CV-01588, 2022 WL 17242872 (M.D. Pa. Nov. 23, 2022) ..................69

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck
  Consumer Pharms. Co.*,
  290 F.3d 578 (3d Cir. 2002) ................................................................69

iv

*Polansky v. Exec. Health Res., Inc.*,
No. 12-CV-4239, 2018 WL 1964195 (E.D. Pa. Apr. 26, 2018) .......................58

*Schmutte v. Resort Condominiums Int'l, L.L.C.*,
No. 05-CV-311, 2006 WL 3462656 (S.D. Ind. Nov. 29, 2006) .................50, 51

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) ...............................................................54

*United States v. Berks Cnty., Pa.*,
250 F. Supp. 2d 525 (E.D. Pa. 2003) ..................................................73

*United States v. Esquivel*,
88 F.3d 722 (9th Cir. 1996) ...............................................................25

*Wayne Land & Min. Grp., LLC v. Delaware River Basin Comm'n*,
No. 16-CV-00897, 2020 WL 762835 (M.D. Pa. Feb. 14, 2020) ......................58

## Rules

Fed. R. Civ. P. 8(a)(1) .............................................................................8

Fed. R. Civ. P. 53. ..........................................................................66, 72

Fed. R. Evid. 201 ............................................................................25, 27

Fed. R. Evid. 703 ...............................................................................54

## Other Authorities

Arkansas Fire Code 803 ...........................................................................24

International Building Code..........................................................................*passim*

Ohio Admin. Code 4101:1 ........................................................................24

Tex. Loc. Gov't Code § 214.216 (Effective: January 1, 2022) .................................1

Pursuant to ¶ 124 of the Settlement Agreement, Bobrick submits the following proposed findings of fact and conclusions of law. The evidence relied upon and cited herein from "the record in the Action" and "the record in the Enforcement Motion" is provided consistent with the broad parameters of the Settlement Agreement:

> Proposed findings of fact must be supported by appropriate citations to the record in the Action or the record on the Enforcement Motion (including but not limited to the Enforcement Motion, Response to Enforcement Motion, New Matter, Reply to New Matter, the record of the Enforcement Motion Hearing, and any stipulations entered into by the Parties). Proposed conclusions of law must be supported by appropriate citations to legal authority.

Dkt. 435, ¶ 124.

## I.   Bobrick serves a Notice of Breach on Scranton Products; Scranton Products denies that it has violated the Settlement Agreement.

1.   On April 20, 2022, Bobrick served a Notice of Breach on Scranton Products explaining that it was in breach of the Settlement Agreement. Exhibit 1. The Notice of Breach explained, among other things, that (i) "as of January 1, 2022, Texas became the fiftieth state to adopt a version of the International Building Code that requires HDPE bathroom partitions to pass the NFPA 286 test" (*id.* at 2)[1] (ii) while some states allowed local variations to the state-adopted Code,

---

[1] Tex. Loc. Gov't Code § 214.216 (Effective: January 1, 2022) ("To protect the public health, safety, and welfare, the International Building Code, as it existed on May 1, 2012, is adopted as a municipal commercial building code in this state.").

Bobrick was unaware of any jurisdictions—even at the local level—with complete exemptions from the NFPA 286 testing requirement (*id*. at 3-4, 33), (iii) Scranton Products was in breach of the Settlement Agreement, including ¶ 89, by marketing and advertising its HDPE toilet partitions as "fire rated" under the obsolete ASTM E84 standard (*i.e.*, "Class A" and "Class B"), in contradiction of the Customer Letter (*id*. at 15-16, 24, 27-28), and (iv) as evidence of Scranton Products' breach conduct, non-compliant "Class B" HDPE partitions had been improperly "specified and bid . . . for installation in a new federal courthouse project [the Sylvia H. Rambo U.S. Courthouse] in Harrisburg, Pennsylvania." (*id*. at 25).

2.     Bobrick's Notice of Breach provided "examples" of webpages and other customer communications that breached the Settlement Agreement: "Scranton Products makes these false statements *throughout* its available marketing materials and communications. Bobrick has identified *at least the following examples*, but *reasonably believes there are additional instances of Scranton Products perpetuating these false statements* in the marketplace . . ." *Id*. at 14 (emphasis added).

3.     Bobrick's Notice of Breach requested that Scranton Products (i) remove from its website and other customer communications all marketing and advertising referring to HDPE toilet partitions as "ASTM E84" tested and "Class A" and "Class B" fire rated and (ii) provide training to its employees instructing

them to cease using the terms "ASMT E84", "Class A," and "Class B" to indicate fire ratings for its HDPE toilet partitions. *Id*. at 35-36.

4.      Scranton Products responded on July 19, 2022 in a letter: (i) claiming that "as many as fourteen [state] jurisdictions . . . permit but do not require the use of NFPA 286 testing for the products at issue"[2] (Ex. 44 at 5) and (ii) refusing to correct its marketing and advertising to remove the terms "ASTM E84," "Class A," and "Class B" from its marketing and advertising materials and other customer communications concerning HDPE toilet partitions (*id*.).

## II.    Scranton Products updates the URL link in the Customer Letter, including in January 2022 and July 2024, to show that all 50 states had, as of the January 2022 update, adopted editions of the IBC that require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard.

5.      The Customer Letter in Exhibit D to the Settlement Agreement included an active URL link to the "ICC's [International Code Counsel's] *current* summary of jurisdictions" and the various editions of the International Building Codes ("IBC") they had adopted. Dkt. 435 (emphasis added).

---

[2] Scranton Products' 2022 representation that 14 state jurisdictions do not require NFPA 286 testing of HDPE toilet partitions was inaccurate even when the Settlement Agreement was executed in 2017, as the language of the Customer Letter itself shows: "As of July 2017, according to a chart published by the ICC, *at least 43 states and the District of Columbia have adopted a version of the IBC that requires HDPE bathroom partitions to pass the NFPA 286 room corner test*." Dkt. 435, Ex. D (emphasis added).

6.      Shortly after the Settlement Agreement was approved by the Court in March 2018, the ICC updated its website to reflect the current status of IBC adoption across the country, rendering the old link in Exhibit D outdated and dead. As of that change, the outdated link no longer represented the "ICC's current summary of jurisdictions," as the Customer Letter stated and required to be cited.[3]

7.      Accordingly, in April 2019, Scranton Products agreed, at the request of Bobrick and pursuant to ¶ 88 of the Settlement Agreement,[4] to update the URL link in the Customer Letter to the current, active link, as the Settlement Agreement allows the parties to do. *See* Exhibit 70 at 1 n.1; Dkt. 435 at ¶ 88.

8.      In January 2022, Scranton Products agreed for a second time to update the URL link in the Customer Letter, again at the request of Bobrick pursuant to ¶ 88. Exhibit 73. The updated link showed, as explained *infra*, that all 50 states had

---

[3] In the parties' joint motion to approve the settlement agreement, Scranton Products conceded: "The requirements of NFPA 286, and which jurisdictions have adopted it as applying to HDPE bathroom partitions, are matters determined by independent third parties, and that change from time to time." Dkt. 411 at ¶ 33.

[4] Paragraph 88 of the Settlement Agreement provides: "Scranton Products may, at its discretion, modify the Customer Letter from time to time, but only (a) with the prior written agreement of Bobrick, which agreement will not unreasonably be withheld if the changes are non-substantive, or if the changes are substantive but reflect a change in the law or an alteration in the requirements of NFPA 286, or (b) by approval of the Court upon Scranton Products' motion after Bobrick has had notice sufficient to provide it with an opportunity to request to be heard by the Court." Dkt. 435.

by then adopted an edition of the IBC that requires HDPE toilet partitions to be tested in accordance with the NFPA 286 standard.[5]

9.      Finally, in July 2024, Scranton Products agreed for a third time, pursuant to ¶ 88, to update the URL link in the Customer Letter. This current link, like the January 2022 link, also shows that all 50 states have adopted an edition of the IBC that requires HDPE toilet partitions to be tested in accordance with the NFPA 286 standard. *See* Exhibit 74 at 1.[6]

10.     Without these updates to the URL link, the Customer Letter would have provided internally contradictory information because it would have referred to the "ICC's *current* summary of jurisdictions" (emphasis added), while citing a link that either (i) contained outdated information, *i.e.*, not a "current" summary, or (ii) no longer led to an active webpage.[7]

_____

[5] For those states that have an "X" in the IBC column, you must click on the state name, which links to a separate webpage that, under the "View Digital Codes" hyperlink, confirms that the state has adopted an edition of the IBC that would require NFPA 286 compliance.

[6] Like the 2022 link, for those states that have an "X" in the IBC column, you must click on the state name, which links to a separate webpage that, under the "View Digital Codes" hyperlink, confirms that the state has adopted an edition of the IBC that would require NFPA 286 compliance

[7] For example, if one clicks on the URL link in Customer Letter in Exhibit D to the Settlement Agreement (Dkt. 435), it leads to a webpage that reads: "Sorry, the page you requested cannot be found." Such a "dead link" does not comport with ¶¶ 89 and 5 of the Settlement Agreement.

11.     In short, the Settlement Agreement requires Scranton Products to update the URL link to ensure that the Customer Letter continues to cite the "ICC's *current* summary of jurisdictions" when it changes, as demonstrated by Scranton Products' course of performance in updating that link three times.[8] *Clark Motor Co. v. Manufacturers & Traders Tr. Co.*, 360 F. App'x 340, 344 (3d Cir. 2010) ("The Pennsylvania Supreme Court has stated that course of performance can be 'perhaps the strongest indication of what the writing means.'" (quoting *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 741 (1978)).

## III.     Bobrick files its Third Enforcement Motion, and this Court rules that it has jurisdiction over Bobrick's claim that Scranton Products' marketing and advertising materials violate the Settlement Agreement.

12.     On August 4, 2022, Bobrick filed its Third Motion to Enforce the Settlement Agreement (Third Enforcement Motion). Dkt. 704.

13.     The Third Enforcement Motion raised three grounds for breach of the Settlement Agreement: (i) Scranton Products' failure to update the Customer Letter to reflect further adoption of the NFPA 286 testing standard (as reflected in the URL link) (*id.* at ¶¶ 7-45), (ii) Scranton Products' continued promotion (*i.e.*, sale) of non-NFPA 286 HDPE toilet partitions (*id.* at ¶¶ 46-58), and (iii) Scranton

---

[8] Any other inconsistencies within the Customer Letter, in light of the updated current URL link, could be addressed by the Special Master in the context of the injunctive phase of the breach action, as discussed *infra*.

Products' false and misleading marketing and advertising of non-NFPA 286 HDPE toilet partitions (*id*. at ¶¶ 59-73).

14.     On August 8, 2023, this Court issued a Memorandum and Order denying for lack of jurisdiction the first two breach claims raised in Bobrick's Third Enforcement Motion.[9] Dkt. 732, 733. However, the Court ruled, as to the third breach claim at issue here: "The motion will go forward as to Bobrick's alleged breach based on Scranton Products' statements concerning fire ratings of bathroom partitions in its marketing materials." Dkt. 732 at 11-12; Dkt. 733 at ¶ 2. The Court later explained, in an Order denying Scranton Products' motion for clarification, that Bobrick must prove in the first instance a conflict with the Customer Letter. Dkt. 800 at 5 n.2 ("Enforcement of this provision does not entail consideration of evidence of the fire rating of Scranton Products' partitions contained in documents or communications a party may characterize as false or misleading *but is not in conflict* with the substance of the information in the Customer Letter." (emphasis added)).

---

[9] On Bobrick's claim that the Customer Letter should be changed to reflect the current state of NFPA 286 adoption, the Court concluded that the Court did not have jurisdiction to *compel* Scranton Products to change the Customer Letter; rather, ¶ 88 allowed Scranton Products to voluntarily change the Customer Letter with Bobrick's consent. Dkt. 732 at 3-9 ("Based on the foregoing, the Court finds no authority in the Settlement Agreement to compel Scranton Products to do anything other than that required by paragraph 88 when it comes to modifying the Settlement Agreement.").

15.     Consistent with federal notice-pleading rules,[10] Bobrick's third and remaining claim cited four webpages as "examples" of Scranton Products' marketing and advertising and other customer communications in violation of the Settlement Agreement. Dkt. 704 at ¶ 60 ("Examples of Scranton Products' making such statements are attached . . ."); *id.* at ¶ 72 ("These examples, of which there are undoubtedly many more, illustrate why Scranton Products cannot pass the burden of fire and safety compliance to its customers when Scranton Products is unaware of any jurisdiction where non-NFPA 286-compliant HDPE toilet partitions can be legally installed and it is Scranton Products' own false and misleading marketing materials and communications that lead customers to falsely believe that there are such jurisdictions."); *see also* Tr. of Evid. Hearing Day 1 at 63:12-65:3 (this Court's ruling that Bobrick's Third Enforcement Motion raised "categories" of marketing and advertising materials that violate the Settlement Agreement and declining to read the Third Enforcement Motion so narrowly as to exclude documents not specifically attached to the Third Enforcement Motion but nevertheless still falling within those exemplary categories).

--------

[10] Fed. R. Civ. P. 8(a)(1) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."); Dkt. 435 at ¶ 108 ("Enforcement Motions . . . are subject to and governed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Middle District of Pennsylvania, except as otherwise provided in this Settlement Agreement, by separate agreement of the parties (with any necessary Court approval), or by order of the Court.")

**IV.    Paragraph 89 of the Settlement Agreement prohibits marketing and advertising that contradicts the substance of the information in the Customer Letter; it must be read in the context of ¶ 5, which this Court previously ruled is a substantive provision of the Settlement Agreement.**

    **A.    Paragraphs 89 and 5 of the Settlement Agreement**

16.    Paragraph 89 of the Settlement Agreement states:

Scranton Products will not include in its marketing materials, advertisements, bulletins, terms and conditions, sales acknowledgements, shipping confirmations, website, or any other document or communication related to the sale of non-NFPA 286 compliant HDPE toilet partitions anything contradicting the substance of the information in the Customer Letter.

17.    While Scranton Products would have this Court define the term "contradicting" in ¶ 89 to mean "wholly incompatible with" or, as Scranton Products' counsel put it at the evidentiary hearing, "to imply the opposite of,"[11] the Oxford English Dictionary defines "contradictory" as "mutually opposed or *inconsistent*." https://www.oed.com/search/dictionary/?scope=Entries&q=contradictory (emphasis added); *see also Bobrick Washroom Equip., Inc. v. Scranton Products, Inc.*, 2023 WL 5054671, at *5-6 (M.D. Pa. Aug. 8, 2023) (Mariani, J.) (citing Oxford English Dictionary and citing Pennsylvania case law for the proposition that "a court may inform its understanding of contractual terms by considering their dictionary definitions" (cleaned up)).

---

[11] Tr. of Evid. Hearing Day 2 at 48:12-13.

18.    At the evidentiary hearing, Bobrick's Vice President of External Affairs, Alan Gettelman, testified about ¶ 89 and how it interacts with other provisions of the Settlement Agreement.

19.    Mr. Gettelman was personally involved in negotiations of the Settlement Agreement with Scranton Products. Tr. of Evid. Hearing Day 1 at 114.

20.    He testified that ¶ 89 was designed to address Scranton Products' *marketing* of HDPE toilet partitions, while "paragraph 81 had to do with the *sale* of [toilet partitions]." Tr. of Evid. Hearing Day 1 at 115-16 (emphasis added). Scranton Products did not call any witnesses to rebut Mr. Gettelman's testimony.

21.    The plain language of those paragraphs supports Mr. Gettelman's undisputed testimony. Paragraph 81 states, "for each and every *sale* of non-NFPA 286-compliant HDPE toilet partitions . . . ." (emphasis added) By contrast, ¶ 89 states: "Scranton Products will not include in its *marketing materials, advertisements, bulletins* . . . ." (emphasis added).

22.    Paragraph 81 of the Settlement Agreement thus only addresses that Scranton Products must send a Customer Letter with "each and every *sale* of non-NFPA 286-compliant HDPE toilet partitions" to "the entity that submits the purchase order to Scranton Products," defined as the "purchaser" in the Settlement Agreement. (emphasis added)

23.     As Mr. Gettelman further testified, based on his decades of experience in the bathroom accessory industry since joining Bobrick in October 1962, the "purchaser" of toilet partitions, as defined in ¶ 81, would typically be a distributor or dealer. Tr. of Evid. Hearing Day 1 at 116; *see also id*. at 98:15-99:1 (Mr. Koffel testimony); *id*. at 116:5-117:10 (Mr. Gettleman testimony); *id*. at 123:4-15 (same); *id*. at 124:17-125:4 (same). Scranton Products agreed with that description. *Id*. at 181:22-182-6 (Mr. Borgia testimony).

24.     By contrast, a "purchaser," Mr. Gettelman testified, would typically not be the architect, contractor, or other persons responsible for ensuring code compliance. Tr. of Evid. Hearing Day 1 at 116:18-120:1 (Mr. Gettelman testimony). Scranton Products presented no evidence to the contrary at the hearing.

25.     Because the Customer Letter, under the Settlement Agreement, need only be sent to the "purchaser," whereas Scranton Products' marketing and advertising on its website, bulletins, and proprietary specification would naturally reach a much larger audience, including architects and officials (like the GSA) responsible for code compliance and project decision making, Mr. Gettelman testified that ¶ 89 was designed to ensure that Scranton Products' statements in its marketing and advertising did not circumvent the information in the Customer Letter that Bobrick had carefully bargained for:

> Mr. Gettelman: So, yes, we were concerned, and we were concerned that this information was broadcast beyond the customer letter and

> beyond the distributor, who was getting the customer letter, we wanted
> to make sure all the decision-makers were seeing information that was
> emphasizing the proper code compliance for HDPE toilet partitions.

Tr. of Evid. Hearing Day 1 at 120:16-21.

> Bobrick's Counsel: Paragraph 81 says it goes to the purchaser, okay, it
> doesn't go to the architect. So, again, why is Paragraph 89 in there?

> Mr. Gettelman: Well, because [¶] 81 limits the communication to the
> distributor, the customer letter going to the distributor. We wanted to
> make sure, because we didn't get any further distribution of the
> customer letter in [¶] 81, we wanted to make sure that [¶] 89 was in
> there, because we wanted it, as I've stated earlier in my testimony, we
> wanted the contractor, the subcontractor, the architect and building
> owner to see all the other marketing materials, and we wanted the other
> marketing materials to be consistent with the customer letter not to
> undermine or weaken the customer letter.

Tr. of Evid. Hearing Day 1 at 124:17-125:4. Scranton Products called no

witnesses to challenge Mr. Gettelman's testimony.

> 26.     Moreover, in ¶ 5 of the Settlement Agreement the parties agreed that:

> Bobrick and Scranton Products have a shared interest in protecting
> public safety, encouraging compliance with fire, life safety, and
> building codes, educating market participants such as architects,
> specification writers, and contractors about relevant code requirements,
> and promoting fair and vigorous competition – *including truthful
> advertising* – in the market for toilet partitions.

(emphasis added); *see also* Dkt. 411 at ¶ 7 (Joint Motion to Approve Settlement

Agreement) ("All of these goals [in ¶ 5 of the Settlement Agreement] are in the

public interest and, the Parties submit, will be advanced by the Settlement

Agreement and the Court's retention of jurisdiction as outlined therein.").

27.     This Court previously rejected Scranton Products' argument that ¶ 5 of the Settlement Agreement is merely a non-substantive "whereas clause":

> Bobrick's counsel: The only issue, Your Honor, is, I believe in [Scranton Products'] pre-hearing memo, they said that this paragraph was insignificant, that it was a whereas clause. And really has no operational –
>
> The Court: I did see that, and it's, clearly, not a whereas clause, it's clearly not. Do you seriously say this is a whereas clause?
>
> Scranton Products' counsel: We do.
>
> The Court: Well, I'm telling you right now, I do not interpret the agreement that way. It is not a whereas clause. So if that's what this is about, let's move on.

Tr. of November 30, 2021 Evid. Hearing at 195:12-22.

28.     While Bobrick is not positing that ¶ 5 overrides ¶ 89, both paragraphs should be read together in harmony under well-settled principles of contract construction. *See Bobrick Washroom Equip., Inc. v. Scranton Prod., Inc.*, 2023 WL 5054671, at *5 (M.D. Pa. Aug. 8, 2023) (Mariani, J.) ("In interpreting a contract, the provisions must be construed as a whole and harmonized, if possible, so that all of the terms are given effect.") & ("A contract should not be interpreted in a manner that renders provisions meaningless, superfluous, unreasonable, contradictory, or would lead to absurd results.").

29.     To the extent Scranton Products takes the position that this Court has already ruled on ¶ 5's irrelevance to Bobrick's Third Enforcement Action, this Court has ruled only that ¶ 89 would override ¶ 5 if they are *in conflict with* one

13

another and that ¶ 5 does not provide separate grounds for a breach of the

Settlement Agreement. Dkt. 800 at 5 n.2 (Order Denying SP's Motion for

Clarification).

30.   To be clear, Bobrick's Third Enforcement Motion does not allege a

separate breach of ¶ 5 of the Settlement Agreement. Rather, ¶ 5 simply informs the

purpose behind ¶ 89 (*e.g.*, "truthful advertising"), and, consistent with prior

decisions in this case, the two provisions should be read in harmony, where

possible. *Bobrick*, 2023 WL 5054671, at *5.

**B.   The language of the Customer Letter**

31.   The Customer Letter says:

> Thank you for your order with Scranton Products. We appreciate your business and want to make sure you are completely satisfied with your purchase. You have placed an order for one of our products that is not NFPA 286 compliant. NFPA 286 is a fire test that is intended to help evaluate the flammability characteristics of a wall and ceiling interior finish where such materials constitute the exposed interior surfaces of buildings.
>
> The International Code Council ("ICC") publishes a list of states and territories that have adopted a version of the International Building Code ("IBC") that required HDPE bathroom partitions to pass the NFPA 286 test. As of July 2017, according to a chart published by the ICC, at least 43 states and the District of Columbia have adopted a version of the IBC that requires HDPE bathroom partitions to pass the NFPA 286 room corner test, and at least 5 states have adopted versions of the IBC that generally require HDPE bathroom partitions to pass the NFPA 286 room corner test with limitations allowing for local variations. The ICC's current summary of jurisdictions and their adoptions of these regulations can be found at:

14

https://www.iccsafe.org/wp-content/uploads/Master-I-Code-Adoption
-Chart-Jan-2022.pdf (iccsafe.org)[12]

This letter is not intended to provide you with legal advice about your obligations or about building code requirements. You or the architect or designer on your project should consult the local state and building codes in effect in the area where the partitions are intended to be installed to see if the applicable building code requires HDPE bathroom partitions to be NFPA 286 compliant in the area of installation.

If you have placed an order for non-NFPA 286 compliant bathroom partitions in a jurisdiction that requires HDPE bathroom partitions to be NFPA 286 compliant, and you would like to cancel this order for non-NFPA 286 compliant partitions, you may do so within fourteen (14) days of the date of this letter. If you choose to cancel your order, you may apply the amount already paid toward a purchase of our NFPA 286 compliant partitions, or we will refund the amount you have paid for this order.

32.     This language is identical to the language in Exhibit D to the Settlement Agreement, with one exception: the "current summary" URL link quoted herein reflects the updated link Scranton Products agreed to and had begun using in the Customer Letter as of January 2022. As such, it was the link Scranton Products was using when Bobrick served its Notice of Breach and filed its Third Enforcement Action.

---

[12] Exhibit 73 shows that Scranton Products agreed to update the URL link, as quoted herein. In July 2024, Scranton Products again agreed to update the link to the current one: https://www.iccsafe.org/wp-content/uploads/Master-I-Code-Adoption-Chart-1.pdf. *See* Exhibit 74.

**V.**    **As of January 2022, all 50 states have adopted an edition of the IBC that requires HDPE bathroom partitions to pass the NFPA 286 test; after almost two years of litigation, Scranton Products has identified only two local jurisdictional exceptions that may allow HDPE toilet partitions in some unidentified buildings to be tested in accordance with the ASTM E84 standard.**

33.    The prevalence of the NFPA 286-testing requirement for HDPE toilet partitions is highly relevant to Bobrick's Third Enforcement Motion because: (i) in January 2022, Scranton Products agreed, pursuant to ¶ 88 of the Settlement Agreement, to amend the Customer Letter to substitute the original URL link with the then-current ICC adoption chart showing that all 50 states had adopted the NFPA 286 test for HDPE used as an interior finish, including toilet partitions, and (ii) ¶ 89 of the Settlement Agreement must be read in the context of ¶ 5, which expresses Scranton Products' commitment to "truthful advertising" and its shared interested in "protecting public safety" and "encouraging compliance with fire, life safety, and building codes."

34.    William Koffel was hired as an expert by Bobrick, in part, to determine whether there are any jurisdictions in the United States that do *not* require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard. He determined that, with Texas's adoption of the 2012 edition of the IBC in January 2022, all 50 states have adopted editions of the IBC that require HDPE used as an interior finish, which includes toilet partitions, to be tested in

16

accordance with the NFPA 286 standard.[13] Exhibit 48 at 14, 17, 30-32 (Mr. Koffel's expert report); Tr. of Evid. Hearing Day 1 at 109:5-110:15.

35.     Scranton Products' expert Dale Wheeler issued a rebuttal expert report in which he purported to identify jurisdictions that do not require HDPE partitions to be tested in accordance with the NFPA 286 standard.

36.     In that rebuttal report, Mr. Wheeler concluded that jurisdictions that have adopted the 2009, 2012, or 2015 editions of the IBC do not require HDPE toilet partitions to comply with the NFPA 286 standard. Exhibit 66 at 13-16, 19-21.

37.     Mr. Wheeler's opinion about the 2009, 2012, and 2015 editions of the IBC is wrong, as the plain text of those editions reveals below.

**A.     The 2009 International Building Code**

38.     A copy of relevant portions of the 2009 edition of the IBC with commentary is attached hereto as Exhibit 69.[14]

39.     Chapter 8 of the 2009 IBC governs interior finishes, including toilet partitions.

---

[13] Scranton Products may argue that Mr. Koffel previously testified there were a few jurisdictions that did not require HDPE toilet partitions to be tested in accordance with NFPA 286. However, that testimony was given in 2021—well before additional jurisdictions such as Texas (in 2022) adopted editions of the IBC that now require NFPA 286 testing.

[14] The 2009 edition of the IBC is available here: https://codes.iccsafe.org/content/IBC2009.

40.     Section 803.1.1 states: "Interior wall and ceiling finish materials shall be classified in accordance with ASTM E84 or UL 723."

41.     It contains an "exception," however, for "materials tested in accordance with Section 803.1.2."

42.     Section 803.1.2 clearly states: "Interior wall or ceiling finish materials shall be permitted to be tested in accordance with NFPA 286."

43.     Section 803.12, in turn, clearly defines what materials are subject to § 803.1.2's NFPA 286 testing requirement: "Where high density polyethylene [HDPE] is used as an interior finish, it *shall comply* with Section 803.1.2." (emphasis added)

44.     The commentary to 803.12 further states:

High-density polyethylene (HDPE) is a thermoplastic material that when it burns, it gives off considerable energy and produces flammable liquids fires. Recent full-scale room-corner tests using NFPA 286 have demonstrated a significant hazard with some of these (HDPE) materials. These tests had to be terminated prior to the standard 15-minute duration due to flashover occurring, yet there was still much of the product left to burn. Extensive flammable liquid pool fires occurred during the tests. However, *the Steiner tunnel test* [also known as ASTM E84, with its "Class A" and "Class B" fire ratings]*, is not a suitable measure of the performance of this material because the calculation flame spread index does not take into account the unique hazards known for this material. Therefore, HDPE is required to be tested in a full-scale room-corner test* [also known as the NFPA 286 test] *in accordance with Section 803.1.2*.

(emphasis added)

18

### B.    The 2012 International Building Code

45.    A copy of relevant portions of the 2012 edition of the IBC with commentary is attached hereto as Exhibit 62.[15]

46.    Chapter 8 of the 2012 IBC governs interior finishes, including toilet partitions.

47.    Section 803.1.1 states: "Interior wall and ceiling finish materials shall be classified in accordance with ASTM E84 or UL 723." It contains an "exception," however, for "materials tested in accordance with Section 803.1.2."

48.    Section 803.1.2 clearly states: "Interior Wall or ceiling finish materials shall be permitted to be tested in accordance with NFPA 286."

49.    Section 803.12, in turn, clearly defines what materials are subject to § 803.1.2's NFPA 286 testing requirement: "Where high density polyethylene [HDPE] . . . is used as an interior finish, it *shall comply* with Section 803.1.2." (emphasis added)

50.    The commentary to 803.12 also states:

High-density polyethylene (HDPE) and polypropylene (PP) are thermoplastic materials that, when burned, give off considerable energy and produce flammable liquid fires. Recent full-scale room-corner tests using NFPA 286 have demonstrated a significant hazard with some of these (HDPE) materials. Extensive flammable liquid fires occurred during the tests. *The Steiner tunnel test* [also known as ASTM E84, with its "Class A" and "Class B" fire ratings], *however, is not a suitable*

---

[15] The 2012 edition of the IBC is available here: https://codes.iccsafe.org/content/IBC2012.

*measure of the performance of this material because the calculation of flame spread index does not take into account the unique hazards known for this material; therefore, these materials are required to be tested in a full-scale room-corner test* [also known as the NFPA 286 test] *in accordance with Section 803.1.2.*

(emphasis added)

### C.  The 2015 International Building Code

51.  A copy of relevant portions of the 2015 edition of the IBC with commentary is attached hereto as Exhibit 63.[16]

52.  Chapter 8 of the 2015 IBC governs interior finishes, including toilet partitions.

53.  Section 803.1.1 states: "Interior wall and ceiling finish materials shall be classified in accordance with ASTM E84 or UL 723." It contains an "exception," however, for "materials tested in accordance with Section 803.1.2."

54.  Section 803.1.2 clearly states: "Interior Wall or ceiling finish materials shall be permitted to be tested in accordance with NFPA 286."

55.  Section 803.9, in turn, clearly defines what materials are subject to § 803.1.2's NFPA 286 testing requirement: "Where high-density polyethylene [HDPE] is used as an interior finish it *shall comply* with Section 803.1.2." (emphasis added)

---

[16] The 2015 edition of the IBC is available here: https://codes.iccsafe.org/content/IBC2015.

56.    The commentary to § 803.9 also states:

High-density polyethylene (HDPE) and polypropylene (PP) are thermoplastic materials that, when burned, give off considerable energy and produce flammable liquid fires. Recent full-scale room corner tests using NFPA 286 have demonstrated a significant hazard with some of these (HDPE) materials. Extensive flammable liquid fires occurred during the tests. *The Steiner tunnel test* [also known as ASTM E84, with its "Class A" and "Class B" fire ratings], *however, is not a suitable measure of the performance of this material because the calculation of flame spread index does not take into account the unique hazards known for this material. Therefore, these materials are required to be tested in a full-scale room corner test* [also known as the NFPA 286 test] *in accordance with Section 803.1.2.*

(emphasis added)

**D.    The 2009, 2012, and 2015 editions of the International Building Code require HDPE products used as an interior finish, including toilet partitions, to be tested in accordance with the NFPA 286 standard.**

57.    As shown *supra*, the relevant provisions of the 2009, 2012, and 2015 editions of the IBC are largely the same.

58.    As model codes adopted by state and local jurisdictions, the 2009, 2012, and 2015 editions of the IBC should be interpreted according to the following canons of statutory construction: (i) specific provisions should be read in the context of the statute as a whole and (ii) all provisions should be given meaning, where possible, and not interpreted in a way that renders any language meaningless. *Hayes v. Harvey*, 903 F.3d 32, 41 (3d Cir. 2018) ("[I]n examining the statutory language, we take account of the specific context in which that language is used, and the broader context of the statute as a whole." (cleaned up)); *Disabled*

*in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 539 F.3d 199, 211 (3d Cir. 2008) (citing earlier Third Circuit case for proposition: "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)).

59.     Scranton Products has taken the position that the "shall be permitted" language of § 803.1.2 of the 2009, 2012, and 2015 editions of the IBC means that NFPA 286 testing of HDPE toilet partitions is *allowed*, but *not required*.

60.     This interpretation violates the aforementioned rules of statutory construction because it reads § 803.1.2 out of context in a way that renders other provisions of the IBC meaningless.

61.     The general language of § 803.1.1 states, in a nutshell, that the ASTM E84 test applies to interior finishes unless the "exception" applies for "materials tested in accordance with Section 803.1.2."

62.     Reading the § 803.1.2 "exception" as merely *allowing* NFPA 286 testing, as Scranton Products contends, would mean ASTM E84 testing would also be allowed, rendering meaningless § 803.1.2 as an "exception" to § 803.1.1's general ASTM E84 testing requirement.

63.     This reading would also conflict with the plain language of § 803.12 of the 2009 and 2012 IBCs and § 803.9 of the 2015 IBC, which state in mandatory language that HDPE "*shall* comply with Section 803.1.2." (emphasis added) This

22

language is incompatible with Scranton Products' interpretation of § 803.1.2 that merely allows, but does not require, NFPA 286 testing. Scranton Products' wrongly reads those provisions as "may comply," rather than "shall comply."

64.     If there were any doubt that § 803.1.2 was intended to carve out a *mandatory* NFPA 286 requirement, the commentary to § 803.12 of the 2009 and 2012 IBCs and § 803.9 of the 2015 IBC sets the record straight: "The Steiner tunnel test [also known as ASTM E84] is not a suitable measure of the performance of [HDPE] because the calculation of flame spread index does not take into account the unique hazards known for this material. *Therefore, these materials* ["HDPE" in the 2009 edition] *are required to be tested in a full-scale room corner test* [also known as the NFPA 286 test] *in accordance with Section 803.1.2*." (emphasis added)

65.     In short, there is no question that the 2009, 2012, and 2015 editions of the IBC *require* HDPE used as an interior finish, including toilet partitions, to be tested in accordance with the NFPA 286 standard. *See also* Tr. of Evid. Hearing Day 2 at 9:13-10:4, 17:2-18:13 (Mr. Koffel testifying same about the 2012 and 2015 editions of the IBC).

**E.    After almost two years of litigation, Scranton Products has identified only two local jurisdictions that do not require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard.**

66.    Setting aside jurisdictions that have adopted the 2009, 2012, and 2015 editions of the IBC—which plainly *require* HDPE toilet partitions to be tested in accordance with the NFPA 286 standard—Mr.  Wheeler has only been able to identify two small local jurisdictions that use pre-2009 editions of the IBC and therefore may not require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard: (i) Carbondale, Illinois and (ii) East St. Louis, Illinois.[17]

67.    According to official U.S. Census Bureau data,[18] East St. Louis, Illinois had a 2020 population of only 18,469 people,[19] and Carbondale, Illinois

---

[17] While Mr. Wheeler's expert report includes a color-coded IBC adoption map at page 17 that suggests Ohio and Arkansas have not adopted *any* edition of the IBC state-wide, both Ohio and Arkansas have in fact adopted the 2021 edition of the IBC. *See* Ohio Admin. Code 4101:1-1-01 ("Except provided [in unrelated subsections], the International Building Code 2021 edition . . . as published by the 'International Code Council, Inc.' . . . are hereby incorporated by reference . . ."); Ohio Admin. Code 4101:1-8-01 (incorporating by reference the 2021 edition of the IBC's provisions concerning "interior finishes"); State of Arkansas Fire Prevention Code Rules 2021 Edition, available at https://codes.iccsafe.org/content/ARFPCVIF2021P1/state-of-arkansas-arkansas-fire-prevention-code-rules-2021-edition ("The International Fire Code, 2021 edition, the International Building Code, 2021 edition, and the International Residential Code, 2021 edition, as published by the International Code Council and the rules, as amended and adopted by the Arkansas State Fire Marshal, shall constitute the Arkansas Fire Prevention Code, 2021 edition."); Arkansas Fire Code 803.1.1 & 803.9, available at https://codes.iccsafe.org/content/ARFPCVIF2021P1/chapter-8-interior-finish-decorative-materials-and-furnishings (requiring HDPE used as an interior finish, which includes toilet partitions, to comply with NFPA 286 test).

had a 2020 population of only 21,857 people.[20] The total population of the United States in 2020 was 331,449,281,[21] meaning the combined populations of East St. Louis and Carbondale represented only .000122% of the total U.S. population.

68.    Further, as Bobrick's expert Mr. Koffel testified at the July 2024 evidentiary hearing, the NFPA 286 test is still mandatory for HDPE toilet partitions used in many building applications in East St. Louis and Carbondale, notwithstanding their use of older versions of the IBC. These include (i) healthcare facilities accepting federal funds from or seeking certification with the Centers for Medicare and Medicaid Services ("CMS"), which requires compliance with the 2012 edition of the IBC; (ii) healthcare facilities operated by federal government agencies, such as the Department of Veterans Affairs, which are required by those agencies to meet the requirements of a more recent edition of the NFPA 101; (iii) office buildings leasing space to government agencies, such as the U.S. General

---

[18] This Court is permitted to take judicial notice of official Census Bureau data under Federal Rule of Evidence 201. *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571-72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice."); *United States v. Esquivel*, 88 F.3d 722, 727 (9th Cir. 1996) ("Further, the census documents meet the requirements of [Federal] Rule [of Evidence] 201(b), in that they are 'not subject to reasonable dispute' because they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'").

[19] https://data.census.gov/all?q=east%20st.%20louis.

[20] https://data.census.gov/profile/Carbondale_city,_Illinois?g=160XX00US1711163

[21] https://www.census.gov/quickfacts/fact/table/US/PST045221

Services Administration; (iii) educational facilities, which are subject to the code adopted at the state level; and (iv) buildings that must meet corporate requirements that are based on later editions of the code. Tr. of Evid. Hearing Day 1 at 109-10.

69.     Despite these extremely limited exceptions to the universal NFPA 286-testing standard, Scranton Products' exhibits an irresponsible corporate philosophy that it is irrelevant where or whether NFPA-286 testing is required because Scranton Products lacks knowledge of and accepts no responsibility for whether it is marketing or advertising non-compliant toilet partitions. Exhibit 12 at 42:18-43:6 (Robert Donlon Deposition) (in response to question about "what jurisdiction are you aware of that allows Scranton Products to sell HDPE toilet partitions that are tested only under the E84 test," Mr. Donlon, answering: "I'm not aware of the code in any jurisdiction."); *id*. at 43:7-13 (Bobrick's counsel: "Are you familiar with a fire testing requirements for federal projects?" Mr. Donlon: "I am not." Bobrick's counsel: "You're not aware that all federal projects require that toilet partitions meet the 286 test?" Mr. Donlon: "I am not."); Tr. of Evid. Hearing Day 1 at 132:15-16 (Bobrick's counsel: "Did you get any training on Fire Codes or?" Mr. Donlon: "No."); *id*. at 176:13-15 (Bobrick's counsel: "Do you know that Federal projects require NFPA 286 HDPE toilet partitions?" Mr. Donlon: "I do not know that."); *id*. at 148:5-7 (Bobrick's counsel: "Are you aware what jurisdictions

would allow you to install Class B E84-tested toilet partitions?" Mr. Donlon: "I do not.").

70.    On the contrary, it is Scranton Products' corporate ethos to market and advertise (and sell) any product a customer may ask for regardless of whether that product is code compliant or illegal where used or installed. *See* Exhibit 77 at 66 (Donlon deposition testimony) (Mr. Donlon not aware of False Claims Act); *id*. at 48-49 (in response to hypothetical about a car manufacturer selling cars with no airbags and a defective and illegal gas tank: "Again, we rely on the advice of counsel to make sure we're compliant. We rely on architects and informed dealers to tell us what they need to meet the requirements in their jurisdictions.").

## VI.   Scranton Products continues to use the terms "ASTM E84" and "Class B" as fire ratings to market and advertise its HDPE toilet partitions.

### A.    Scranton Products' website:

71.    Exhibit 15 is a true and correct copy of Scranton Products' webpage titled "Aria Partitions Color Options," dated July 15, 2024, which states on page three: "Tested to Meet ASTM E84, Class B." As of the filing of these findings of fact, this webpage remains accessible at the following URL[22]:

https://www.scrantonproducts.com/aria-partitions-color-options/

---

[22] The Court can take judicial notice, pursuant to Federal Rule of Evidence 201, of the existence of statements made by Scranton Products on its website (but not for the truth of the content of those statements) because the fact of statements made on Scranton Products' public website is "not subject to reasonable dispute."

72.     Exhibit 16 is a true and correct copy of Scranton Products' current webpage titled "Hiny Hiders Color Visualizer," dated July 15, 2024, which states on page three: "Tested to Meet ASTM E84, Class B." As of the filing of these findings of fact, this webpage remains accessible at the following URL:

https://www.scrantonproducts.com/products/hiny-hiders-partitions/color-visualizer/

73.     Exhibit 17 is a true and correct copy of Scranton Products' current webpage titled "Eclipse Color Visualizer," dated July 15, 2024, which states on page three: "Tested to Meet ASTM E84, Class B." As of the filing of these findings of fact, this webpage remains accessible at the following URL:

https://www.scrantonproducts.com/products/eclipse-restroom-partitions/colors-textures-2/

74.     Other examples of marketing and advertising that still use the terms "ASTM E84" and "Class B" include Scranton Products' current Hiny Hiders Brochure (Exhibit 45) and Color Texture Brochure (Exhibit 46), which both label certain colors of HDPE toilet partitions as "Tested to Meet ASTM E84, Class B."

75.     All of these webpages are materially the same in subject matter as the webpages Bobrick identified in its Third Enforcement Motion that used the terms "ASTM E84" and "Class B" as fire ratings to market and advertise Scranton Products' HDPE toilet partitions. Dkt. 704 at ¶¶ 60, 72 & cited exhibits. In fact, the

webpages identified *supra* are updated, current versions of the same webpages Bobrick complained about in its Third Enforcement Action that Scranton Products claims it fully cured, but that still continue to use the obsolete ASTM E84 test and the term "Class B" as a fire rating. Exhibits 15, 16, 17, 45, 46.

### B.   Scranton Products' proprietary specification:

76.    Exhibit 18 is a true and correct copy of Scranton Products' current Hiny Hiders proprietary specification. This proprietary specification, as well as those for Scranton Products' Aria and Eclipse partition lines, are available on Scranton Products website, as of this filing, at this URL: https://www.scranton products.com/for-professionals/#specs.

77.    A proprietary specification is a template provided by manufacturers to architects to assist (and encourage) them in drafting product specifications for building projects. *See* Tr. of Evid. Hearing Day 1 at 139:1-7 (Bobrick's counsel: "Second page, please, under 1.5B, which is Performance Requirements. What do you understand that to mean, Performance Requirements?" Mr. Donlon: "My understanding is this is a tool that a designer or architect can use to build a spec. They go through, and it's a drop down menu, they pick the options or choices that they have, want or need for their project."); *id*. at 148:21-149:2 (Mr. Donlon: "It's my understanding it's a tool for an architect or designer to create a specification for their project. They go on, they pick all the different options, and not to get into too

much detail, but Alan talked a little bit about it earlier, different sizes, doors hinges, all the features and options. It's like buying a car, same kind of idea. They can go through and pick what they want.").

78.    On page 2 of Scranton Products' current proprietary specification, under Section 1.5 Quality Assurance and under subsection D, Scranton Products' proprietary specification states:

> D.    Performance Requirements:
>    1.    Fire Resistance: Partition materials shall comply with the following requirements, when tested in accordance with ASTM E 84, Class B:
>       a.    Tested to Meet ASTM E84, Class B flame spread/smoke developed rating.
>    2.    Material Fire Ratings:
>       a.    National Fire Protection Association (NFPA) 286: Pass.
>       b.    International Code Council (ICC): Class B.

79.    Thus, Scranton Products still explicitly represents in its current proprietary specification that its "ASTM E84, Class B" HDPE partitions are "fire rated" products and, worse yet, that the ICC "requires" "Class B." This marketing and advertising violates ¶ 89 of the Settlement Agreement that covers "any other document or communication related to the sale of non-NFPA 286 compliant HDPE toilet partitions."

**VII. Scranton Products' marketing and advertising violates ¶ 89 of the Settlement Agreement, as read in conjunction with ¶ 5, because it contradicts the substance of the information in the Customer Letter.**

**A. Scranton Products' marketing and advertising contradicts the substance of the information in the Customer Letter because (i) the Customer Letter recognizes only two categories of toilet partitions: NFPA 286-compliant and non-NFPA 286-compliant, not "Class B" and "ASTM E84-compliant," and (ii) the updated version of the Customer Letter that Scranton Products agreed to send shows that all 50 states require NFPA 286 compliance.**

80. Scranton Products' marketing and advertising contradicts the substance of the information in the Customer Letter in violation of ¶ 89, as read in the context of ¶ 5, because the Customer Letter recognizes only two categories of HDPE toilet partitions: (i) those that are "NFPA 286-compliant" and (ii) those that are "not NFPA 286 compliant." (or "non-NFPA 286 compliant"). Dkt. 435, Ex. D. By contrast, Scranton Products' current marketing and advertising represents to customers that there is a third category—toilet partitions that are tested under the "ASTM E84" test and are classified by Scranton Products as "Class B" fire rated.[23] Therefore, as Mr. Koffel testified: "So there is confusion, there is conflict. Either a partition passes 286, per the customer letter, or it does not. The inclusion of this ASTM E84 Class B reference, which is not included in the customer letter, creates

---

[23] Scranton Products also marketed and advertised its HDPE toilet partitions as "Class A" as of the date Bobrick filed its Third Enforcement Action. However, it appears to have since removed those references, to the best of Bobrick's knowledge.

confusion in the marketplace and, therefore, a conflict." Tr. of Evid. Hearing Day 1 at 58:7-11; *see also id.* at 58:13-19 (Bobrick counsel: "Why is that inconsistent with the customer letter?" Mr. Koffel: "Because the customer letter indicates that there are two types of partitions. There is an NFPA 286-tested partition, there is a non-NFPA 286-tested partition . . ."); *id.* at 41:6-22 & 58-74 (testifying that Customer Letter does not mention "Class B" or "ASTM E84" and explaining that Scranton Products website and proprietary specification are inconsistent with the Customer Letter because they use those terms); Tr. of Evid. Hearing Day 2 at 18:20-19:6 (same); Exhibit 78 at 24:18-25:3 (Mark Louchheim deposition) (Bobrick's counsel: "And this question has been asked throughout the case and will continue to be asked. The inconsistency between the marketing materials that Santana at Scranton Products is currently using and the substance of the customer letter, what is the inconsistency in your mind? How do you see the inconsistency?" Mr. Louchheim: "I see it as any mention anywhere in Scranton Products' materials that mentions E84, that mentions Class A, that mentions Class B. Those are all inconsistent."); Exhibit 79 at 34:4-36:1 (Alan Gettelman deposition) (testifying in relevant part about inconsistency between marketing and advertising and the Customer Letter: "But where you start referring to colors that are tested to ASTM E84, Class B, and standard colors that are not tested either E84 or NFPA 286, you're raising to a level of presentation and advertising and communication

suggesting that these are fire-rated materials. And that is either deliberate misinformation or it's misinformation, but it's confusing information. And all of a sudden you're telling the design community, the building owner, the architect, the designer that there are these other colors and these other test protocols that validate these products. And that is not – that is inconsistent with the customer [letter]. It's inconsistent with the settlement agreement, and it's creating confusion in the marketplace.").

81.     To the extent Scranton Products argues that Mr. Koffel admitted Scranton Products may say on its website that it *sells* "Class B" partitions, he did not concede that Scranton Products' marketing and advertising is consistent with the Customer Letter.

82.     Rather, Mr. Koffel testified that Scranton Products' actual use of that terminology in its "marketing and advertising" contradicts the substance of the information in the Customer Letter and thus violates ¶ 89 the Settlement Agreement, which only addresses the "marketing and advertising" of toilet partitions, not their sale. Tr. of Evid. Hearing Day 1 at 83:3-14 (Scranton Products' counsel: "So just Scranton Products putting on its website that it sells Class B materials, that's not a contradiction of the customer letter, in your opinion?" Mr. Koffel: "The way they have put that on their website is a contradiction of the customer letter.").

33

83.     Moreover, although Scranton Products is a "sophisticated part[y] represented by counsel of [its] choosing and . . . had a full opportunity to consult with counsel" about the Settlement Agreement (Dkt. 435 at ¶ 152), it did not negotiate for the Customer Letter to say anything about its ASTM E84-tested toilet partitions, nor anything about that test's "Class A" or "Class B" ratings. Instead, Scranton Products agreed to a Customer Letter that references only NFPA 286-compliant partitions and non-NFPA 286-compliant partitions.

84.     Scranton Products and its army of attorneys also agreed to the wording of ¶ 89 that requires Scranton Products' "marketing and advertising" to be consistent with that language in the Customer Letter, with no mention of "Class B" or "ASTM E84-tested" products therein. *See* Dkt. 730 at 17-19 (this Court concluding that the font size in the Customer Letter did not breach the Settlement Agreement because the Settlement Agreement did not contain language about font size: "As to whether the requirement that 'a letter in the form of Exhibit D' required that the Customer Letter be in 14-point font, no provision of the SA addresses font size and parol evidence shows that font-size was not discussed during settlement negotiations.").

85.     Further, Scranton Products agreed in January 2022, pursuant to ¶ 88 of the Settlement Agreement, to update the URL link in the Customer Letter to the current ICC adoption chart that shows, as Mr. Koffel testified and as shown *supra*,

that all 50 states have adopted editions of the IBC that require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard, not that "ASTM E84 Class B" HDPE toilet partitions are code compliant. Exhibit 73 at 1, 3; *see also Clark Motor Co. v. Manufacturers & Traders Tr. Co.*, 360 F. App'x 340, 344 (3d Cir. 2010) ("The Pennsylvania Supreme Court has stated that course of performance can be 'perhaps the strongest indication of what the writing means.'" (quoting *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 741 (1978)). Thus, as of 2022, Scranton Products' marketing and advertising of "Class B" HDPE toilet partitions also contradicts the current ICC chart, as incorporated into the Customer Letter by Scranton Products' agreed-upon inclusion of the updated URL link.

86.     In July 2024, Scranton Products again voluntarily agreed, pursuant to ¶ 88 of the Settlement Agreement, to update the URL link to the current ICC adoption chart, which also shows that all 50 states have adopted editions of the IBC that require HDPE toilet partitions to be tested in accordance with the NFPA 286 standard. Exhibit 74.

87.     While Scranton Products' expert has identified two tiny local jurisdictions in Illinois that would not require NFPA 286 testing for some unidentified buildings, those two local jurisdictions comprise an extremely narrow exception to an otherwise nationwide mandate that HDPE toilet partitions be tested in accordance with the NFPA 286 standard.

88.     Scranton Products' website marketing and advertising has a

nationwide reach, and its proprietary specification is available to developers in all

jurisdictions—without limitation to those two tiny jurisdictions in Illinois that have

narrow exceptions to the NFPA-286 testing requirement. Tr. of Evid. Hearing Day

1 at 107:25-109:1 (Mr. Koffel testifying that Scranton Products' website does not

have any geographic limitations). By doing so, Scranton Products is essentially

using a small tail to wag the big dog and dictate its marketing and advertising

nationwide.

89.     Moreover, Scranton Products' indiscriminate, nationwide marketing

and advertising includes no disclaimer that HDPE toilet partitions are required to

comply with the NFPA 286 standard in all jurisdictions in the United States, except

Carbondale and East St. Louis, Illinois, nor even any kind of statement, as in the

Customer Letter, advising customers to consult their local code and local officials:

"You or the architect or designer on your project should consult the local state and

building codes in effect in the area where the partitions are intended to be installed

to see if the applicable building code requires HDPE bathroom partitions to be

NFPA 286 compliant in the area of installation." Dkt. 435, Ex. D; *cf.* Federal Trade

Commission, Healthcare Compliance Guidance at 7, Ex. 7, available at https://

www.ftc.gov/system/files/ftc_gov/pdf/Health-Guidance-508.pdf (explaining that

advertising can be deceptive because of what it fails to say and providing

hypothetical example where an advertisement for a supplement fails to explain that only 2% of the population that suffers from a mineral deficiency would benefit from taking the supplement); *F.T.C. v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 124 (D. Conn. 2008) (reciting definition of "false advertisement" in FTC Act and noting "the omission of material information, even if an advertisement does not contain falsehoods, may cause the advertisement to violate section 5."); *Am. Home Prod. Corp. v. F.T.C.*, 695 F.2d 681, 683-84 (3d Cir. 1982) ("'False advertisement,' as defined by 15 U.S.C. § 55(a)(1), is a broadly inclusive term. It encompasses not merely advertisements that are literally untrue, but also materially misleading advertisements—even where it is only the failure to reveal material facts that renders the advertisement misleading." (cleaned up)).

90.     In short, Scranton Products' marketing and advertising is based on the theoretical and extremely narrow possibility that there could be buildings in jurisdictions representing .000122% of the United States population that would allow HDPE toilet partitions to be installed without an NFPA 286 certification. And based on that, Scranton Products promotes—nationwide—Class B HDPE toilet partitions tested under the obsolete ASTM E84 standard that have been deemed a fire hazard in jurisdictions comprising hundreds of millions of Americans—99.99988% of the population!

**B.      Paragraph 81 is irrelevant to whether Scranton Products violated ¶ 89 of the Settlement Agreement because it only concerns the "sale" of toilet partitions (in the context of when the Customer Letter must be sent), not the "marketing and advertising" of HDPE toilet partitions.**

91.      Paragraph 81 of the Settlement Agreement is not relevant to whether

Scranton Products violated ¶ 89 because ¶ 81 only concerns Scranton Products'

*sale* of toilet partitions while ¶ 89 concerns Scranton Products' *marketing and*

*advertising* of toilet partitions. Paragraph 81 states:

> Beginning five (5) business days after the Effective Date, for each and every *sale* of non-NFPA 286-compliant HDPE toilet partitions (including, but not limited to, Class A fire-rated HDPE toilet partitions, Class B fire-rated HDPE toilet partitions, and non-fire-rated HDPE toilet partitions), *Scranton Products will send* the entity that submits the purchase order to Scranton Products (the "purchaser") (regardless of location, because Scranton Products is often not aware of the end user or ultimate locations of installation) *a letter in the form of Exhibit D* (the "Customer Letter").

Dkt. 435 (emphasis added). By contrast, ¶ 89 states:

> Scranton Products will not include in its *marketing materials*, *advertisements*, bulletins, terms and conditions, sales acknowledgements, shipping confirmations, website, or any other document or communication related to the sale of non-NFPA 286 compliant HDPE toilet partitions anything contradicting the substance of the information in the Customer Letter.

(emphasis added)

92.      If Scranton Products and its panoply of lawyers wanted the "Class B"

language from ¶ 81 in the text of the Customer Letter, they could have negotiated

for that. But they instead agreed to a Customer Letter identifying two basic

categories of HDPE toilet partitions: NFPA 286-compliant and non-NFPA 286-compliant.

93.     To the extent Scranton Products argues that ¶ 81 defines the term "non-compliant"[24] for advertising and marketing purposes, as well as for sales, neither ¶ 89 nor the dispositive Customer Letter has similar "Class B" language as ¶ 81. This shows that the parties did not intend the same definition to apply to Scranton Products' marketing or advertising, much less to permit Scranton Products to market its products using a fire testing standard that is not identified in the Customer Letter, thus contradicting its plain language and violating ¶ 89.

94.     As Mr. Gettelman pointed out at the evidentiary hearing, ¶ 89 was intended to ensure Scranton Products' marketing and advertising was consistent with the Customer Letter, which the Settlement Agreement required only be distributed to the "purchaser." By using a fire rating or fire test that is not identified in the Customer Letter, Scranton Products is attempting to market and advertise its way around the information contained in the Customer Letter, which is only sent to the "purchaser," to sell product that has been deemed a non-compliant partition in the vast majority of the United States, as explained *supra*.

---

[24] Scranton Products' questions to Mr. Koffel about whether "non-compliant" is defined in ¶ 81 of the Settlement Agreement calls for a legal conclusion that he is not qualified to render as a fire code expert.

**C.**    **Bobrick's President Matthew Louchheim testified that Scranton Products' marketing and advertising contradicts the substance of the information in the current version of the Customer Letter.**

95.    Scranton Products may cite Matthew Louchheim's deposition testimony—a witness Scranton Products chose not to call at the evidentiary hearing—for the proposition that there is nothing in Scranton Products' marketing and advertising that contradicts the Customer Letter.

96.    Matthew Louchheim did *not* testify in his deposition as a corporate representative and explained that he had no involvement with Bobrick's Third Enforcement Motion; that is the responsibility of his father Mark Louchheim as Bobrick's Chairman and CEO—another witness Scranton Products chose not to call. Tr. of Matthew Louchheim Dep. at 84:4-11 (Scranton Products' counsel: "Do you have any involvement in – other than sitting here today, in the – this – the litigation against Scranton Products." Mr. Louchheim: "No." Scranton Products' counsel: "Okay. Who makes decisions at Bobrick about that litigation?" Mr. Louchheim: "The CEO."); *id*. at 84:24-85:1 (Scranton Products' counsel: "Did you have any involvement in the decision to bring this third enforcement action against Bobrick?" Mr. Louchheim: "I had no involvement.").

97.    Matthew Louchheim's testimony that Scranton Products' marketing and advertising does not contradict the Customer Letter was the result of Scranton Products' counsel's using an outdated version of the Customer Letter in his

deposition that Scranton Products agreed to update years ago in 2019, then 2022, and again in 2024 because it no longer showed the "*current* summary of jurisdictions and their adoptions of [the IBC]," as the Customer Letter states. Tr. of Matthew Louchheim Dep. at 188-90; Dkt. 435, Ex. D (emphasis added); *see also* Exhibit 70 (Scranton Products agreeing in April 2019 to update the ICC link in the Customer Letter); Exhibit 73 (Scranton Products agreeing in January 2022 to update the ICC link in the Customer Letter); Exhibit 74 (Scranton Products agreeing in July 2024 to update the ICC link in the Customer Letter).

98.     In any event, Matthew Louchheim clarified in his deposition, in response to continued questioning from Scranton Products, that he believed Scranton Products' marketing and advertising would contradict the Customer Letter based on the *current* URL link to the ICC adoption chart, not the outdated, dead link that Scranton Products' counsel tried to use at his deposition:

> Scranton Products' counsel: Same question, can you point to anything specific in Exhibit 16 that specifically contradicts anything in the customer letter?

> Matthew Louchheim: Let me – let me take a second.

> Scranton Products' counsel: Sure, please. Yes, please. It's important.

> Matthew Louchheim: Let me take a second. So here – let me take a – so to answer the question – and I realize I may have misspoken. To answer this question is really hard for me to do because I don't have the link. So I would need to see the link to be able to answer these questions. And I think I may have misspoken.

41

Because if I were to follow that link, and if that link showed to me that it's not 43 states and all 50 states then it would be a contradiction. So I would like to withdrawal [sic] my prior statements and that's the contradiction, if there is one. But I cannot tell you without seeing this link.

. . .

[Scranton Products' counsel pulling up outdated, broken link]

Matthew Louchheim: Well, that link is just a – an index, it's not a chart. So it looks like the link is dead. It's not the current link. I don't think it's the current link. It's supposed to go to an adoption chart. And I don't see an adoption chart. So I can't answer these questions.

Scranton Products' counsel: Do you want to look around the website?

Matthew Louchheim: No, no. So I don't see any contradiction.

Scranton Products' counsel: Okay.

Matthew Louchheim: So I – I want to go back. You asked for me to say is there a contradiction. This document refers to a link. The link will then inform you of whether or not – it should take you to a master code adoption chart. That current link doesn't work based on the link that you put in.

So I – I – I question the – the integrity of the current letter [sic] because the – the chart is not there or, at least maybe you didn't type it in right.

So if – let me put it to you this way. If it were the case, that based on the chart and the requirements that NFPA 286 is required in all 50 states and the District of Columbia, and if all these marketing materials show product that is Class A or Class B then I would see a contradiction.

Tr. of Matthew Louchheim Dep. at 187:20-191:3.

**D.      Scranton Products' expert Dale Wheeler is not a credible witness because he did not review relevant Scranton Products documents and lacks expertise concerning HDPE toilet partitions and the ASTM E84 and NFPA 286 fire tests.**

99.    Scranton Products has proffered Mr. Wheeler as an expert on Scranton Products' marketing and advertising materials concerning the fire rating of its HDPE toilet partitions.

100.    However, Mr. Wheeler testified in his deposition that he had not reviewed the pivotal documents at issue in this Third Enforcement Action, including: (i) Scranton Products' proprietary specification, (ii) documents concerning the Sylvia H. Rambo U.S. Courthouse ("Harrisburg Federal Courthouse"), (iii) documents Scranton Products produced in discovery and (iv) and Scranton Products' correspondence with customers. Exhibit 76 at 50:7-19 (testifying that he did not review Scranton Products' proprietary specification); *id*. at 64:21-65:9 (testifying that he did not review documents relating to Harrisburg Federal Courthouse); *id*. at 47:4-19 (testifying that he did not review any documents Scranton Products produced in this Third Enforcement Action); *id*. at 46:4-48:3 (testifying that he did not review emails between employees of Scranton Products and its customers).

101.    He also testified that he never talked to any employee of Scranton Products about the issues raised in the Third Enforcement Action, or even reviewed their deposition transcripts. *Id*. at 9:12-18, 66:5-9.

102.    Further, Mr. Wheeler's testimony at his deposition shows he is not qualified to opine on HDPE toilet partitions, the NFPA 286 test, the ASTM E84 test, the marketing of a products' fire rating, or employee training related thereto. Exhibit 76 at 24:18-21 (inaccurately testifying that HDPE stands for "high density polyurethane," rather than "polyethylene" (underlining added))[25]; *id.* at 27:4-16, 28:8-13 (testifying that the last time he attended an ASTM E84 test was 20 years ago and that he never attended an ASTM E84 test of HDPE material, nor of toilet partitions); *id.* at 29:9-18 (testifying that the only time he ever witnessed a NFPA 286 test was via video in a continuing education setting); *id.* at 28:16-19 (testifying that he has never done any work on the NFPA 286 test prior to this Third Enforcement Action); *id.* at 29:25-30:19 (testifying that the only time he reviewed NFPA 286 or ASTM E84 testing results for toilet partitions was at the direction of Scranton Products' counsel); *id.* at 22:9-15 (testifying that he never worked for a toilet partition manufacturer before Scranton Products); *id.* at 24:13-17 (testifying that he has never done consulting work or expert work involving products made of HDPE, with the exception of this litigation); *id.* at 38:10-14, 15-18 (testifying that he has never advised clients about marketing or advertising their products or training concerning the marketing or advertising of their products).

_____

[25] As Scranton Products' website explains, HDPE is an acronym that stands for "high density polyethylene." https://www.scrantonproducts.com/is-hdpe-safe/.

**VIII.  Scranton Products' marketing and advertising that contradicts the substance of the information in the Customer Letter creates confusion in the marketplace and, as but one example, has resulted in dangerous, non-compliant HDPE toilet partitions being ordered for the Harrisburg Federal Courthouse, requiring injunctive relief.**

103.   Scranton Products' marketing and advertising creates confusion because it represents, nationwide, that some of its HDPE toilet partitions have a "Class B" fire rating using the "ASTM E84 test."

104.   Moreover, by marketing and advertising a category of toilet partitions using an obsolete fire test under the ASTM E84 standard that is not identified in the Customer Letter, Scranton Products' marketing and advertising creates confusion about the fire rating of toilet partition colors and textures advertised as available *either* as "Class B" *or* NFPA 286 rated.

105.   Specifically, Scranton Products' current marketing and advertising divides its HDPE toilet partitions into three relevant categories: "Standard," "Class B," and NFPA 286. Exhibits 15, 16, 17, 45, 46. As Mr. Koffel testified, the presentation of these three categories, including one for "Class B," which does not appear anywhere in the Customer Letter, makes it seem as though some partitions, when ordered in colors and textures that are available as *either* "Class B" *or* NFPA 286, are, in fact, *both* "Class B" *and* NFPA 286-compliant. Tr. of Evid. Hearing Day 1 at 55:10-58:11, 68:13-18, 71:3-16, 73:8-19, 74:6-12, 82:1-9, 93:20-25 (Mr.

Koffel testimony about how these categories are confusing to consumers)[26]; *see also id*. at 189:19-20, 190:18-21, 192:10-19 (Mr. Borgia: "I don't recall the conversation, but the partitions can be a Class B or 286." Bobrick's counsel: "Same partition?" Mr. Borgia: "Pardon me?" Bobrick's counsel: "Same partition? Same product?" Mr. Borgia: "The same line, the same brand." Bobrick's counsel: "Is the product different, i[f] it's a 286 partition?" Mr. Borgia: "Other than the rating, the product would be the same.").

106.   If Scranton Products' marketing and advertising were properly organized into only two basic categories—NFPA 286-compliant and non-NFPA 286-compliant HDPE toilet partitions—it would avoid this confusion and, more

---

[26] For example, Mr. Koffel testified: "So, again, I will repeat that the way the colors are shown, it does not show that this product is compliant and these products are not. The marketplace, clearly, has noted that the way this color chart is formed, they're of the opinion that this white[,] orange peel product complies with NFPA 286, as well as ASTM E84. But the second concern that I did not, previously, express is that the customer letter talks about NFPA 286-compliant product and a non-NFPA 286-compliant product. If this color chart was organized with the same structure that's in the customer letter, I believe, people could interpret that information and they could apply the customer letter correctly." Tr. of Evid. Hearing Day 1 at 68:13-24; *see also id*. at 73:5-16 (Bobrick's counsel: "Is there anything, in this particular document on the website, that you find to be inconsistent with the customer letter?" Mr. Koffel: "Very similar to what we just looked at. When I first looked at this chart, I identified colors, such as the white orange-peel color, that were in all three sections. It was not clear to me that those were three distinctly separate products. So, again, if this is structured to say, here are products that are compliant with NFPA 286, and here are products that are available or colors that are available that are not compliant with NFPA 286. I think that's very clear and it's consistent with the customer letter.").

importantly, would be consistent with the Customer Letter that identifies only these two basic categories and does not mention the ASTM E84 test or "Class B" partitions, as explained *supra*.

107.   The Harrisburg Federal Courthouse presents an exemplary case study in how Scranton Products' marketing and advertising contradicts the substance of the information in the Customer Letter and creates confusion that results in dangerous, non-compliant toilet partitions being ordered by even sophisticated architects.

108.   Construction began on the Harrisburg Federal Courthouse in May 2018. https://www.gsa.gov/about-us/gsa-regions/region-3-midatlantic/region-3-newsroom/midatlantic-feature-stories-and-news-releases/groundbreaking-event-held-for-new-us-courthouse-for-the-middle-district-of-pennsylvania-06252018.

109.   The Harrisburg Federal Courthouse project was originally "slated to be completed by fall 2021."[27] *Id*.

110.   Scranton Products was selected as the vendor for toilet partitions.

111.   As a federal project, materials used in the Harrisburg Federal Courthouse, including toilet partitions, were required to comply with the most recent version of the IBC at the time the project was awarded. *See* GSA Facilities

---

[27] The Harrisburg Federal Courthouse was delayed and opened to the public later in April 2023. https://www.uscourts.gov/news/2023/04/17/modern-courthouse-pennsylvania-opens-public.

Standards for the Public Buildings Service (PBS-P-100) at § 1.4, available at
https://www.gsa.gov/real-estate/design-and-construction/engineering/facilities-
standards-for-the-public-buildings-service/archived-facilities-standards-and-
documents (Issued March 2016) (click on the hyperlink titled "2016 Facilities
Standards (P100) [PDF – 3MB]") ("For all designs and construction performed on
Federal buildings by GSA or those functions under GSA's construction authority,
GSA has adopted the technical requirements of the nationally recognized codes
and standards referred to in this subsection. . . . The latest edition of these codes
and standards, in effect at the time of design contract award, must be used
throughout design and construction of the project."); *id*. at § 1.4.2 ("GSA has
adopted the technical requirements of the family of codes issued by the
International Code Council (ICC), except as noted below."); *id*. at § 3.5.2
("Finishes must meet the allowable fire performance and smoke development
requirements of the International Building Code and P100 Chapter 7, Section 7.5,
and all other requirements of the International Building Code."); Exhibit 76 at
106:8-25 (Wheeler deposition) (acknowledging that federal projects require HDPE
toilet partitions to comply with NFPA 286 standard).

112.   The Harrisburg Federal Courthouse design contract was awarded to
Ennead Architects in January 2017, so the 2015 edition of the IBC applied to the
Harrisburg Federal Courthouse project, including its requirement that HDPE toilet

partitions must be tested according to NFPA 286, as shown *supra*. *See also* Tr. of Evid. Hearing Day 1 at 67:4-8 (Mr. Koffel testifying that NFPA 286 partitions were required for the Harrisburg Federal Courthouse).

113.   Scranton Products does not dispute that NFPA 286 was the correct standard for HDPE toilet partitions to be used in the Harrisburg Federal Courthouse.

114.   Despite the 2015 IBC's requirement that HDPE toilet partitions be tested in accordance with the NFPA 286 standard, the HDPE partitions initially ordered from Scranton Products were non-compliant "Class B" partitions. Exhibit 75 at 1 (Scranton Products sales order).[28]

115.   The sales order submitted to Scranton Products on that date shows that Scranton Products was well aware that non-compliant partitions were ordered for the Harrisburg Federal Courthouse, which belies the notion that Scranton Products does not know where its product will be installed.[29] *Id*. (under "Project"

---

[28] Bobrick has redacted certain irrelevant information in Exhibit 75 for arguable confidentiality reasons, but will provide an unredacted copy to the Court, upon request.

[29] Mr. Gettelman also testified, based on his decades of experience in the bathroom accessory industry, that toilet partitions are "made to order" and, as such, the "layout drawings" typically include the "job name." Tr. of Evid. Hearing Day 1 at 120:22-122:5.

line, stating "Harrisburg Federal Courthouse" and showing "fire rating" as non-compliant "Class B").

116.    While the non-compliant order was fortunately rectified two years later in 2022 (SP Ex. 13)—albeit after the Harrisburg Federal Courthouse's projected completion date of fall 2021—a 2022 email obtained by Bobrick in response to a FOIA request to the GSA about the Harrisburg Federal Courthouse shows that the correction was prompted by a "FOIA request,"[30] not Scranton Products' notifying the builder about the non-compliant order or providing it with a copy of the Customer Letter. Exhibit 30 at 10. That email is dated one month after Bobrick served its December 13, 2021 FOIA request on the GSA (*id.*) seeking, among other things:

---

[30] A cover letter from the GSA is affixed to the email chain showing that it was produced in response to Bobrick's FOIA request and demonstrating that it is authentic. *See Fareed v. Cent. Rivers Power MA, LLC*, No. 20-CV-11053, 2021 WL 3634158, at *5 (D. Mass. Aug. 17, 2021) ("Similarly, documents produced in response to FOIA requests generally are admissible as self-authenticating."); *Cf. Schmutte v. Resort Condominiums Int'l, L.L.C.*, No. 05-CV-311, 2006 WL 3462656, at *15 (S.D. Ind. Nov. 29, 2006) ("[T]he first page of Exhibit 1 shows that the DOL file is the official file that was produced pursuant to the Freedom of Information Act. This satisfies the authentication requirement pursuant to Rules 901(b)(7) and 902(5).").

Further, Bobrick offers this document to show that the FOIA request was the catalyst for the GSA's investigating whether non-compliant toilet partitions had been ordered for the Harrisburg Federal Courthouse. This is not a hearsay purpose because Bobrick is not offering it for the truth of the statement therein, *i.e.*, that the GSA "received a FOIA request regarding the toilet partitions," but rather to show there was a discussion of a FOIA request in conjunction with the investigation of the fire rating of toilet partitions for the Harrisburg Federal Courthouse.

> Any communications, analyses, or other documents concerning the fire performance requirements for toilet partitions to be installed in the Harrisburg Courthouse, including but not limited to documents concerning the compliance of said toilet partitions with 40 U.S.C. §3312, with the fire performance requirements set forth in the applicable internationally recognized model building, fire, and life safety codes (such as, for example, the International Building Code, the International Fire Code, or the NFPA 101 Life Safety Code), with the acceptance criteria set forth in NFPA 286, or with particular fire ratings set forth in ASTM E-84.

*Id*. at 1 (GSA FOIA response cover letter).

117.   Further, other documents produced in discovery reveal that Scranton Products' marketing and advertising at issue here caused the confusion that led to the order for non-compliant HDPE toilet partitions in the first place. Exhibit 31 is an email exchange produced by Scranton Products (as shown by the Bates number) between Stefan Abel, an architect at Ennead Architects, and Scranton Products' Product Specialist Greg Borgia concerning bathroom partitions ordered for the Harrisburg Federal Courthouse. In that email, Mr. Abel states:

> Unfortunately, our current project specification calls for compliance with ASTM E84 and omits an additional requirement for compliance with NFPA 286. When reviewing the project submittal that was received by our office it looks as if there may be multiple Eclipse Partition product types that are in compliance with either one or the other code. *When I download the specification for this product on your website, both are listed under section 1.5.C (clip below and page 2 in attached Scranton Spec). This section seems to indicate that the same product is compliant with both testing standards.*
>
> In the end, we are required to meet NFPA 286 and I am looking for confirmation on what we need to do to request product that meets this project requirement. Please provide direction at your earliest

51

convenience via email or feel free to call at the number noted below. Thank you in advance.

(emphasis added)

118.   This email, and especially the italicized portion, corroborates Mr. Koffel's opinion testimony at the evidentiary hearing that customers interpreted Scranton Products' marketing and advertising at issue here, including Scranton Products' proprietary specification, as showing that certain colors and textures, *i.e.*, "the same product," "[are] compliant with both testing standards," meaning "Class B" and NFPA 286. Tr. of Evid. Hearing Day 1 at 60:10-61:5, 65:16-67:9; 68:13-18. It also corroborates Mr. Koffel's testimony that Scranton Products' proprietary specification caused non-compliant HDPE toilet partitions to be ordered for the Harrisburg Federal Courthouse. *Id*. at 66:10-16.

119.   Exhibit 30, the FOIA email chain, also shows confusion. On page 8, an email states: "We have not reviewed the toilet partition schedule, but from the snip in Debbie's email, it looks like 'white' with 'orange peel texture' passes both ASTM E84 with a class B rating and NFPA 286. So, if our reading is correct, the partitions would be acceptable."[31] The "snip" of the "toilet partition schedule" (*id*.

---

[31] Bobrick is offering this document for the purpose of showing confusion. This is not a hearsay purpose because it is the statement's falsity, *i.e.*, that the same partition is both "Class B" and NFPA 286-compliant, that shows confusion. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) ("The first level of hearsay analysis concerns the underlying statements said to show confusion. Such statements fall into two categories—those exhibiting confusion and those

at 12) appears to be, or at least is similar in organization to, Scranton Products' marketing and advertising in its color charts. *See* Exhibits 15, 16, 17.

120.   At the evidentiary hearing, Mr. Koffel testified that he relied upon these emails in rendering his opinion that Scranton Products' marketing and advertising creates confusion by suggesting that Scranton Products' partitions, if ordered in certain colors and textures, are both "Class B" and NFPA 286-compliant, which is inconsistent with the only two categories of products in the Customer Letter (NFPA 286-compliant and non-NFPA 286-compliant partitions). Tr. of Evid. Hearing Day 1 at 56:16-58:19; *id*. at 97:14-98:3.

121.   Mr. Koffel also testified in his deposition that he conducted a seminar on sprinkler systems for about 20 GSA representatives in 2024, including some from Region III, whose responsibility includes the Harrisburg Federal Courthouse. Exhibit 13 at 98:17-104:1. While he avoided any discussion about the Harrisburg Federal Courthouse project (*id*. at 98:18-22), he overheard several GSA employees speaking about how they had almost installed the wrong toilet partitions in the Harrisburg Federal Courthouse and were glad they caught it.[32] *Id*. at 99:25-100:3.

---

proclaiming it. Statements of the first type . . . are not hearsay because they are not submitted for their truth; indeed, it is their falsity that shows the speaker's confusion." (cleaned up)).

[32] As raised during the first day of the evidentiary hearing (Tr. at 60), Bobrick does not offer this hearsay conversation for its truth but rather (i) to show that the fire rating of toilet partitions was an issue of public significance to the GSA and (ii) as support for Mr. Koffel's expert opinion about market confusion.

122.   In short, Scranton Products' marketing and advertising materials, including Scranton Products' proprietary specification and color charts, confused the GSA and other personnel involved in the Harrisburg Federal Courthouse project into thinking the correct product had been ordered, when, in fact, non-compliant "Class B" product had been ordered. And, as Mr. Koffel testified, based on his review of documents in discovery, the GSA did not see the Customer Letter until very late in the building process, after the non-compliant partition order had already been brought to their attention through Bobrick's FOIA request. Tr. of Evid. Hearing Day 1 at 111:3-7 (Mr. Koffel testifying).

## IX.   Scranton Products failed to adequately cure the breach raised in Bobrick's Third Enforcement Motion.

### A.   Scranton Products' removal of the phrase "fire rated" from its website was not a good faith attempt to cure.

123.   On November 14, 2023, Scranton Products filed a Motion to Stay [Bobrick's Third] Enforcement Motion Management Conference Pending Further

---

Fed. R. Evid. 703 (allowing experts to base their opinions on otherwise inadmissible evidence and to introduce the factual bases for those opinions "to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect"); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) ("Rule 703 thus focuses on the data underlying the expert's opinion. It permits experts to rely on hearsay so long as that hearsay is of the kind normally employed by experts in the field." (cleaned up)). Because the Court is the fact finder in this case, not a jury, there is no prejudice to introducing the GSA conversation as a factual basis for Mr. Koffel's opinion, which is being challenged by Scranton Products.

Guidance from the Court. Dkt. 740. Attached to that Motion, which the Court later denied (Dkt. 745), was a declaration by Scranton Products' then-Vice President of Sales and Marketing Rob Donlon.[33] Dkt. 740, Ex. C.

124.   In an attachment to that declaration, Mr. Donlon included a chart identifying five webpages that were modified or deleted by Scranton Products as part of its purported cure. Dkt. 740-4. Scranton Products later confirmed, in an interrogatory signed by Scranton Products' President Scott Van Winter, that the items listed in Mr. Donlon's declaration represented the full scope of Scranton Products' purported cure. Exhibit 6 at 10 ("Scranton Products' Vice President of Sales and Marketing, Rob Donlon, outlined the steps Scranton Products undertook to cure any alleged breach in his Declaration in Support of Scranton Products' Motion to Stay the Enforcement Motion Management Conference ('Donlon Declaration'), which is incorporated herein by reference. (Dkt. 740-3.)").

125.   However, while all entries in the Donlon chart say "deleted," at least two of the entries list URL hyperlinks that lead to valid, working webpages (entry numbers 1 and 5 in the chart). The chart, however, does not identify what changes were made to those two still-active webpages as part of Scranton Products' purported cure.

---

[33] Mr. Donlon was promoted in January 2024 to Vice President and General Manager of Scranton Products. Tr. of Evid. Hearing Day 1 at 125-26.

126.   While the other three entries in the chart have URLs that are no longer valid, the substance of those deleted webpages appears to have simply been moved to different webpages on Scranton Products' website. For example, entry two on the chart is a webpage Scranton Products calls "Hiny Hiders Partition Brochure." While Scranton Products claims that brochure was "deleted," it strongly resembles Hiny Hiders literature that fits the description of a "brochure" currently on Scranton Products' website, as downloaded by Bobrick's expert Mr. Koffel on October 30, 2023 and confirmed to be on Scranton Products' website as of May 13, 2024. *See* Exhibit 45. As such, it appears Scranton Products did not delete these webpages, but rather only moved the information therein, with undisclosed modifications, to new webpages. That is not a good faith cure.

127.   Bobrick's attempts to elicit information in discovery and at the hearing on what information was deleted or modified from these webpages as part of Scranton Products' cure has led to blanket privilege objections on the basis that all changes and modifications to Scranton Products' website were undertaken at the direction of Scranton Products' counsel. Tr. of Evid. Hearing Day 1 at 134:14-20 (Bobrick's counsel: "Okay. So as far as this reference to outline the steps that Scranton took to cure any alleged breach, what steps did Scranton take to cure the breach?" Mr. Donlon: "We deleted or modified the documents at the direction of

counsel." Bobrick's counsel: "Anything else that you know about, other than that fact?" A. "I think that's it.")

128.   At the evidentiary hearing, Mr. Donlon was asked about his declaration and the chart attached thereto documenting Scranton Products' purported cure. He testified that Scranton Products' attorneys drafted his declaration chart and that he made no changes to it. Tr. of Evid. Hearing Day 1 at 126:15-21. He also testified that legal counsel alone made the determination of what information in Scranton Products' marketing and advertising materials to delete or modify. *Id*. at 127:4-8.

129.   When asked what type of information Scranton Products deleted as part of its cure, as set forth in the chart, Mr. Donlon responded, "I don't think I can answer that," and Scranton Products' counsel objected on privilege grounds. *Id*. at 128:8-20. After some further attempts to elicit non-privileged information with no success (*id*. at 128-30), Bobrick's counsel finally asked: "The only way that you can answer my question, as to what was deleted or modified, is to disclose what counsel told you to delete or modify; is that correct? Just yes or no?" *Id*. at 130:7-9. Mr. Donlon responded: "Yes, I think it is." *Id*. at 130:18.

130.   Scranton Products cannot rely on the attorney-client privilege in discovery and at the evidentiary hearing to shield information about its defense (*i.e.*, its purported cure), while simultaneously relying on that same purportedly

privileged information to claim it cured the breach. *Wayne Land & Min. Grp., LLC v. Delaware River Basin Comm'n*, No. 16-CV-00897, 2020 WL 762835, at *14 n.9 (M.D. Pa. Feb. 14, 2020) (Mariani, J.) ("It is well recognized that the use of privilege as a 'shield' against discovery precludes the party asserting the privilege from later using the undiscoverable information as a 'sword.'"); Tr. of Evid. Hearing Day 1 at 151:14-152:21; *id*. at 157 (The Court, ruling on objection to question about witness's understanding of breach action: "[T]here's no sword and shield here. You're not going to be able to use privileged communications when it suits you, and then object when – use them as a shield when Mr. Hittinger wants to use them. They're either not in or they're not out. Right now, they're out.").

131.   At this point, the only remedy for Scranton Products' reliance on the advice of counsel for its cure efforts, and its invocation of the privilege in response to questions thereabout, is to preclude evidence about Scranton Products' cure. Discovery has closed and testimony has already been given, so an order overruling Scranton Products' privilege objection would be meaningless. *Polansky v. Exec. Health Res., Inc.*, No. 12-CV-4239, 2018 WL 1964195, at *3, n.1 (E.D. Pa. Apr. 26, 2018) (Baylson, J.) ("The Court notes that because defendant asserts privilege and/or attorney work product to preclude discovery of its reasons for the selection process, it cannot then rely on those reasons in further motion practice or at trial. As [plaintiff] pointed out in his brief, a party cannot use the privilege as both a

'sword' and a 'shield.' The Court assumes that because of Defendant's invoking of privilege and work product to preclude any discovery about its reasons for making certain selections, it is giving up any future attempt to introduce those reasons in the record of this case.")

132.   Even if Scranton Products were not precluded by the sword-shield doctrine from submitting evidence concerning its cure, a comparison of pre-Third Enforcement Motion and post-Third Enforcement Motion webpages shows that Scranton Products' cure efforts were undertaken in bad faith.

133.   Bobrick's Notice of Breach explained, as does Bobrick's Third Enforcement Motion, that Scranton Products' marketing and advertising of HDPE toilet partitions as "ASTM E E84" tested and "Class B" "fire rated" thereunder violated the Settlement Agreement. Exhibit 1 at 13-14, 16. As examples, Bobrick's Notice of Breach cited, among other documents, Scranton Products' color selection form and color texture brochure. *Id*. at 13-14, 16 & Ex. 4, 5.

134.   While Scranton Products has apparently removed explicit references to "fire rated" when using the terms "ASTM E84" and "Class B" on its website,[34] it continues to use the terms "Class B" and "ASTM E84" as fire ratings, as they are widely understood in the industry. Tr. of Evid. Hearing Day 1 at 134:21-135:6

---

[34] Mr. Wheeler testified that this is the difference between the old versions of the webpages and the new versions. Tr. of Evid. Hearing Day 1 at 226:24-227:4.

(Bobrick's counsel: "I'll show you Exhibit 15. That is a reference to ASTM E84 and Class B. What's Class B? Do you know what that is?" Mr. Donlon: "It's a classification in the ASTM E84 test." Bobrick's counsel: "Is it a fire rating?" Mr. Donlon: "It meets a certain flame spread and smoke develop." Bobrick's counsel: "So it's a fire rating?" Mr. Donlon: "I would say it's a fire rating." Bobrick's counsel: "ASTM E84, what is that?" Mr. Donlon: "It's a test method." Bobrick's counsel: "Used to determine a fire rating?" Mr. Donlon: "That's my understanding, yes."); *id*. at 135:11-12 (Bobrick's counsel: "Is Class A a fire rating?" Mr. Donlon: "Yes."); *id*. at 135:23-24 (Bobrick's counsel: "And is the Class A product fire-rated?" Mr. Donlon: "Yes."); *id*. at 42:10-43:25 (Bobrick's expert Mr. Koffel explaining that Class B is a fire rating under the ASTM E84 test, which is a different test than the NFPA 286 test).

135.    Removing the phrase "fire rated" did not cure the breach because Scranton Products continues to employ terminology ("ASTM E84" and "Class B") on its website that is widely understood in the industry to denote a fire rating. Removing the phrase "fire rated" while continuing to use terms that everyone knows to be fire ratings demonstrates Scranton Products' bad faith.

136.    As further evidence of Scranton Products' bad faith cure efforts, Scranton Products has produced customer-service emails in which Scranton Products' employees continue tell customers explicitly that its "Class B" HDPE

toilet partitions are "fire rated."[35] *See, e.g.*, Exhibit 36 at 1; Exhibit 37 at 1; Exhibit 39 at 2; Exhibit 40 at 1; Exhibit 41 at 2.

137.   Mr. Donlon also testified in his deposition that if a customer were to ask him if Scranton Products' HDPE toilet partitions are fired rated, he would say, "we have NFPA 286 partitions and partitions that meet ASTM E84 Class B." Exhibit 77 at 39:21-40:2. That is the same type of statement that Scranton Products purported to remove from its website as part of its cure. That answer is also not consistent with the Customer Letter, which speaks only of NFPA 286-compliant and non-NFPA 286-compliant partitions, not "Class B" or "ASTM E84."

138.   As Mr. Donlon testified, Scranton Products does not train its employees on the fire codes. Tr. of Evid. Hearing at 132:15-16 (Bobrick's counsel: "Did you get any training on fire codes or?" Mr. Donlon: "No."). He also testified in his deposition that Scranton Products employees are not provided training on the

---

[35] Scranton Products has already stipulated to the foundation of emails between its customer service personnel and customers, which were produced by Scranton Products in discovery. Tr. of Evidentiary Hearing Day 1 at 77:8-9. Further, Your Honor has already ruled that Scranton Products statements in these emails would be an "admission against interest" "to the extent that somebody on this, Lisa Marie Wilcox, for example, to the extent that she is a Scranton Products authorized representative." *Id.* at 76:9-15. As Mr. Donlon testified, the Scranton Products employees that made statements in these emails were Scranton Products' authorized representatives. Tr. of Evid. Hearing Day 1 at 144:8-15, 144:23-145:2, 146:14-23. While Bobrick is not introducing these exhibits as independent breaches in the Third Enforcement Action, they are relevant to show that Scranton Products did not engage in good faith cure efforts.

"fire rating of [its] products." Ex. 12 at 38:13-25 (Bobrick's counsel: "Well, for example, is there any training given to Scranton Products' employees about the fire rating of your products?" Mr. Donlon: "Not specifically, no." Bobrick's counsel: "Generally?" Mr. Donlon: "I mean, we rely on licensed architects and informed dealers to tell us what requirements they do. We don't give legal advice or regulatory advice about the code." Bobrick's counsel: "Well, your employees talk to customers about the fire rating of your toilet partition products?" Mr. Donlon: "They may.").

139.   Nor did Scranton Products even notify its employees of changes to the website as part of its cure effort. Tr. of Evid. Hearing Day 1 at 131:19-24 (Mr. Donlon testifying, "we don't communicate additions, deletions, changes to the website to the sales team").

140.   Scranton Products' removal of the word "fire rated" from its website cannot be deemed a good faith attempt to cure when it failed to notify its customer service employees of the change. Nor when it failed to provide them appropriate training about the cure, such that those employees continue to make the same kind of statements to customers regarding fire rated HDPE toilet partitions that Scranton Products purportedly removed from its website as part of its cure.

141.   Mr. Donlon testified that Scranton Products also did not notify its customers of the website or other changes, meaning customers may still be relying

on outdated information in selecting Scranton Products toilet partitions after downloading or printing old versions of Scranton Products' website, brochures, or proprietary specification. Tr. of Evid. Hearing Day 1 at 131:19 – 132:14 (Bobrick's counsel: "After Scranton Products engaged in this exercise of deleting and modifying things from the website, was there any effort made to tell the employees in sales, for example, what had been deleted or modified from the website?" Mr. Donlon: "No, we don't communicate additions, deletions, changes to the website to the sales team."); *id*. at 132:17 – 133:13 (Bobrick's counsel: "After these deletions and modifications were made, was there any effort made to contact customers to let them know that, you know that the website that you were looking at before, well, we made some changes to it. Here are the changes. Did you do that?" Mr. Donlon: "No." Bobrick's counsel: "Did Scranton Products make any effort to confirm with customers whether they might have downloaded the prior website and still have a copy of it, to make sure they weren't relying on something which had been deleted or modified?" Mr. Donlon: "No, I wouldn't know if they could do that or not.").

**B.      Any cure efforts undertaken by Scranton Products after Bobrick filed its Third Enforcement Motion are irrelevant to whether Scranton Products reasonably cured.**

142.    Mr. Donlon's cure declaration was filed on November 14, 2023 (Dkt. 740-3), more than a year after Bobrick filed its Third Enforcement Motion in August 2022 (Dkt. 704).

143.    That declaration purported to document all cure efforts Scranton Products undertook prior to Bobrick's filing of its Third Enforcement Motion as part of its cure. Dkt. 740-3 at ¶ 6 ("I document <u>any</u> modifications or deletion of Scranton's marketing materials in an index . . . , a true and accurate copy of which is attached as Exhibit 1." (underlining added)); *see also* Exhibit 6 at 10 (Scranton Products' supplemental interrogatory answers) ("Scranton Products' Vice President of Sales and Marketing, Rob Donlon, outlined the steps Scranton Products undertook to cure any alleged breach in his Declaration in Support of Scranton Products' Motion to Stay the Enforcement Motion Management Conference.").

144.    On April 3, 2024, Scranton Products served supplemental answers to Bobrick's interrogatories, 5 months after the Donlon cure declaration was filed with the Court. Exhibit 6. Those supplemental answers purported to identify, in Appendix A thereto, 32 additional webpages that Scranton Products "modified or deleted."

145.   However, these 32 webpages appear to have been "modified or deleted" only after the cure period ended on July 20, 2022[36] and Bobrick filed its Third Enforcement Motion, as shown by (i) Mr. Donlon's declaration, which did not list these 32 webpages as part of Scranton Products' cure efforts and (ii) Scranton Products initial interrogatory answers, which it served on Bobrick on February 12, 2024, well after the Third Enforcement Motion was filed, and which did not include or identify those 32 webpages as part of Scranton Products' cure.

146.   Regardless, even after these 32 webpage modifications or deletions, Scranton Products continues to employee the same "ASTM E84" and "Class B" terminology that Bobrick's Third Enforcement Motion alleges violated the Settlement Agreement.

## X.   Bobrick's remedies for breach of the Settlement Agreement include liquidated damages, injunctive relief, and attorneys' fees and costs.

147.   If this Court finds a violation of the Settlement Agreement, Bobrick respectfully requests (i) liquidated damages in the amount of $2.5 million and (ii) that the issues of reasonable attorneys' fees and costs and appropriate injunctive relief be referred to Special Master Thomas I. Vanaskie to meet and confer with the parties and their experts. This process could also entail a hearing, if necessary,

---

[36] Bobrick served its Notice of Breach on April 20, 2022, and the Settlement Agreement gave Scranton Products three months to cure. Dkt. 435 at ¶ 92.

on those issues and would include a report and recommendation for review and approval by Your Honor. *See* Fed. R. Civ. P. 53.

### A. Liquidated damages and related injunctive relief:

148.   Under the Settlement Agreement, a party that brings a successful enforcement action is entitled to liquidated damages. Dkt. 435 at ¶¶ 98-103.

149.   There are two types of breaches under the Settlement Agreement for purposes of liquidated damages. Liquidated damages for a Level 1 breach are "between US $1 million and US $2.5 million for each such breach, as determined by the Court." *Id*. at ¶ 98. Liquidated damages for a Level 2 breach are "up to US $50,000, as determined by the Court, for each such breach." *Id*. at ¶ 103.

150.   "A Level 1 Breach is intended by the Parties to denote a serious violation of th[e] Settlement Agreement that threatens to frustrate or undermine the core purposes of the agreement." *Id*. at ¶ 95.

151.   The Settlement Agreement contains a non-exhaustive list of Level 1 breach examples. *Id*. at ¶ 95(a)-(g). While marketing and advertising in a manner that contradicts the Customer Letter in violation of ¶ 89 is not on that non-exhaustive list, it is a plainly a breach that "threatens to frustrate or undermine the core purposes of the agreement." *Id*. at ¶ 95. This is because, as Mr. Gettelman testified, ¶ 89 was intended to prevent Scranton Products from undermining the public safety and educational purposes of the Customer Letter.

152.   As such, Scranton Products has committed a Level 1 breach.

153.   In awarding an amount of liquidated damages between $1 million and $2.5 million, the Court must assess, among other factors, "whether there was a good faith dispute as to whether there was a breach, or whether the breach was willful." *Id*. at ¶ 100.

154.   Facts in this Enforcement Action weighing in favor of a $2.5 million liquidated damages award include:

> i.   Scranton Products' efforts to contradict and undermine the substance of the information in the Customer Letter. As Mr. Gettelman testified, ¶ 89 was intended to operate in tandem with the Customer-Letter provisions of the Settlement Agreement to ensure Scranton Products was not marketing and advertising in a way that undermined the public-safety and educational value of the Customer Letter (a principle set forth in ¶ 5 of the Settlement Agreement)—a major component of the Settlement Agreement. The systematic failure to send the Customer Letter is expressly a Level 1 breach, so it follows that Scranton Products' systematic undermining of the Customer Letter through marketing and advertising is also a Level 1 breach. *Id*. at ¶ 95(b) & (c).

ii.  Scranton Products' lack of transparency in its cure attempt. Throughout this litigation, Scranton Products has asserted the attorney-client privilege whenever Bobrick has attempted to inquire what specific information Scranton Products modified or deleted as part of its cure, depriving Bobrick the opportunity to assess that cure, and requiring it to compare deleted and revised webpages with current versions available on Scranton Products' website. *See*, *e.g.*, Tr. of Evid. Hearing Day 1 at 126-130. Review of these privileged materials, if necessary, can also be handled *in camera* by the Special Master to the extent it impacts the form and scope of injunctive relief to be ordered.

iii.  Scranton Products bad faith cure. As explained *supra* at Part IX, Scranton Products' cure attempt amounted to removing the word "fire rated" from its website's references to "ASMT E84" and "Class B" HDPE toilet partitions. However, Scranton Products continues to use the term "Class B" in marketing and advertising its HDPE toilet partitions and related communications with customers (also covered by ¶ 89), and Scranton Products testified that the term "Class B" is a fire rating under the (obsolete) ASTM E84 standard, as it is widely understood in the industry. Thus, its

cure was undertaken in bad faith. Retrospective and prospective cure of this conduct can be assessed and addressed by the Special Master with input from the parties and their experts. If not resolved through those party discussions with the assistance of the Special Master, they can be subject to a report and recommendation for injunctive relief by the Special Master in the public interest,[37] after an evidentiary hearing.

iv.  Scranton Products failure to train its employees on its "cure." As explained *supra* at ¶¶ 138-39, after Scranton Products purported to cure the issues raised in Bobrick's Third Enforcement Motion, deficient as those cure efforts were, it failed to provide training to its employees to ensure that their statements to customers were consistent with its cure efforts. As a result, Scranton Products' customer service personnel continue to represent that its "Class B"

---

[37] *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 731 (3d Cir. 2004) (finding public interest supported issuing injunction in Lanham Act case because of "right of the public not to be deceived or confused" (cleaned up)); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 597 (3d Cir. 2002) ("We agree with those district courts that have found that there is a strong public interest in the prevention of misleading advertisements . . ." (cleaned up)); *Mountain Prods., Inc. v. Piccola*, No. 22-CV-01588, 2022 WL 17242872, at *22 (M.D. Pa. Nov. 23, 2022) (Mariani, J.) ("As a general matter, there is a strong public interest in enforcing valid contracts." (cleaned up)).

HDPE toilet partitions are "fire rated." This lack of training can also be assessed and resolved by the Special Master through injunctive relief if necessary.

v. Scranton Products failure to notify customers about the cure. As explained *supra* at ¶ 141, Scranton Products did not notify its customers about its cure, meaning its old marketing and advertising materials could be, and likely are, still circulating in the marketplace and thus in use in selecting toilet partitions. This too can be assessed and resolved by the Special Master, including through injunctive relief if necessary.

vi. Scranton Products' studied disregard of the consequences of its false and misleading advertising. Having engaged in marketing and advertising that contradicts the substance of the information in the Customer Letter, Scranton Products failed to intervene when it became aware that its marketing and advertising led to non-compliant partitions being installed in the Harrisburg Federal Courthouse. As explained *supra* at ¶¶ 114-16, Scranton Products knew that "Class B" non-compliant toilet partitions were ordered for installation in the Harrisburg Federal Courthouse, which required NFPA 286 partitions, but failed to notify anyone involved

in the project. Avoidance of such possible future calamities against

the public interest can hopefully be avoided through a resolution

plan or a report and recommendation for injunctive relief by the

Special Master, and approved by this Court.

155.   Bobrick requests injunctive relief in the form of an order directing

Scranton Products to remove from its marketing and advertising of its HDPE toilet

partitions all references to "ASTM E84," "Class A,"[38] and "Class B."

156.   Scranton Products is, of course, permitted by the Settlement

Agreement to *sell* non-compliant product, and nothing in these findings of fact and

conclusions of law should be construed as asking the Court or the Special Master

to preclude the sale of such toilet partitions.

157.   Bobrick also requests injunctive relief in the form of an order

directing Scranton Products to cease using the terms "ASTM E84," "Class A," and

"Class B" in correspondence with its customers about its HDPE toilet partitions,

except to the extent the correspondence concerns toilet partitions ordered for

installation in any jurisdiction that allows ASTM E84 testing of HDPE toilet

---

[38] While Scranton Products continued to market and advertise its HDPE
toilet partitions as "Class A" as of the date Bobrick filed its Third Enforcement
Motion, after the cure period had expired, Scranton Products appears to have since
removed those references as of the date of the evidentiary hearing. However,
reference to "Class A" in Scranton Products' marketing and advertising would
violate the Settlement Agreement in the same manner as its references to "Class
B," so Bobrick requests injunctive relief as to the term "Class A" as well.

partitions. *See, e.g.*, Exhibits 36 at 1, 37 at 1, 39 at 2, 40 at 1, 41 at 2. Scranton Products may continue to advertise, consistent with the Customer Letter, that it sells NFPA 286-compliant product and non-NFPA 286-compliant product.

158.   Bobrick requests that these and other prospective injunctive relief issues, including the need for retrospective injunction relief in the public interest, be referred to Judge Vanaskie as Special Master for resolution with the parties and their experts or by a report and recommendation after a hearing, if necessary.

159.   Such a referral is contemplated and permitted by the Settlement Agreement and will be efficient and warranted if undertaken by Special Master Vanaskie whose unique knowledge of this case, the parties, and the issues is undisputed. Dkt. 435 at ¶ 116 (allowing the Court to appoint a master to resolve discovery disputes).

160.   A referral to a Special Master for these issues is also permitted under Federal Rule of Civil Procedure 53(a)(1)(C): "Unless a statute provides otherwise, a court may appoint a master only to . . . address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."

161.   The advisory committee notes to Rule 53 provide:

If any master is to be used for such matters as a preliminary injunction hearing or a determination of complex damages issues, for example, the master should be a trial master. The line, however, is not distinct. A pretrial master might well conduct an evidentiary hearing on a

discovery dispute, and a post-trial master might conduct evidentiary hearings on questions of compliance.

162.   They also state:

A master's pretrial or post-trial duties may include matters that could be addressed by a judge, such as reviewing discovery documents for privilege, or duties that might not be suitable for a judge. Some forms of settlement negotiations, investigations, or administration of an organization are familiar examples of duties that a judge might not feel free to undertake.

163.   Consistent with Rule 53's broad scope, courts often refer complex and contentious cases to special masters to implement and supervise injunctive relief. *See*, *e.g.*, *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 874 (D.N.J. 2003) (Cavanaugh, J.) (granting permanent injunction requiring defendants to conduct environment cleanup and appointing special master to monitor cleanup), *aff'd*, 399 F.3d 248 (3d Cir. 2005); *United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d 525, 542 (E.D. Pa. 2003) (Baylson, J.) (appointing Special Master to implement Court's injunctive relief in Voting Rights Act case).

164.   Bobrick requests that the Special Master retain jurisdiction over this matter to supervise and monitor injunctive relief orders.

**B.   Attorneys' fees and costs:**

165.   Under ¶ 128 of the Settlement Agreement, Bobrick is entitled to attorneys' fees and costs if the Court awards damages or issues injunctive relief for a breach of the Settlement Agreement:

73

If the Party that filed the Enforcement Motion is awarded any amount of damages or obtains any injunctive relief as a result of the Enforcement Motion, then, within 14 calendar days after the Court's order resolving the Enforcement Motion is docketed, that Party may file and serve an application for its reasonable attorneys' fees and costs incurred in enforcing the Settlement Agreement. In accordance with paragraph 91 of this Settlement Agreement, the Court will order the Party found to be in breach of the Settlement Agreement to pay the prevailing Party's reasonable attorneys' fees and costs, in an amount determined by the Court, within 14 calendar days of the Court's order stating the amount to be paid.

166.   Accordingly, should this Court find in Bobrick's favor on its Third Enforcement Action, Bobrick will file an application for attorneys' fees and costs.

167.   Bobrick agrees that the Special Master can resolve issues concerning the reasonableness of its attorneys' fees and costs.

Respectfully submitted,

August 23, 2024                **BAKER & HOSTETLER LLP**

By:   */s/ Carl W. Hittinger*
Carl W. Hittinger (PA 30250)
Tyson Y. Herrold (PA 314262)
1735 Market Street
Suite 3300
Philadelphia, PA 19103-7501
T: (215) 564-2898
F: (215) 564-3439
chittinger@bakerlaw.com
therrold@bakerlaw.com

*Counsel for Bobrick*
*Washroom Equipment, Inc.*

74

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a correct copy of Bobrick Washroom Equipment's

Proposed Findings of Fact and Conclusions of Law has been served on all counsel

of record via the Court's electronic filing system.

Date: August 23, 2024                        /s/ Carl W. Hittinger
                                             CARL W. HITTINGER